**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| INMET MINING, LLC,[1] | ) | |
| | ) | Case No. 23-70113 |
| Debtor. | ) | |
| | ) | |
| BLUEGRASS NATURAL RESOURCES, LLC, | ) ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proceeding No. 25-07001 |
| | ) | |
| v. | ) | |
| | ) | |
| BLACKJEWEL LIQUIDATION TRUST by and through DAVID J. BECKMAN, TRUSTEE, and THE LIQUIDATING TRUST OF INMET MINING, LLC, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) ) | |
| | ) | |
| BLACKJEWEL LIQUIDATION TRUST, LLC by and through DAVID J. BECKMAN, TRUSTEE, | ) ) ) | |
| | ) | |
| Counterclaim-Plaintiff. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BLUEGRASS NATURAL RESOURCES, LLC, and THE LIQUIDATING TRUST OF INMET MINING, LLC, | ) ) ) | |
| | ) | |
| Counterclaim-Defendants. | ) ) | |

**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF DEFENDANT
BLACKJEWEL LIQUIDATION TRUST, LLC TO ADVERSARY COMPLAINT**

---

[1] The Debtor in this chapter 11 case, and the last four digits of the Debtor's taxpayer identification number, are as follows: INMET Mining, LLC (1693).

Blackjewel Liquidation Trust, LLC, by and through its trustee David J. Beckman (the "Blackjewel Trust"), as successor for certain purposes of the estates of the former debtors and debtors-in-possession (collectively, the "Blackjewel Debtors") in the chapter 11 cases styled *In re Blackjewel, L.L.C.*, Case No. 19-30289 (Bankr. S.D. W.Va. 2019) (the "Blackjewel Bankruptcy Cases") filed in the United States Bankruptcy Court for the Southern District of West Virginia (the "West Virginia Court"), answers the *Complaint for Declaratory and Injunctive Relief and Contempt Sanctions* [Docket No. 1] (the "Complaint") filed by Bluegrass Natural Resources, LLC, formerly known as Bluegrass Energy, LLC ("Bluegrass") in the above-captioned adversary proceeding, and states and avers as follows:

1.      In response to Paragraph 1 of the Complaint, the Blackjewel Trust admits that the Complaint purports to seek a declaratory judgment with respect to what entity owns certain real property located in Lee County, Virginia (the "Lee County Assets") and injunctive relief and contempt sanctions against the Blackjewel Trust.  The Blackjewel Trust denies that Bluegrass is entitled to the declaratory judgment, injunctive relief, contempt sanctions, or any of the other relief sought in the Complaint. Further responding, the Blackjewel Trust denies any remaining allegations in Paragraph 1 of the Complaint.

2.      In response to Paragraph 2 of the Complaint, the Blackjewel Trust admits that in September of 2019, INMET Mining, LLC ("INMET") acquired certain assets in a transaction with the Blackjewel Debtors in the Blackjewel Bankruptcy Cases and that the terms of the transaction, including the related contractual agreements, were approved by the West Virginia Court pursuant to the *Order (I) Approving the Sale of Certain Assets to Kopper Glo Mining, LLC Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related*

*Relief* [Docket No. 1096] (the "INMET Sale Order") and that certain Assignment and Assumption

Agreement and Bill of Sale Regarding Specific Assets dated on or around September 7, 2019 (the

"INMET APA"), which was attached as Exhibit A to the INMET Sale Order.  The Blackjewel

Trust denies the remaining allegations in Paragraph 2 of the Complaint, including to the extent that

they are inconsistent with the INMET Sale Order or INMET APA.

3.      The Blackjewel Trust denies the allegations in Paragraph 3 of the Complaint,

including specifically denying that INMET purchased the Lee County Assets from the Blackjewel

Debtors or that Bluegrass purchased the Lee County Assets from INMET.

4.      In response to Paragraph 4 of the Complaint, the Blackjewel Trust admits that this

Court approved the sale of certain of INMET's assets, certain of which were previously purchased

from the Blackjewel Debtors, to Bluegrass pursuant to the *Order (I) Approving the Sale of Certain*

*Assets to Bluegrass Energy LLC Free and Clear of Liens, Claims, Encumbrances, and Other*

*Interests, (II) Approving the Assumption and Assignment of Certain Executory Contracts and*

*Unexpired Leases, and (III) Granting Related Relief* [INMET Docket No. 536] (the "Bluegrass

Sale Order") and the Amended and Restated Stalking Horse Asset Purchase Agreement [INMET

Docket No. 617] (the "Bluegrass APA").  The Blackjewel Trust denies the remaining allegations

in Paragraph 4 of the Complaint, including that INMET purchased the Lee County Assets from

the Blackjewel Debtors or that the Lee County Assets were sold by INMET to Bluegrass pursuant

to the Bluegrass Sale Order or Bluegrass APA.

5.      Paragraph 5 of the Complaint contains allegations not directed at the Blackjewel

Trust and, as a result, no response is required.  To the extent a further response is required, the

Blackjewel Trust denies the allegations in Paragraph 5 of the Complaint.

6.      Paragraph 6 of the Complaint contains allegations not directed at the Blackjewel Trust and, as a result, no response is required.  Further responding, the Blackjewel Trust responds that Paragraph 6 contains legal conclusions to which no response is required.  To the extent a further response is required, the Blackjewel Trust is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 6 of the Complaint and, therefore, denies those allegations.

7.      In response to Paragraph 7 of the Complaint, the Blackjewel Trust admits that on April 4, 2024, counsel to the Blackjewel Trust sent a letter to counsel for Bluegrass and the Liquidating Trust of INMET Mining, LLC (the "INMET Trust") requesting, among other things, confirmation that the Lee County Assets were not sold or transferred to INMET and thereafter to Bluegrass (the "Letter").  Further responding, the Blackjewel Trust states that the April 4, 2024, Letter is a written document, the contents of which speaks for itself.  The Blackjewel Trust denies the remaining allegations in Paragraph 7 of the Complaint.

8.      Paragraph 8 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.

9.      Paragraph 9 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.  Further responding, the Blackjewel Trust denies that Bluegrass is entitled to any requested relief.

10.      Paragraph 10 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.

11.      Paragraph 11 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.

12.     Paragraph 12 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.

13.     Paragraph 13 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.

14.     Paragraph 14 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.  Further responding, the Blackjewel Trust denies that Bluegrass is entitled to any requested relief.

15.     The Blackjewel Trust admits that Bluegrass is a Delaware limited liability company and otherwise asserts that it lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 15 of the Complaint.

16.     The Blackjewel Trust lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 16 of the Complaint.

17.     The Blackjewel Trust admits the allegations in Paragraph 17 of the Complaint.

18.     The Blackjewel Trust admits that the INMET Trust is the successor entity to INMET.  Further responding, Paragraph 18 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.

19.     In response to Paragraph 19 of the Complaint, the Blackjewel Trust admits that the Blackjewel Debtors filed voluntary petitions in the West Virginia Court on July 1, 2019, and July 24, 2019.  The Blackjewel Trust denies the remaining allegations in Paragraph 19 of the Complaint.

20.     In response to Paragraph 20 of the Complaint, the Blackjewel Trust admits that the West Virginia Court entered the INMET Sale Order and that annexed as Exhibit A to the INMET Sale Order was the INMET APA.  The Blackjewel Trust denies the remaining allegations in

Paragraph 20 of the Complaint, including that INMET acquired the Lee County Assets pursuant to the INMET APA.

21.     In response to the allegations in Paragraph 21 of the Complaint, the Blackjewel Trust refers to the INMET Sale Order, including the attachments thereto, for a true and accurate statement of their contents.  To the extent the allegations in Paragraph 21 are not consistent with the INMET Sale Order, including the attachments thereto, the Blackjewel Trust denies the allegations contained in this Paragraph.  The Blackjewel Trust further denies the allegations in this Paragraph regarding Bluegrass having any knowledge of INMET's belief or intent before or after the execution of the INMET APA concerning what was a "principal element" of the INMET APA.

22.     In response to Paragraph 22 of the Complaint, upon information and belief, the Blackjewel Trust admits that the Lone Mountain preparation plant is located in Lee County, Virginia on a small and relatively insignificant fraction of the total amount of Lee County Assets. The Blackjewel Trust denies the remaining allegations in Paragraph 22 of the Complaint.

23.     The Blackjewel Trust denies the allegations in Paragraph 23 of the Complaint.

24.     In response to the allegations in Paragraph 24 of the Complaint, the Blackjewel Trust refers to the INMET Sale Order, including the attachments thereto, for a true and accurate statement of their contents.  To the extent the allegations in Paragraph 24 are not consistent with the INMET Sale Order, including the attachments thereto, the Blackjewel Trust denies the allegations contained in this Paragraph.

25.     In response to Paragraph 25 of the Complaint, the Blackjewel Trust states that these allegations contain characterizations, legal argument, and conclusions to which no response is required.  To the extent a response is required, the Blackjewel Trust denies the allegations in this Paragraph, including the alleged factual and legal conclusions.

26.     Paragraph 26 of the Complaint contains allegations not directed at the Blackjewel Trust and, as a result, no response is required.  To the extent a response is required, the Blackjewel Trust is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 26 of the Complaint and, therefore, denies those allegations.

27.     Paragraph 27 of the Complaint contains allegations not directed at the Blackjewel Trust and, as a result, no response is required.  To the extent a response is required, the Blackjewel Trust is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 27 of the Complaint and, therefore, denies those allegations.

28.     In response to Paragraph 28 of the Complaint, the Blackjewel Trust admits that INMET improperly entered the Lee County Assets to, among other potential activities, convey and process coal without the Blackjewel Debtors' or Blackjewel Trust's knowledge, permission, or authorization to, among other potential activities, convey and process coal without the Blackjewel Debtors' or Blackjewel Trust's knowledge, permission, or authorization.  The Blackjewel Trust denies the remaining allegations in Paragraph 28 of the Complaint.

29.     In response to Paragraph 29 of the Complaint, the Blackjewel Trust admits that since July 1, 2019, neither the Blackjewel Debtors nor Blackjewel Trust paid property taxes associated with the Lee County Assets.  The Blackjewel Trust denies any remaining allegations in Paragraph 29 of the Complaint.

30.     In response to Paragraph 30 of the Complaint, the Blackjewel Trust admits that INMET filed a voluntary chapter 11 bankruptcy petition in this Court on April 5, 2023, and that the Court entered the Bluegrass Sale Order attached to the Complaint as Exhibit B.  The Blackjewel Trust denies the remaining allegations in this Paragraph, including that the Lee County Assets were sold by the Blackjewel Debtors to INMET pursuant to the INMET Sale Order and INMET

APA or that the Lee County Assets were sold by INMET to Bluegrass pursuant to the Bluegrass Sale Order or Bluegrass APA.

31.     The Blackjewel Trust denies the allegations in Paragraph 31 of the Complaint.

32.     The Blackjewel Trust denies the allegations in Paragraph 32 of the Complaint.

33.     The Blackjewel Trust denies the allegations in Paragraph 33 of the Complaint.

34.     Paragraph 34 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required. To the extent a response is required, the Blackjewel Trust refers to the Bluegrass Sale Order, including the attachments thereto, for a true and accurate statement of their contents. To the extent the allegations in Paragraph 34 are not consistent with the Bluegrass Sale Order, including the attachments thereto, the Blackjewel Trust denies the allegations contained in this Paragraph.

35.     Paragraph 35 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required. To the extent a response is required, the Blackjewel Trust refers to the Bluegrass Sale Order, including the attachments thereto, for a true and accurate statement of their contents. To the extent the allegations in Paragraph 35 are not consistent with the Bluegrass Sale Order, including the attachments thereto, the Blackjewel Trust denies the allegations contained in this Paragraph.

36.     The Blackjewel Trust denies the allegations in Paragraph 36 of the Complaint.

37.     The Blackjewel Trust admits the allegations in Paragraph 37 of the Complaint, including that INMET filed the Bluegrass APA attached to the Complaint as Exhibit C.

38.     Paragraph 38 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required. To the extent a response is required, the Blackjewel Trust refers to the Bluegrass APA, for a true and accurate statement of

their contents.  To the extent the allegations in Paragraph 38 are not consistent with the Bluegrass APA, including the attachments thereto, the Blackjewel Trust denies the allegations contained in this Paragraph.

39.    Paragraph 39 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.  To the extent a response is required, the Blackjewel Trust refers to the Bluegrass APA, for a true and accurate statement of their contents.  To the extent the allegations in Paragraph 39 are not consistent with the Bluegrass APA, including the attachments thereto, the Blackjewel Trust denies the allegations contained in this Paragraph.

40.    Paragraph 40 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.  To the extent a response is required, the Blackjewel Trust refers to the Bluegrass APA, for a true and accurate statement of their contents.  To the extent the allegations in Paragraph 40 are not consistent with the Bluegrass APA, including the attachments thereto, the Blackjewel Trust denies the allegations contained in this Paragraph.

41.    Paragraph 41 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.  To the extent a response is required, the Blackjewel Trust is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 41 of the Complaint and, therefore, denies those allegations.

42.    Paragraph 42 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.  To the extent a response is required, the Blackjewel Trust is without information or knowledge sufficient to form a belief as

to the truth of the allegations in Paragraph 42 of the Complaint and, therefore, denies those allegations.

43.    In response to Paragraph 43 of the Complaint, the Blackjewel Trust states that these allegations contain characterizations, legal argument, and conclusions to which no response is required.  To the extent a response is required, the Blackjewel Trust denies the allegations in this Paragraph 43.

44.    In response to Paragraph 44 of the Complaint, the Blackjewel Trust states that these allegations contain characterizations, legal argument, and conclusions to which no response is required.  To the extent a response is required, the Blackjewel Trust denies the allegations in this Paragraph 44.

45.    In response to Paragraph 45 of the Complaint, the Blackjewel Trust admits that Bluegrass provided the Blackjewel Trust with the letter attached to the Complaint as Exhibit D, but otherwise states that these allegations contain characterizations, legal argument, and conclusions to which no response is required.  To the extent a response is required, the Blackjewel Trust denies the allegations in this Paragraph 45.

46.    Paragraph 46 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.

47.    The Blackjewel Trust admits the allegations in Paragraph 47 of the Complaint.

48.    The Blackjewel Trust admits the allegations in Paragraph 48 of the Complaint.

49.    The Blackjewel Trust admits the allegations in Paragraph 49 of the Complaint.

50.    The Blackjewel Trust admits the allegations in Paragraph 50 of the Complaint.

51.    The Blackjewel Trust admits the allegations in Paragraph 51 of the Complaint.

52.    The Blackjewel Trust admits the allegations in Paragraph 52 of the Complaint.

53.    Paragraph 53 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.

54.    Paragraph 54 of the Complaint contains allegations, including legal conclusions, not directed to the Blackjewel Trust to which no response is required.

**COUNT ONE**

**(Declaratory Judgment Against the Blackjewel Trust and the INMET Trust That Bluegrass Acquired and Owns the Lee County Assets)**

55.    In response to Paragraph 55 of the Complaint, the Blackjewel Trust incorporates its responses to Paragraphs 1–54 of the Complaint, as if fully restated herein.

56.    The Blackjewel Trust denies the allegations in Paragraph 56 of the Complaint.

57.    The Blackjewel Trust denies the allegations in Paragraph 57 of the Complaint.

58.    The Blackjewel Trust denies the allegations in Paragraph 58 of the Complaint.

59.    In response to Paragraph 59 of the Complaint, the Blackjewel Trust admits that it filed the following three sale-related objections in INMET's bankruptcy case styled *In re INMET Mining, LLC*, Case No. 23-70113 (GRS) (Bankr. E.D. Ky. 2023) (the "INMET Case"):

  a.    *Preliminary Objection of the Blackjewel Liquidation Trust to Debtor's Sale Order and Cure Notice* [INMET Docket No. 357];

  b.    *Preliminary Objection of the Blackjewel Liquidation Trust to Debtor's Pigeon Creek Assets Bidding Procedures Motion* [INMET Docket No. 382]; and

  c.    *Objection of the Blackjewel Liquidation Trust to Debtor's Kentucky Assets Sale Order and APA* [INMET Docket No. 509].

The Blackjewel Trust denies the remaining allegations in Paragraph 59 of the Complaint.

60.    The Blackjewel Trust denies the allegations in Paragraph 60 of the Complaint.

61.    The Blackjewel Trust denies the allegations in Paragraph 61 of the Complaint.

62.     In response to Paragraph 62 of the Complaint, the Blackjewel Trust states that these allegations contain characterizations, legal argument, and conclusions to which no response is required.  To the extent a response is required, the Blackjewel Trust denies the allegations in this Paragraph 62.

## COUNT TWO

### (Against the Blackjewel Trust for Injunctive Relief)

63.     In response to Paragraph 63 of the Complaint, the Blackjewel Trust incorporates its responses to Paragraphs 1–62 of the Complaint, as if fully restated herein.

64.     To the extent a response is required, the Blackjewel Trust refers to the Bluegrass Sale Order, for a true and accurate statement of their contents.  To the extent the allegations in Paragraph 64 are not consistent with the Bluegrass Sale Order, including the attachments thereto, the Blackjewel Trust denies the allegations contained in this Paragraph.

65.     The Blackjewel Trust denies the allegations in Paragraph 65 of the Complaint.

66.     In response to Paragraph 66 of the Complaint, the Blackjewel Trust states that these allegations contain characterizations, legal argument, and conclusions to which no response is required.  To the extent a response is required, the Blackjewel Trust denies the allegations in Paragraph 66 of the Complaint, including that Bluegrass is entitled to any of the relief requested.

## COUNT THREE

### (Against the Blackjewel Trust for Contempt Sanctions)

67.     In response to Paragraph 67 of the Complaint, the Blackjewel Trust incorporates its responses to Paragraphs 1–66 of the Complaint, as if fully restated herein.

68.     The Blackjewel Trust denies the allegations in Paragraph 68 of the Complaint.

69.     In response to Paragraph 69 of the Complaint, the Blackjewel Trust states that these allegations contain characterizations, legal argument, and conclusions to which no response is required.  To the extent a response is required, the Blackjewel Trust denies the allegations in Paragraph 69 of the Complaint, including that Bluegrass is entitled to any of the relief requested.

70.     The Blackjewel Trust denies each and every allegation of the Complaint not expressly admitted herein.

## **RELIEF REQUESTED**

In response to the Relief Requested section of the Complaint, the Blackjewel Trust admits that Bluegrass purports to seek the relief requested.  The Blackjewel Trust expressly denies that Bluegrass is entitled to any of the relief requested in the Complaint.

## **AFFIRMATIVE AND OTHER DEFENSES**

1.     Bluegrass' Complaint fails to state a claim upon which relief can be granted.

2.     Bluegrass' Complaint and the relief requested therein is barred by the doctrines of res judicata.

3.     Bluegrass' claims are barred by the plain language of the INMET Sale Order, INMET APA, Bluegrass Sale Order, and/or Bluegrass APA.

4.     The relief sought in Bluegrass' Complaint is barred by the doctrines of equitable estoppel and judicial estoppel.

5.     The relief sought in Bluegrass' Complaint is barred by the doctrine of unclean hands.

6.     The relief sought in Bluegrass' Complaint is barred by Bluegrass' fraudulent and intentional misconduct.

7.     The relief sought in Bluegrass' Complaint is barred by the doctrine of waiver.

8.      The Blackjewel Trust hereby provides notice of its intention to assert and rely on additional affirmative defenses that may arise or become apparent during discovery in this action.

## COUNTERCLAIMS

The Blackjewel Trust, by and through its trustee, David J. Beckman, for its counterclaims against Bluegrass and, as applicable, the additional defendant in the Complaint, the INMET Trust, states and avers as follows.

### Nature and Scope of the Counterclaims

1.      The counterclaims asserted herein arise out of the same transactions and occurrences that are the subject of Bluegrass' Complaint against the Blackjewel Trust and the INMET Trust.  The Blackjewel Trust asserts the counterclaims now to preserve them and to avoid potential arguments later regarding the possible application of claim preclusion or issue preclusion principles.  The Blackjewel Trust recognizes that the Court may order that proceedings to determine the extent of Bluegrass' and the INMET Trust's liability should proceed through other means.

2.      The Blackjewel Trust anticipates amending its counterclaims to include additional causes of action and/or potentially additional parties as additional information becomes known throughout the course of discovery.  Very little information has been provided to the Blackjewel Trust regarding the nature of INMET's and Bluegrass' activities on or related to (a) the Lee County Assets, (b) certain real property located in Harlan County, Kentucky (the "Excluded Harlan County Property"), and (c) certain real property located in Wise County, Virginia (the "Excluded Wise County Property," and collectively with the Lee County Assets and Excluded Harlan County Property, the "Retained Property").

3.      As alleged in more detail below, neither the Blackjewel Debtors nor the Blackjewel Trust sold or transferred the Retained Property to INMET, Kopper Glo Mining, LLC, Bluegrass, the INMET Trust, or any other party pursuant to the INMET Sale Order or the INMET APA.

Accordingly, the Blackjewel Trust requests that the Court issue a declaratory judgment that (a) the Retained Property was not sold or transferred to INMET pursuant to the INMET Sale Order or INMET APA, (b) the Blackjewel Trust owns the Retained Property, and (c) neither INMET nor Bluegrass has any ownership interest in the Retained Property. Moreover, the INMET Trust was, and Bluegrass has been and continues to be, unjustly enriched from their unauthorized conveyance and coal processing operations on the Retained Property and intentional and unreasonable interference with the Blackjewel Debtors' and Blackjewel Trust's property rights associated with the Retained Property. Lastly, since the entry of the INMET Sale Order, INMET and Bluegrass engaged in the unjustified and unauthorized trespass onto the Retained Property, resulting in the decreased value of the Retained Property—Bluegrass should be immediately required to cease from entering onto the Retained Property to avoid any further risk of reducing the value of the Retained Property. The Blackjewel Trust anticipates that discovery will provide a basis for additional claims concerning this pattern of concealment and inappropriate conduct.

4.      The Blackjewel Trust consents to the Court's entry of a final order in connection with its counterclaims.

### Parties to the Counterclaims

5.      The Blackjewel Trust is a co-defendant in this adversary proceeding and, for certain purposes, the successor to the Blackjewel Debtors, including for the purpose of prosecuting the counterclaims asserted herein.

6.      Bluegrass is the plaintiff in this adversary case. Upon information and belief, (a) Bluegrass is a Delaware limited liability company with a principal place of business in Downers Grove, Illinois, which was formed for the purpose of acquiring certain assets from INMET in the

INMET Case, and (b) Bluegrass' sole member and manager is Javelin Global Commodities US

Holdings, Inc., a Delaware corporation with its principal place of business in St. Louis, Missouri.

7.     The INMET Trust is a co-defendant in this adversary proceeding and is the

successor entity to INMET.

**The INMET Sale Order and INMET APA.**

8.     The Blackjewel Debtors filed voluntary chapter 11 petitions in the West Virginia

Court on July 1, 2019, and July 24, 2019.

9.     On July 25, 2019, the Blackjewel Debtors filed a motion [BJLT Docket No. 312]

requesting, among other things, approval of bidding procedures, an auction process, and one or

more sales of their assets.

10.    On July 26, 2019, the West Virginia Court approved the Blackjewel Debtors'

requested relief [BJLT Docket No. 356], set forth the dates for interested parties to bid on the

Blackjewel Debtors' assets, approved the Blackjewel Debtors to administer an auction, and

scheduled a hearing to approve the proposed sales.

11.    At the auction, INMET agreed to buy certain assets "known as Black Mountain and

Lone Mountain."  [BJLT Docket No. 529].

12.    Counsel for the Blackjewel Debtors and INMET engaged in extensive negotiations

regarding the terms of the INMET APA during and after the auction and prior to executing the

INMET APA (the "Negotiations").

13.    On September 17, 2019, the West Virginia Court entered the INMET Sale Order,

with the INMET APA annexed thereto as Exhibit A.

14.    Paragraph 1(ii) of the INMET APA provides that INMET purchased certain real

property (defined as "Owned Real Property" in the INMET APA) from the Blackjewel Debtors,

which is defined as "[t]he real property interests owned by [the Debtors] Sellers associated with the Transferred Permits and described on Exhibit B attached hereto and made a part hereof and incorporated herein by reference."

15.     Upon the insistence of INMET, Exhibit B of the INMET APA contains a list of real property interests that were acquired by the Blackjewel Debtors in earlier prepetition acquisitions.

16.     Twenty parcels located in Lee County, Virginia (*i.e.*, the Lee County Assets and one additional parcel) are listed in Exhibit B of the INMET APA.

17.     The Excluded Harlan County Property and Excluded Wise County Property are listed in Exhibit B of the INMET APA.

18.     Given the urgency surrounding the Blackjewel Debtors' 2019 sale process, INMET did not create a unique list of real property that it was purchasing pursuant to the INMET APA.

19.     As a result, Exhibit B of the INMET APA includes real property that the Blackjewel Debtors sold to INMET, but also includes real property that the Blackjewel Debtors did not sell to INMET.

20.     INMET and the Blackjewel Debtors understood that Exhibit B of the INMET APA included real property that the Blackjewel Debtors were not selling to INMET.

21.     In order to limit, and properly reflect, which real property was being sold to INMET pursuant to the INMET APA, the parties agreed on a preamble to Exhibit B of the INMET APA that expressly limited and identified which real property parcels on Exhibit B were being sold to INMET and which were not.

22.     The preamble to Exhibit B states that the real property INMET purchased from the Blackjewel Debtors includes "the real property interests ***identified in this Exhibit B*** or any attachment hereto, to the extent such real property interests [are] ***associated with the Transferred***

*Permits*" and that "[f]or the avoidance of doubt, any real property listed [in Exhibit B] below and *situated in locations other than Harlan County, Kentucky, or Wise County, Virginia, are specifically excluded* from the Owned Real Property [(the "INMET Purchased Real Property")], unless otherwise agreed upon by Buyer following the Effective Date[.]" (Emphasis added).

23.    All of the previous drafts of the INMET APA, including the preamble of Exhibit B of the INMET APA, exchanged by the parties during the 2019 Negotiations always excluded the Retained Property from the INMET Purchased Real Property.

24.    Exhibit B of the INMET APA, as modified by the preamble to Exhibit B, reflects the final schedule of INMET Purchased Real Property that the Blackjewel Debtors sold INMET, which excludes the Retained Property.

25.    Therefore, the Retained Property was never sold or transferred to INMET.

26.    Paragraph 1(i) of the INMET APA provides that INMET purchased certain "Transferred Permits" (as defined in the INMET APA) from the Blackjewel Debtors, which are defined as "[t]he permits described on Exhibit A attached hereto and made a part hereof and incorporated herein by reference."

27.    Exhibit A of the INMET APA contains a list of the Transferred Permits, two of which are located in Lee County, Virginia:  (a) the Wallins Mine (permit #1202027) and (b) the LMP Prep Plant (permit #1301411).

28.    The real property associated with the Wallins Mine permit and LMP Prep Plant permit is not part of the INMET Purchased Real Property because all real property in Lee County, Virginia is excluded from the definition of INMET Purchased Real Property pursuant to the preamble in Exhibit B of the INMET APA.

29.     Exhibit A of the INMET APA contains a list of the Transferred Permits, a certain number of which are located in Harlan County, Kentucky and Wise County, Virginia (the "Harlan/Wise County Transferred Permits").

30.     The real property listed in Exhibit B of the INMET APA that is associated with the Harlan/Wise County Transferred Permits was INMET Purchased Real Property (the "Harlan/Wise County INMET Purchased Real Property").

31.     The Harlan/Wise County INMET Purchased Real Property does not include certain real property listed in Exhibit B of the INMET APA because such real property, while located in Harlan County, Kentucky and Wise County, Virginia, is not associated with any of the Transferred Permits listed in Exhibit A of the INMET APA (and are therefore Retained Property). For example, the real property located in Harlan County, Kentucky and recorded at DB 368, P 272 and listed on page 7 of Exhibit B of the INMET APA is Excluded Harlan County Property because the real property is not associated with the Harlan/Wise County Transferred Permits.

32.     The preamble in Exhibit B of the INMET APA states that "[t]he final schedule of Owned Real Property [INMET Purchased Real Property] shall be determined no later than the final determination of the Assumed Leases schedule."

33.     On January 27, 2020, the Blackjewel Debtors filed the *Notice of Final Schedule of Executory Contracts and Unexpired Leases to be Assumed and Assigned to INMET Mining, LLC, as Designee of Kopper Glo Mining, LLC* [BJLT Docket No. 1708], which contained the final list of executory contracts and unexpired leases the Blackjewel Debtors were assuming and assigning to INMET pursuant to the INMET Sale Order and INMET APA.

34.     On or before January 27, 2020, INMET did not modify or attempt to modify the list of INMET Purchased Real Property purchased from the Blackjewel Debtors pursuant to the INMET Sale Order and INMET APA.

35.     After January 27, 2020, no party may modify the list of INMET Purchased Real Property pursuant to Exhibit B of the INMET APA, including the limitations set forth in the preamble to Exhibit B, which narrowed the INMET Purchased Real Property list by excluding certain real property contained in Exhibit B

**The Bluegrass Sale Order and the Bluegrass APA.**

36.     On April 5, 2023 (the "INMET Petition Date"), INMET filed the INMET Case in this Court.

37.     On the INMET Petition Date, INMET did not own the Retained Property.

38.     On April 27, 2023, INMET filed a motion [INMET Docket No. 161] in the INMET Case requesting, among other things, approval of bidding procedures, an auction process, and one or more sales of its assets.

39.     On May 10, 2023, this Court approved INMET's requested relief [INMET Docket No. 248], set forth the dates for interested parties to bid on INMET's assets, approved INMET to administer an auction, and scheduled a hearing for this Court to approve the proposed sales.

40.     On June 9, 2023, Black Mountain Marketing and Sales LP ("BMMS") filed an APA in accordance with the sale process established by this Court [INMET Docket No. 358] (the "Initial BMMS APA").  The Initial BMMS APA between INMET and BMMS did not include the sale of any Lee County Assets to BMMS.  Based on this Initial BMMS APA, the sale auction was cancelled and BMMS was declared the winning bidder.

21

41.     On July 2, 2023, INMET filed a draft Bluegrass Sale Order, which did not identify any Lee County Assets to be sold to BMMS [INMET Docket No. 470].

42.     On July 2, 2023, INMET filed a revised, executed version of the Initial BMMS APA between INMET and BMMS (the "Second BMMS APA").  Schedule 2.1(d)(i) of the Second BMMS APA included the list of "Owned Real Property" being sold to BMMS.  Schedule 2.1(d)(i) of the Second BMMS APA also did not include the Lee County Assets [INMET Docket No. 472].

43.     On July 5, 2023, INMET filed amended schedules, along with blacklines, to the Second BMMS APA [INMET Docket No. 487] (the "Amended Schedules").  The Amended Schedules added the Lee County Assets to Schedule 2.1(d)(i).

44.     On July 11, 2023, INMET filed a further revised version of the Second BMMS APA between INMET and BMMS with the Amended Schedules [INMET Docket No. 513] (the "Initial Bluegrass APA").  Schedule 2.1(d)(i) of the Initial Bluegrass APA included the Lee County Assets.

45.     On July 12, 2023, this Court held a hearing to consider the Initial Bluegrass APA [INMET Docket No. 523].

46.     On July 13, 2023, this Court entered the Bluegrass Sale Order to authorize INMET to sell certain property to BMMS's affiliate, Bluegrass, and to execute the Initial Bluegrass APA [INMET Docket No. 536].  The Initial Bluegrass APA was not attached to the Bluegrass Sale Order.

47.     On the July 28, 2023 (the "INMET Closing Date"), Bluegrass acquired certain property from INMET pursuant to the Bluegrass Sale Order and the Bluegrass APA.

48.     At some point after the INMET Closing Date, Bluegrass allegedly recorded deeds reflecting (a) the Blackjewel Debtors' conveyance of the Lee County Assets to INMET, and (b) INMET's conveyance of the Lee County Assets to Bluegrass.

49.     Upon information and belief, INMET failed to pay any of the outstanding property taxes for the Lee County Assets from the time of the purported acquisition from the Blackjewel Debtors on September 17, 2019 (*i.e.*, entry of the INMET Sale Order) through the INMET Closing Date—a period of more than three years and ten months.  This is consistent with the fact that INMET never acquired and did not own any of the Lee County Assets.

50.     On August 10, 2023, INMET filed the finalized and executed Bluegrass APA [INMET Docket No. 617].

51.     The Blackjewel Trust is not a party to the Bluegrass APA.

52.     Paragraph 1.1 of the Bluegrass APA defines "Owned Real Property" as "all real property ***owned by [INMET] Seller***, and all right, title and interest of [INMET] Seller therein . . . ."  (Emphasis added).

53.     Paragraph 2.1(d)(i) of the Bluegrass APA, which sets forth the assets Bluegrass purchased from INMET, provides that INMET sold all "Owned Real Property wherever situated, including, without limitation, the Owned Real Property listed in Schedule 2.1(d)(i)."

54.     On Schedule 2.1(d)(i) of the Bluegrass APA, INMET purported to convey the "Owned Real Property" to Bluegrass, including the Lee County Assets parcels and certain of the Excluded Harlan County Property parcels, "by quit claim deed only, unless [INMET] Seller obtains a deed conveying any of the following real property to [INMET] Seller, then such real property shall be conveyed to [Bluegrass] Buyer by the same type of deed or other instrument obtained by [INMET] Seller."

55.     Paragraph 5.4(a) of the Bluegrass APA, which contains INMET's representations and warranties, claims that "Schedule 5.4(a) sets forth an accurate and complete list of the Owned Real Property as of the Execution Date."

56.     On Schedule 5.4(a) of the Bluegrass APA, INMET again purported to convey the "Owned Real Property" to Bluegrass, including the Lee County Assets parcels and Excluded Harlan County Property parcels, "by quit claim deed only, unless [INMET] Seller obtains a deed conveying any of the following real property to [INMET] Seller, then such real property shall be conveyed to [Bluegrass] Buyer by the same type of deed or other instrument obtained by [INMET] Seller."

57.     The preamble of the Bluegrass Sale Order defines "Purchased Assets" as "[INMET's] *the Debtor's properties and assets* being sold pursuant to the [Bluegrass APA] Stalking Horse Agreement."  (Emphasis added).

58.     Paragraph K of the Bluegrass Sale Order, which is titled "Purchased Assets Property of Debtor's Estate," provides that "[t]he Purchased Assets to be transferred and/or assigned, as applicable, to [Bluegrass] the Buyer . . . constitute property of [INMET's] the Debtor's estate within the meaning of Section 541(a) of the Bankruptcy Code."

59.     Paragraph Z of the Bluegrass Sale Order, which is titled "Validity of Transfer," states that "the transfer of the Purchased Assets to [Bluegrass] the Buyer will be a legal, valid, and effective transfer of the Purchased Assets, and will vest [Bluegrass] the Buyer with all rights, title, and interest of [INMET] the Debtor in and to the Purchased Assets, free and clear of all Liens, Claims, and Interests."

60.     Paragraph 7.A of the Bluegrass Sale Order, which is titled "Transfer of Assets Free and Clear," provides that "[INMET] the Debtor is authorized and directed to transfer the Purchased

Assets in accordance with the terms of the [Bluegrass APA] Stalking Horse Agreement free and clear of all Liens, Claims, and Interests."

61.     The Bluegrass Sale Order does not include a finding by the Court that any of the following provisions or schedules in the Bluegrass APA are accurate or correct:   Paragraph 2.1(d)(i), Schedule 2.1(d)(i), Paragraph 54.(a), or Schedule 5.4(a).

62.     Notwithstanding INMET's assertions, representations, and warranties to Bluegrass in the Bluegrass APA, INMET did not own any of the Retained Property prior to the INMET Closing Date.

63.     As a result, no Retained Property was, or could have been, sold or transferred from INMET to Bluegrass pursuant to the Bluegrass Sale Order or Bluegrass APA on or after the INMET Closing Date.

64.     On December 19, 2023, the INMET Trust was formed as the successor to INMET.

**INMET's and Bluegrass' Entry and Commercial Activity on the Retained Property.**

65.     Upon information and belief, after the entry of the INMET Sale Order, INMET began improperly entering Retained Property (the "INMET Unauthorized Entries") to, among other potential activities, convey and process coal without the Blackjewel Debtors' or Blackjewel Trust's knowledge, permission, or authorization (the "INMET Unauthorized Commercial Activities").

66.     Upon information and belief, after the execution of the Bluegrass APA, Bluegrass began entering Retained Property (the "Bluegrass Unauthorized Entries," together with the INMET Unauthorized Entries, the "Unauthorized Entries") to, among other potential activities, convey and process coal without the Blackjewel Trust's knowledge, permission, or authorization

(the "Bluegrass Unauthorized Commercial Activities," together with the INMET Unauthorized Commercial Activities, the "Unauthorized Commercial Activities").

67.     Neither the Blackjewel Debtors nor the Blackjewel Trust ever knew of, authorized, or granted INMET or Bluegrass permission to conduct any of the Unauthorized Entries on their Retained Property.

68.     Neither the Blackjewel Debtors nor the Blackjewel Trust ever received any consideration from INMET, Bluegrass, or the INMET Trust from the Unauthorized Commercial Activities

**The Blackjewel Trust's Sale Process and Outreach to Bluegrass and the INMET Trust.**

69.     The Blackjewel Trust owns real property in Kentucky, West Virginia, and Virginia, including the Retained Property.

70.     The Blackjewel Trust is evaluating the most efficient and cost-effective process to generate the most value from the Blackjewel Trust's real property, including the Retained Property, for the benefit of the Blackjewel Trust's parties in interest.

71.     The Lee County Assets owned by the Blackjewel Trust alone consist of approximately 3,722 acres of real property in Lee County, Virginia.

72.     On April 4, 2024, counsel to the Blackjewel Trust sent a letter to counsel for Bluegrass and the INMET Trust requesting confirmation that the Lee County Assets were not sold or transferred to INMET and thereafter to Bluegrass (the "Letter").

73.     The Blackjewel Trust sent the Letter after becoming aware that Bluegrass was paying the outstanding tax bills related to the Lee County Assets.

74.    The Letter notified Bluegrass and the INMET Trust, *inter alia*, that if they did not agree that the Lee County Assets were not sold or transferred, then the Blackjewel Trust intended to commence an adversary proceeding in the West Virginia Court.

75.    The Blackjewel Trust provided Bluegrass and the INMET Trust until Friday, April 12, 2024, at 4:00 p.m. prevailing Eastern Time to respond to the Letter.

76.    On April 12, 2024, at 3:46 p.m. (prevailing Eastern Time), Bluegrass responded with a letter notifying the Blackjewel Trust that it disagreed with its position that the Lee County Assets were not sold or transferred to INMET (the "Bluegrass Response Letter").  Despite acknowledging that "the schedules of the [INMET APA] INMET Assignment Agreement suggest[] that INMET did not acquire any real property other than real property located in Harlan County, Kentucky and Wise County, Virginia," Bluegrass insisted that INMET acquired the Lee County Assets pursuant to the INMET APA and subsequently sold it to Bluegrass.

77.    The Blackjewel Trust did not receive a substantive response to its Letter from the INMET Trust.

**Bluegrass' Initial Kentucky Complaint Was Dismissed by the Court.**

78.    Approximately forty-five minutes after sending the Bluegrass Response Letter—on April 12, 2024, at 4:31 p.m. (prevailing Eastern Time)—Bluegrass filed a complaint in this Court seeking (a) a declaratory judgment that Bluegrass acquired and owns the Lee County Assets, (b) injunctive relief against the Blackjewel Trust, and (c) contempt sanctions against the Blackjewel Trust [AP KY Docket No. 5] (the "Initial Kentucky Complaint") in the adversary proceeding case styled *Bluegrass Natural Resources, LLC v. David J. Beckman, as Trustee of the Blackjewel Liquidation Trust, LLC*, AP Case No. 24-ap-07002 (GRS) (Bankr. E.D. Ky. 2024) (the "Initial Kentucky Adversary Proceeding").

79. On June 12, 2024, the Blackjewel Trust filed a *Motion to Dismiss the Adversary Proceeding* [AP KY Docket No. 42] (the "Blackjewel MTD") in the Initial Kentucky Adversary Proceeding on the grounds that, *inter alia*, the Initial Kentucky Complaint violated the *Barton* Doctrine.

80. Following Bluegrass' objection to the Blackjewel MTD [AP KY Docket No. 47] and the Blackjewel Trust's reply in support of the same [AP KY Docket No. 48], on July 30, 2024, the Court dismissed the Initial Kentucky Adversary Proceeding [AP KY Docket Nos. 56, 57].

81. On August 20, 2024, the Court closed the Initial Kentucky Adversary Proceeding.

**The West Virginia Adversary Proceeding was Stayed by the West Virginia Court.**

82. On May 1, 2024, the Blackjewel Trust commenced an adversary proceeding against Bluegrass and the INMET Trust [AP WV Docket No. 1] (the "West Virginia Complaint") in the West Virginia Court styled *Blackjewel Liquidation Trust by and through David J. Beckman, Trustee v. Bluegrass Natural Resources, LLC and Liquidating Trust of INMET Mining, LLC*, AP Case No. 24-ap-03000 (Bankr. S.D. W.Va. 2024) (the "West Virginia Adversary Proceeding") seeking the same relief sought in these counterclaims.

83. On October 17, 2024, the West Virginia Court dismissed the claims asserted against the INMET Trust in the West Virginia Complaint primarily because of the *Barton* Doctrine. [AP WV Docket No. 24].

84. On October 31, 2024, Bluegrass filed a motion seeking leave to file an adversary proceeding against the Blackjewel Trust in this Court and to dismiss the West Virginia Adversary Proceeding on the ground that, among other things, the West Virginia Complaint failed to join a necessary party (*i.e.*, the INMET Trust) [AP WV Docket No. 27] (the "Bluegrass MTD").

85.    Following the Blackjewel Trust's response to the Bluegrass MTD [AP WV Docket No. 34], on December 9, 2024, the West Virginia Court stayed the West Virginia Adversary Proceeding until January 15, 2025, and granted leave for Bluegrass to commence an action against the Blackjewel Trust in this Court [AP WV Docket No. 35].

**Bluegrass Takes Affirmative Acts to Change Deed Records.**

86.    Upon information belief, neither INMET nor the INMET Trust ever paid taxes associated with, or changed any of the real property ownership records related to, the Lee County Assets after the entry of the INMET Sale Order on July 13, 2023.

87.    Upon information and belief, beginning on or around its receipt of the Letter on April 4, 2024, Bluegrass has been surreptitiously changing the real property ownership records related to the Retained Property so that such records showed Bluegrass as the owner of certain Retained Property (the "Improper Deed Changes").

88.    On April 25, 2024, the Blackjewel Trust demanded that Bluegrass cease and desist from making the Improper Deed Changes to the Retained Property.

89.    As of the filing of this response, the Blackjewel Trust has not received a response from Bluegrass to its April 25, 2024, demand.

**COUNT ONE**
**(Against Counterclaim-Defendants for Declaratory Judgment**
**Regarding the Retained Property)**

90.    The Blackjewel Trust incorporates each and every allegation contained in Paragraphs 1 through 89 of its counterclaims as if fully rewritten herein.

91.    The Retained Property was not sold or transferred to INMET by the Blackjewel Debtors or the Blackjewel Trust pursuant to the INMET Sale Order or INMET APA.

92.     An actual and justiciable controversy exists between the Blackjewel Trust, the
INMET Trust, and Bluegrass concerning the INMET APA and whether any of the Retained
Property was sold or transferred by the Blackjewel Debtors or the Blackjewel Trust to INMET.

93.     This controversy is within this Court's original jurisdiction.

94.     Pursuant to 28 U.S.C. § 2201, 11 U.S.C. § 105, and Bankruptcy Rule 7001(9), this
Court may declare the rights and legal relations between the Blackjewel Trust, the INMET Trust,
and Bluegrass related to the Retained Property, and that declaration has the force and effect of a
final judgment.

95.     The Blackjewel Trust is entitled to, and hereby expressly requests, a declaration
that (a) the Retained Property was not sold or transferred to INMET pursuant to the INMET Sale
Order or INMET APA, (b) the Blackjewel Trust owns the Retained Property, and (c) neither the
INMET Trust nor Bluegrass has any ownership interest in the Retained Property.

**COUNT TWO**
**(Against Counterclaim-Defendants for Unjust Enrichment)**

96.     The Blackjewel Trust incorporates each and every allegation contained in
Paragraphs 1 through 95 of its counterclaims as if fully rewritten herein.

97.     Upon information and belief, INMET and Bluegrass were enriched by engaging in
the Unauthorized Commercial Activities and from other unauthorized use of the Retained
Property.

98.     Upon information and belief, INMET and Bluegrass received a financial benefit in
exchange for the coal that was conveyed and processed on account of the Unauthorized
Commercial Activities and from other unauthorized use of the Retained Property.

99.     The Unauthorized Commercial Activities by INMET and Bluegrass, and other unauthorized use of the Retained Property, decreased the value of the Retained Property and damaged the Blackjewel Debtors and the Blackjewel Trust.

100.    INMET and Bluegrass intentionally concealed their Unauthorized Commercial Activities, and other unauthorized use of the Retained Property, from the Blackjewel Debtors and the Blackjewel Trust.

101.    INMET and Bluegrass knew they were being unjustly enriched because both knew, or should have known, that the Retained Property had not been sold or transferred by the Blackjewel Debtors or the Blackjewel Trust.

102.    The Unauthorized Commercial Activities and other unauthorized use of the Retained Property by INMET and Bluegrass was inequitable and extracted value from the Retained Property that should have been provided to the Blackjewel Debtors and the Blackjewel Trust.

103.    It would be inequitable for Bluegrass and the INMET Trust to retain the benefits of its unjust enrichment without payment to the Blackjewel Trust.

104.    There is no agreement or contract between the Blackjewel Debtors or Blackjewel Trust and INMET, the INMET Trust, or Bluegrass related to the Retained Property.

105.    Bluegrass and the INMET Trust should be forced to account to the Blackjewel Trust for the value of the coal conveyed and processed on the Retained Property and the proceeds thereof as a result of the Unauthorized Commercial Activities and the benefits otherwise derived from the unauthorized use of the Retained Property.

### COUNT THREE
### (Against Counterclaim-Defendants for Trespass to Land)

106.    The Blackjewel Trust incorporates each and every allegation contained in Paragraphs 1 through 105 of its counterclaims as if fully rewritten herein.

107.    INMET and Bluegrass intentionally engaged in the Unauthorized Entries and Unauthorized Commercial Activities on the Retained Property.

108.    INMET's and Bluegrass' Unauthorized Entries and Unauthorized Commercial Activities were without justification and were not authorized or otherwise permitted by the Blackjewel Debtors or the Blackjewel Trust.

109.    Each of INMET's and Bluegrass' Unauthorized Entries and Unauthorized Commercial Activities on the Retained Property was an act of trespassing onto the Blackjewel Debtors' or the Blackjewel Trust's real property.

110.    Upon information and belief, the Blackjewel Debtors and the Blackjewel Trust have been damaged, including, without limitation, by the decreased value of the Retained Property as a result of INMET and Bluegrass trespassing onto the Retained Property since the entry of the INMET Sale Order.

111.    The Blackjewel Trust should be compensated by Bluegrass and the INMET Trust for the damages caused by INMET and Bluegrass, including, without limitation, for decrease in the Retained Property's value due to INMET's and Bluegrass' trespasses.

112.    The Court should immediately require Bluegrass to cease from entering onto the Retained Property and avoid any further risk of reducing the value of the Retained Property.

### COUNT FOUR
### (Against Bluegrass for Slander of Title)

113.    The Blackjewel Trust incorporates each and every allegation contained in Paragraphs 1 through 112 of its counterclaims as if fully rewritten herein.

114.    Pursuant to Bluegrass' Improper Deed Changes, upon information and belief, Bluegrass purported to transfer the Retained Property from the Blackjewel Trust to Bluegrass by changing the Retained Property's deed records (the "Retained Property Deed Records") in the

applicable clerk's office in Lee County, Virginia, Harlan County, Kentucky, and Wise County, Virginia.

115.    The Blackjewel Trust owns the Retained Property.

116.    The Retained Property Deed Records recorded and published by Bluegrass were slanderous, disparaging, and false.

117.    Bluegrass' Improper Deed Changes affected and disparaged the Blackjewel Trust's title to the Retained Property.

118.    Bluegrass acted with malicious intent and in reckless disregard of the truth or falsity of the Retained Property Deed Records recorded and published by Bluegrass.

119.    Bluegrass' Improper Deed Changes caused the Blackjewel Trust to incur the following special damages, including, but not limited to, the following:  (a) lost settlement opportunity with holders of alleged secured claims against the Blackjewel Debtors, (b) lost asset sale opportunities with potential purchasers seeking real property that includes some or all of the Retained Property, (c) lost marketing opportunities with potential purchasers for the Retained Property, (d) expenses, including attorneys' fees and expenses, to remove the cloud on title regarding the Retained Property, and (e) expenses, including attorneys' fees and expenses, associated with keeping the Blackjewel Bankruptcy Cases open while this dispute is adjudicated.

120.    As the owner of the Retained Property, the Blackjewel Trust should be compensated by Bluegrass for the damage caused by Bluegrass' slander of title concerning the Retained Property.

**COUNT FIVE**
**(Against Bluegrass for Injunctive Relief)**

121.    The Blackjewel Trust incorporates each and every allegation contained in Paragraphs 1 through 120 of its counterclaims as if fully rewritten herein.

122.    The *First Amended Joint Chapter 11 Plan of Liquidation for Blackjewel L.L.C. and Its Affiliated Debtors* [BJLT Docket No. 2499] (the "<u>Plan</u>")[2] "permanently enjoined" "all entities who have held, hold, or may hold Claims against or Interests in the [Blackjewel] Debtors" from, among other things, "taking any actions to interfere with the implementation or consummation of the Plan." See *id.* Art. 12.6.

123.    The *Proposed Findings of Fact, Conclusions of Law, and Order (I) Approving the First Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for Blackjewel, L.L.C. and Its Affiliated Debtors, and (II) Confirming the First Amended Joint Chapter 11 Plan of Liquidation for Blackjewel, L.L.C. and Its Affiliated Debtors* [BJLT Docket No. 3147] (the "<u>Confirmation Order</u>")[3] provides that the liquidation trustee to the Blackjewel Trust (the "<u>Trustee</u>") is authorized to "wind up the [Blackjewel] Debtors' affairs . . . in accordance with this Confirmation Order, the Plan, and the Liquidation Trust Agreement." *See id.* ¶ 5.

124.    The Trust Agreement [BJLT Docket No. 2602-1][4] states that the Trustee "shall, without any further Bankruptcy Court approval, . . . liquidate the Liquidation Trust Assets." *See id.* § 3.5.1.

125.    The Trust Agreement defines "Liquidation Trust Assets" to include "all other remaining property and assets of the [Blackjewel] Debtors." *See id.* 1.1.

126.    The Plan enjoins any entity from interfering with the liquidation of the Blackjewel Trust's assets.

127.    The Retained Property is owned by the Blackjewel Trust.

---

[2] A copy of the Plan is attached hereto as **<u>Exhibit A</u>**.
[3] A copy of the Confirmation Order is attached hereto as **<u>Exhibit B</u>**.
[4] A copy of the Trust Agreement is attached hereto as **<u>Exhibit C</u>**.

128.     Bluegrass' Improper Deed Changes purporting to transfer the Retained Property owned by the Blackjewel Trust violates the Plan's injunction provision by interfering with the Blackjewel Trust's efforts to liquidate its assets, specifically the Retained Property, in accordance with the Trust Agreement as authorized by the Confirmation Order.

129.     The Blackjewel Trust is entitled to, and hereby expressly requests, injunctive relief against Bluegrass barring it from asserting any interest in or ownership of the Retained Property or further interfering with the Blackjewel Trust's marketing or sale(s) of the Retained Property.

**COUNT SIX**
**(Against Bluegrass for Contempt Sanctions)**

130.     The Blackjewel Trust incorporates each and every allegation contained in Paragraphs 1 through 129 of its counterclaims as if fully rewritten herein.

131.     Bluegrass' Improper Deed Changes purporting to transfer the Retained Property owned by the Blackjewel Trust violates the Plan's injunction provision by interfering with the Blackjewel Trust's efforts to liquidate its assets, specifically the Retained Property, in accordance with the Trust Agreement as authorized by the Confirmation Order.

132.     The Blackjewel Trust hereby expressly requests that the Court (a) find Bluegrass in contempt of the Confirmation Order and Plan, and (b) sanction Bluegrass on account of such contempt.

WHEREFORE, the Blackjewel Trust respectfully requests the following relief:

A.       On Bluegrass' Complaint, that Bluegrass take nothing by way of the Complaint and that the Complaint be dismissed with prejudice, at Bluegrass' cost.

B.       On Count I of the counterclaims, that the Court issue a declaratory judgment that (a) the Retained Property was not sold or transferred to INMET pursuant to the INMET Sale Order of INMET APA, (b) the Blackjewel Trust owns the Retained Property, and (c) neither the INMET Trust nor Bluegrass has any ownership interest in the Retained Property.

C.   On Count II of the counterclaims, that the Court enter a money judgment against the INMET Trust and Bluegrass in favor of the Blackjewel Trust in an amount to be proven at trial, plus reasonable attorneys' fees and costs, related to the value of the coal conveyed and processed by INMET and Bluegrass on the Retained Property from the Unauthorized Commercial Activities.

D.   On Count III of the counterclaims, that the Court (a) enter a money judgment against the INMET Trust and Bluegrass in favor of the Blackjewel Trust in an amount to be proven at trial, plus reasonable attorneys' fees and costs, related to the decrease in value to the Retained Property due to INMET and Bluegrass trespassing onto the Retained Property, and (b) immediately require Bluegrass to cease from entering onto the Retained Property and avoid any further risk of reducing the value of the Retained Property.

E.   On Count IV of the counterclaims, pursuant to the Improper Deed Changes, that the Court enter a money judgment against Bluegrass in favor of the Blackjewel Trust in an amount to be proven at trial, plus reasonable attorneys' fees and costs, related to the special damages caused by Bluegrass' slander of title concerning the Retained Property.

F.   On Count V of the counterclaims, pursuant to the Improper Deed Changes, that the Court enjoin Bluegrass from (a) asserting any interest in or ownership of the Retained Property, and (b) further interfering with the Blackjewel Trust's marketing or sale(s) of the Retained Property.

G.   On Count VI of the counterclaims, pursuant to the Improper Deed Changes, that the Court (a) find Bluegrass in contempt of the Confirmation Order and Plan, and (b) sanction Bluegrass on account of such contempt in an amount to be proven at trial.

H.   That the Court issue an order awarding the Blackjewel Trust all other relief the Court finds equitable and just, including reasonable attorneys' fees, costs, and pre- and post-judgment interest.

*[Remainder of Page Intentionally Left Blank]*

DATED:  February 21, 2025

**SQUIRE PATTON BOGGS (US) LLP**

*/s/ F. Maximilian Czernin*
F. Maximilian Czernin (KY 93674)
Stephen D. Lerner (*Pro Hac Vice* Motion Pending)
Kyle F. Arendsen (Admitted *Pro Hac Vice*)
201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
max.czernin@squirepb.com
stephen.lerner@squirepb.com
kyle.arendsen@squirepb.com

*Counsel to the Blackjewel Liquidation Trust, LLC*

## Exhibit A

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Blackjewel L.L.C., *et al.*, | ) | Case No. 19-30289 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

---

**FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION
FOR BLACKJEWEL L.L.C. AND ITS AFFILIATED DEBTORS**

---

Dated:      October 21, 2020

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Blackjewel L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings, LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The headquarters for each of the Debtors is located at PO Box 1010, Scott Depot, WV 25560.

# TABLE OF CONTENTS

**Page**

**ARTICLE 1. DEFINITIONS AND INTERPRETATION** ..........................................................1
    **1.1**    **Definitions.** ......................................................................................................1
    **1.2**    **Interpretation; Application of Definitions and Rules of Construction.** ..........12
    **1.3**    **Appendices and Plan Documents.** .................................................................12

**ARTICLE 2. UNCLASSIFIED CLAIMS** ................................................................................13
    **2.1**    **Administrative Expense Claims and Priority Tax Claims.** .............................13
    **2.2**    **Fee Claims.** ....................................................................................................13
    **2.3**    **U.S. Trustee Fees.** ..........................................................................................14

**ARTICLE 3. CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS** .............................................................................................................14
    **3.1**    **Summary.** .......................................................................................................14
    **3.2**    **Classification of Claims and Interests.** ..........................................................14
    **3.3**    **Treatment of Claims and Equity Interests.** ....................................................15

**ARTICLE 4. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR
INTERESTS** .............................................................................................................17
    **4.1**    **Classes Entitled To Vote.** ..............................................................................17
    **4.2**    **Tabulation of Votes on a Non-Consolidated Basis.** ........................................17
    **4.3**    **Acceptance by Impaired Classes.** ..................................................................17
    **4.4**    **Elimination of Vacant Classes.** .....................................................................17
    **4.5**    **Confirmation Pursuant to Section 1129(b) or "Cramdown."** ........................18

**ARTICLE 5. MEANS FOR IMPLEMENTATION** ..................................................................18
    **5.1**    **Corporate Existence.** .....................................................................................18
    **5.2**    **Closing of the Debtors' Chapter 11 Cases.** ....................................................18
    **5.3**    **Plan Funding.** ................................................................................................19
    **5.4**    **Settlement of Intercompany Matters.** ............................................................19
    **5.5**    **Release of Avoidance Actions for Holders of Claims in Class 3.** ....................19
    **5.6**    **Monetization of Assets.** .................................................................................19
    **5.7**    **Books and Records.** .......................................................................................19
    **5.8**    **Reporting Duties.** ..........................................................................................19
    **5.9**    **Tax Obligations.** ............................................................................................20
    **5.10**    **Cancellation of Existing Securities and Agreements.** ....................................20
    **5.11**    **Indemnification Obligations.** ........................................................................20
    **5.12**    **Effectuating Documents; Further Transactions; Exemption from
Certain Transfer Taxes.** ................................................................................20
    **5.13**    **Comprehensive Settlement of Claims and Controversies.** ..............................21

**ARTICLE 6. PROCEDURES FOR RESOLVING CLAIMS** ...................................................21
    **6.1**    **Allowance of Claims.** ....................................................................................21

| | | |
|---|---|---|
| 6.2 | Objections to Claims. | 22 |
| 6.3 | Estimation of Claims. | 22 |

**ARTICLE 7. PROVISIONS GOVERNING DISTRIBUTIONS** ...................................23

| | | |
|---|---|---|
| 7.1 | Satisfaction of Claims. | 23 |
| 7.2 | Distributions on Account of Claims Allowed as of the Effective Date. | 23 |
| 7.3 | Distributions on Account of Claims Allowed After the Effective Date. | 23 |
| 7.4 | Delivery of Plan Distributions. | 23 |
| 7.5 | Claims Paid or Payable by Third Parties. | 25 |
| 7.6 | No Post-Petition Interest on Claims. | 26 |

**ARTICLE 8. EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........................26

| | | |
|---|---|---|
| 8.1 | Assumption of Executory Contracts and Unexpired Leases. | 26 |
| 8.2 | Rejection of Executory Contracts and Unexpired Leases. | 26 |
| 8.3 | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 27 |
| 8.4 | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 27 |

**ARTICLE 9. LIQUIDATION TRUST** .................................................................28

| | | |
|---|---|---|
| 9.1 | Generally. | 28 |
| 9.2 | Purposes and Establishment of the Liquidation Trust. | 28 |
| 9.3 | Liquidation Trust Assets. | 29 |
| 9.4 | Valuation of Assets. | 29 |
| 9.5 | Appointment of the Liquidation Trustee. | 29 |
| 9.6 | Duties and Powers of the Liquidation Trustee. | 30 |
| 9.7 | Funding of the Liquidation Trust. | 32 |
| 9.8 | Exculpation; Indemnification. | 32 |
| 9.9 | Federal Income Tax Treatment of Liquidation Trust. | 32 |
| 9.10 | Tax Reporting. | 33 |
| 9.11 | Tax Withholdings by Liquidation Trustee. | 34 |
| 9.12 | Dissolution. | 34 |

**ARTICLE 10.** ...........................................................................................35

**RECLAMATION TRUST** ............................................................................35

| | | |
|---|---|---|
| 10.1 | Generally. | 35 |
| 10.2 | Purposes and Establishment of the Reclamation Trust. | 35 |
| 10.3 | Reclamation Trust Assets. | 36 |
| 10.4 | Appointment of the Reclamation Trustee. | 36 |
| 10.5 | Duties and Powers of the Reclamation Trustee. | 36 |
| 10.6 | Funding of the Reclamation Trust. | 38 |
| 10.7 | Exculpation; Indemnification. | 38 |
| 10.8 | Federal Income Tax Treatment of Reclamation Trust. | 38 |
| 10.9 | Tax Reporting. | 38 |
| 10.10 | Tax Withholdings by Reclamation Trustee. | 38 |
| 10.11 | Dissolution. | 39 |

**ARTICLE 11. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** ...............................................................................................39

    **11.1**    **Conditions Precedent to the Effective Date.** .................................39
    **11.2**    **Satisfaction and Waiver of Conditions Precedent.** .......................40
    **11.3**    **Effect of Non-Occurrence of Conditions to the Effective Date.** .....40

**ARTICLE 12. EFFECT OF CONFIRMATION** ............................................40

    **12.1**    **Binding Effect.** ..........................................................................40
    **12.2**    **Term of Pre-Confirmation Injunctions or Stays.** ........................40
    **12.3**    **Debtor Release.** ........................................................................40
    **12.4**    **Third-Party Release.** .................................................................42
    **12.5**    **Exculpation and Limitation of Liability.** ....................................42
    **12.6**    **Injunction Related to Releases and Exculpation.** .........................43

**ARTICLE 13. RETENTION OF JURISDICTION** .....................................43

**ARTICLE 14. MISCELLANEOUS PROVISIONS** ......................................46

    **14.1**    **Dissolution of Committee.** ..........................................................46
    **14.2**    **Modification of Plan.** .................................................................46
    **14.3**    **Revocation or Withdrawal of Plan.** ............................................46
    **14.4**    **Allocation of Plan Distributions Between Principal and Interest.** ...47
    **14.5**    **Severability.** .............................................................................47
    **14.6**    **Governing Law.** ........................................................................47
    **14.7**    **Inconsistency.** ...........................................................................47
    **14.8**    **Time.** .......................................................................................47
    **14.9**    **Exhibits.** ...................................................................................47
    **14.10**    **Notices.** ...................................................................................48
    **14.11**    **Filing of Additional Documents.** ...............................................48

# INTRODUCTION[2]

Blackjewel L.L.C. and the other debtors and debtors in possession in the above-captioned cases propose the following joint chapter 11 plan of liquidation. In reviewing the Plan, readers should refer to the Disclosure Statement, including the exhibits and supplements thereto, for a discussion of the Debtors' business history and operations, risk factors, a summary and analysis of the Plan, and certain related matters including, among other things, certain tax matters and other considerations to be issued and distributed under the Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and sections 14.2 and 14.3 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

The only Persons that are entitled to vote on the Plan are holders of Allowed Claims in Classes 1, 2, and 3. Such Persons are encouraged to read the Plan and the Disclosure Statement and their respective exhibits and schedules in their entirety before voting to accept or reject the Plan. No materials other than the Disclosure Statement and the respective schedules, notices, and exhibits attached thereto and referenced therein have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

## ARTICLE 1.

## DEFINITIONS AND INTERPRETATION

### 1.1 Definitions.

The following terms shall have the meanings set forth below. Such meanings shall be equally applicable to both the singular and plural forms of such terms.

**1.1.1** "*503(b)(9) Claims*" means Claims that have been timely and properly filed prior to the Bar Date and that are granted administrative expense priority treatment pursuant to section 503(b)(9) of the Bankruptcy Code.

**1.1.2** "*510 Claims*" means Claims against any of the Debtors that are subordinated pursuant to section 510(b) or (c) of the Bankruptcy Code.

**1.1.3** "*Administrative Bar Date*" means (i) November 4, 2019 for Administrative Expense Claims arising from the Petition Date through October 14, 2019, as established by the *Order (I) Setting Bar Dates for Filing Proofs of Claim Including Requests for Payment Under Section 503(B)(9) of the Bankruptcy Code, (II) Setting a Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims, (III) Establishing the Amended Schedules Bar Date and the Rejection Damages Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, Including 503(B)(9) Requests, (V) Approving Notice of Bar Dates, and (VI) Granting Related Relief* [Docket No. 1188] entered on October 4, 2019, and (ii) the date that is 45 days after the Effective Date for Administrative Expense Claims arising after October 14, 2019.

---

[2] All capitalized terms used but not defined in this Introduction have the meanings set forth in article 1 of the Plan.

**1.1.4** "*Administrative Expense Claim*" means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code (other than a Fee Claim or U.S. Trustee Fees) incurred during the period from the Petition Date to the Effective Date, including, without limitation: (a) any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, and any indebtedness or obligations incurred or assumed by any of the Debtors during the Chapter 11 Cases; (b) 503(b)(9) Claims; and (c) any payment to be made under the Plan to cure a default under an assumed executory contract or unexpired lease.

**1.1.5** "*Allowed Claim or Interest*" (with respect to a specific type of Claim, if applicable) means (a) any Claim (or a portion thereof) against a Debtor as to which no action to dispute, deny, or otherwise limit recovery with respect thereto, or alter the priority thereof (including a claim objection), has been timely commenced within the applicable period of limitation fixed by the Plan or applicable law, or, if an action to dispute, deny, equitably subordinate, or otherwise limit recovery with respect thereto, or alter priority thereof, has been timely commenced, to the extent such Claim has been allowed (whether in whole or in part) by a Final Order of a court of competent jurisdiction with respect to the subject matter or (b) any Claim against a Debtor or portion thereof that is allowed (i) in any contract, instrument, or other agreement entered into in connection with the Plan, (ii) pursuant to the terms of the Plan, (iii) by Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim (x) that was incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases to the extent due and owing without defense, offset, recoupment, or counterclaim of any kind and (y) that is not otherwise disputed.

**1.1.6** "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that have been or may be brought on behalf of the Debtors or the Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code.

**1.1.7** "*Avoidance Action Release*" means the release by the Debtors of any Avoidance Action against the holder of an Allowed General Unsecured Claim, provided that the foregoing shall not apply to the Hoops Parties, United Bank, or settlements of Avoidance Actions approved by the Bankruptcy Court during these Chapter 11 Cases.

**1.1.8** "*Bankruptcy Code*" means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.1.9** "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of West Virginia, or any other court exercising competent jurisdiction over the Chapter 11 Cases or any proceeding therein.

**1.1.10** "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as amended from

time to time, as applicable to the Chapter 11 Cases, and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of West Virginia.

       **1.1.11** "***Bar Date***" means November 4, 2019, as established by the *Order (I) Setting Bar Dates for Filing Proofs of Claim Including Requests for Payment Under Section 503(B)(9) of the Bankruptcy Code, (II) Setting a Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims, (III) Establishing the Amended Schedules Bar Date and the Rejection Damages Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, Including 503(B)(9) Requests, (V) Approving Notice of Bar Dates, and (VI) Granting Related Relief* [Docket No. 1188] entered on October 4, 2019.

       **1.1.12** "***Business Day***" means any day other than a Saturday, Sunday, or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a)(6).

       **1.1.13** "***Cash***" means the legal currency of the United States and equivalents thereof.

       **1.1.14** "***Causes of Action***" means, subject to the releases, exculpations, and injunctions set forth in the Plan, any and all actions, causes of action (including Avoidance Actions), suits, accounts, controversies, obligations, judgments, damages, demands, debts, rights, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and Claims, whether known or unknown, reduced to judgment or not, liquidated or unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or tort, arising in law, equity, or otherwise.

       **1.1.15** "***Chapter 11 Cases***" means the cases that are being jointly administered under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and captioned *In re Blackjewel L.L.C.*, *et al.*, Case No. 19-30289 (BAK).

       **1.1.16** "***Claim***" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

       **1.1.17** "***Claims Agent***" means Prime Clerk LLC, or any other entity approved by the Bankruptcy Court to act as the Debtors' claims and noticing agent pursuant to 28 U.S.C. § 156(c).

       **1.1.18** "***Claims Register***" means the official register of Claims against the Debtors maintained by the Claims Agent.

       **1.1.19** "***Class***" means each category of Claims and Interests established under article 3 of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

       **1.1.20** "***Clearwater Adversary Proceeding***" means that adversary proceeding commenced by the Debtors against Clearwater Investment Holdings, LLC on June 11, 2020, administered under case number 20-03008.

**1.1.21** "*Collateral*" means any property or interest in property of the Estates of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

**1.1.22** "*Committee*" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code, which consists of (a) Walker Machinery Company, (b) Jennmar Corporation of Virginia, (c) CAM Mining, LLC, (d) United Central Industrial Supply Company, LLC; and (e) Kentucky River Properties, LLC. United Central Industrial Supply Company, LLC resigned as a member of the Committee during these Chapter 11 cases.

**1.1.23** "*Committee Parties*" means (i) the Committee, (ii) each of the Committee's members acting in their respective capacities as members thereof, and (iii) each of the foregoing parties' current officers, affiliates, partners, directors, employees, agents, members, representatives, advisors, and professionals (including any attorneys, consultants, financial advisors, investment bankers, and other professionals retained by the Committee or by any member thereof), together with their respective successors and assigns; *provided*, *however*, that such attorneys and professional advisors shall only include those that provided services in connection with the Chapter 11 Cases.

**1.1.24** "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Debtors' Chapter 11 Cases.

**1.1.25** "*Confirmation Hearing*" means a hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.1.26** "*Confirmation Order*" means an order entered by the Bankruptcy Court (a) approving the Disclosure Statement as having adequate information in accordance with section 1125 of the Bankruptcy Code, and (b) confirming the Plan, including all exhibits, appendices, supplements, and related documents.

**1.1.27** "*Debtor(s)*" means, individually or collectively, as the context requires: Blackjewel L.L.C.; Blackjewel Holdings L.L.C.; Revelation Energy Holdings, LLC; Revelation Management Corporation; Revelation Energy, LLC; Dominion Coal Corporation; Harold Keene Coal Co. LLC; Vansant Coal Corporation; Lone Mountain Processing, LLC; Powell Mountain Energy, LLC; and Cumberland River Coal LLC.

**1.1.28** "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Section 12.3 hereof.

**1.1.29** "*Disallowed*" means a finding of the Bankruptcy Court in a Final Order, or provision in the Plan providing, that a Disputed Claim shall not be an Allowed Claim.

**1.1.30** "*Disbursing Agent*" means the Liquidation Trustee or such entity or entities designated by the Liquidation Trustee, which entities may include, without limitation, the Liquidation Trustee.

      **1.1.31**     "*Disclosure Statement*" means the disclosure statement in respect of the Plan and all exhibits, schedules, supplements, modifications, and amendments thereto.

      **1.1.32**     "*Disputed*" means, with respect to any Claim against a Debtor, including any portion thereof, any Claim (a) that is listed on the Schedules as contingent, unliquidated, or disputed, (b) as to which the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and Bankruptcy Rules or that is otherwise disputed by any Debtor or the Liquidation Trustee in accordance with applicable law, which objection, request for estimation, or dispute has not been determined by a Final Order, or (c) with respect to which a proof of claim was required to be filed by order of the Bankruptcy Court but as to which such proof of claim was not timely or properly filed.

      **1.1.33**     "*Distributable Cash*" means any cash generated by the Liquidation Trustee from the liquidation of the Liquidation Trust Assets or the proceeds of the Litigation Proceedings after accounting for the costs and expenses of the Liquidation Trust.

      **1.1.34**     "*Distribution Date*" means the Initial Distribution Date or any of the Periodic Distribution Dates, as applicable.

      **1.1.35**     "*Distribution Record Date*" means, with respect to all Classes for which Plan Distributions are to be made, the third Business Day after the Confirmation Date or such other later date as shall be established by the Bankruptcy Court in the Confirmation Order.

      **1.1.36**     "*Effective Date*" means the date specified by the Debtors in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, which date shall be the earlier of (i) the first Business Day on which all of the conditions set forth in Section 11.1 of the Plan have been satisfied or waived and no stay of the Confirmation Order is in effect and (ii) to the extent any outstanding conditions precedent to consummating the Plan have been waived by the Debtors in accordance with the Plan, seven days after the Confirmation Date.

      **1.1.37**     "*Estate*" means each estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

      **1.1.38**     "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' post-petition restructuring efforts, operation and administration of the Debtors' assets, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, filing, solicitation of acceptances, confirmation, approval, implementation, or administration of the Disclosure Statement, the Plan, the settlements and agreements contained in the Plan, the property to be distributed under the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Debtors' Chapter 11 Cases, the pursuit of entry of a Confirmation Order, the distribution of property under the Plan, or any other related agreement; *provided, however,* that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted willful misconduct or gross negligence. For the avoidance of doubt, no Claim, Cause of Action, obligation, or liability expressly set forth in or preserved by the Plan constitutes an Exculpated Claim.

**1.1.39** "*Exculpated Party*" means, collectively, the Debtors, each of the Debtors' current officers and directors that served in such capacities between the Petition Date and the Effective Date (other than the Hoops Parties), the Committee and each of the Committee's members acting in their respective capacities as members thereof, and the Professional Persons of each of the foregoing acting in their respective capacities as such that served in such capacities between the Petition Date and the Effective Date.

**1.1.40** "*Executory Contract*" means any contract to which any of the Debtors is a party that is subject to assumption or rejection under sections 365 and 1123 of the Bankruptcy Code.

**1.1.41** "*Fee Claim*" means a Claim by a Professional Person for compensation, indemnification, or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 363, 503(b), or 1103(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, including, without limitation, in connection with final fee applications of such Professional Persons.

**1.1.42** "*Final Order*" means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered on the docket in the Debtors' Chapter 11 Cases (or on the docket of such other court of competent jurisdiction), which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment; *provided, further*, that the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

**1.1.43** "*General Unsecured Claim*" means any unsecured Claim against any Debtor, including (a) trade Claims, (b) unsecured Claims held by a non-Debtor affiliate of the Debtors against the Debtors, and (c) Claims arising out of the rejection of Executory Contracts and Unexpired Leases by any Debtor, but excluding any Intercompany Claim.

**1.1.44** "*Governmental Bar Date*" means December 30, 2019, as established by the *Order (I) Setting Bar Dates for Filing Proofs of Claim Including Requests for Payment Under Section 503(B)(9) of the Bankruptcy Code, (II) Setting a Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims, (III) Establishing the Amended Schedules Bar Date and the Rejection Damages Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, Including 503(B)(9) Requests, (V) Approving Notice of Bar Dates, and (VI) Granting Related Relief* [Docket No. 1188] entered on October 4, 2019.

**1.1.45** "*Hoops Parties*" means the following individuals (1) Jeffrey A. Hoops, (2) Patricia A. Hoops, (3) Jeffery A. Hoops, II; (4) Jeremy A. Hoops; (5) Joshua A. Hoops; (6) Jessica Hoops; (7) Lesley Hoops; (8) Amanda Hoops, (10) Brent T. Walls, and (11) any and all Relatives of Hoops, and the following entities: (1) Genesis Trucking; (2) Construction & Reclamation Services; (3) Lexington Coal Company, LLC; (4) Lexington Coal Royalty Company, LLC; (5) Grand Patrician Resort, LLC; (6) Triple H Real Estate, LLC; (7) Black Diamond Insurance Group, LLC; (8) Clearwater Investment Holdings, LLC; (9) Hoops Dynasty Trust(s); (10) Clearwater Trust(s); (11) JBLCO, LLC; (12) Active Medical; (13) Forrest Machine, LLC; (14) Prep Plant Solutions LLC; (15) Blackjewel Trust; (16) Revelation Energy Trust; (17) Lexington Trust; (18) Walls & Associates, PLLC; (19) Triple H Aviation, LLC; (20) Aquatic Resources Management, LLC; (21) Kewa; (22) Blackjewel Marketing & Sales, LLC; (23) Omni Insurance Group, LLC; (24) Appalachian Medical, LLC; (25) Republic Superior Products; (26) Legends Construction Co., LLC; (27) any and all entities, partnerships, or proprietorships owned and/or controlled, directly or indirectly, by Hoops and/or the Relatives of Hoops (provided that ownership of less than five percent (5%) of the outstanding common stock of any publicly traded corporation shall not be deemed to constitute ownership for the purposes of this clause; and (28) any and all trusts or entities created for the benefit of Hoops or the Relatives of Hoops.

**1.1.46** "*Impacted States*" means collectively Tennessee, Virginia, Kentucky, and West Virginia.

**1.1.47** "*Impaired*" means impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.1.48** "*Initial Distribution Date*" means the date occurring as soon as reasonably practicable after the Effective Date when Plan Distributions shall commence.

**1.1.49** "*Intercompany Claim*" means any Claim (including an Administrative Expense Claim), Cause of Action, or remedy asserted against a Debtor by another Debtor. For the avoidance of doubt, Intercompany Claim does not include any Claim asserted against a Debtor by a direct or indirect non-Debtor Subsidiary of any Debtor or by a Debtor against any direct or indirect non-Debtor Subsidiary of any Debtor.

**1.1.50** "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor. For the avoidance of doubt, Intercompany Interest does not include any Interest of a Debtor in a direct or indirect non-Debtor Subsidiary of any Debtor or of any direct or indirect non-Debtor Subsidiary in any Debtor.

**1.1.51** "*Interest*" means the interest (whether legal, equitable, contractual, or otherwise) of any holders of any membership interests or class of equity securities of any of the Debtors represented by shares of common or preferred stock or other instruments evidencing an ownership interest in any of the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant, or right, contractual or otherwise, to acquire any such interest. For the avoidance of doubt, the class of units designated as Senior Preferred Units created on July 14, 2017, by the Debtors and the class of units designated as Series A Units created on July 15, 2017, by the Debtors are deemed to be Interests under the Plan.

**1.1.52** "*Lexington Adversary Proceeding*" means that adversary proceeding commenced by the Debtors against Lexington Coal Company, LLC on July 1, 2020, administered under case number 20-03012.

**1.1.53** "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.1.54** "*Liquidation Trust*" means the trust created pursuant to the Liquidation Trust Agreement on the Effective Date in accordance with the Plan, the Confirmation Order and the Liquidation Trust Agreement.

**1.1.55** "*Liquidation Trust Agreement*" means the Liquidation Trust Agreement to be dated as of the Effective Date establishing the terms and conditions of the Liquidation Trust, substantially in the form attached to the Plan Supplement.

**1.1.56** "*Liquidation Trust Assets*" means the assets to be transferred to the Liquidation Trust on the Effective Date including, without limitation, the Liquidation Trust Causes of Action, the Liquidation Trust Reserve, and all other remaining property and assets of the Debtors, including account receivables and royalty streams (as shown in the Liquidation Analysis attached to the Disclosure Statement). For the avoidance of doubt, the Liquidation Trust Assets shall not include the Reclamation Trust Assets.

**1.1.57** "*Liquidation Trust Beneficiaries*" means the holders of the Liquidation Trust Interests.

**1.1.58** "*Liquidation Trust Causes of Action*" means collectively, the Causes of Action transferred to the Liquidation Trust on the Effective Date, including any defense or counterclaim to any Disputed Claim and the Litigation Proceedings, but excluding any and all Causes of Action released and/or exculpated pursuant to the terms of the Plan. For the avoidance of doubt, the Liquidation Trust Causes of Action shall not include any Avoidance Action released pursuant to the Avoidance Action Release.

**1.1.59** "*Liquidation Trust Interests*" means the uncertificated beneficial interests in the Liquidation Trust representing the right of each holder of an Allowed Claim to receive Cash distributions from the Liquidation Trust on account of such Liquidation Trust Interests in accordance with the terms of this Plan and the Liquidation Trust Agreement.

**1.1.60** "*Liquidation Trust Reserve*" means, as more fully described in the Liquidation Trust Agreement, the Cash transferred to the Liquidation Trust on the Effective Date to fund the initial operations of the Liquidation Trust.

**1.1.61** "*Liquidation Trustee*" means the person or firm to be appointed to manage the Liquidation Trust pursuant to Section 9.5 of the Plan and the Liquidation Trust Agreement.

**1.1.62** "*Litigation Proceedings*" means the United Bank Adversary Proceeding, the Clearwater Adversary Proceeding, the LCC Adversary Proceeding, and any adversary proceeding commenced after the date hereof by the Debtors or the Liquidation Trustee.

For the avoidance of doubt, the Litigation Proceedings shall not include any Avoidance Action released pursuant to the Avoidance Action Release.

       **1.1.63**      "***Non-Intercompany Interest***" means any Interest in a Debtor that is not an Intercompany Interest.

       **1.1.64**      "**Ongoing Professionals**" means those ongoing Professional Persons that continued to represent or assist the Debtors or the Committee in carrying out their duties through the Effective Date.

       **1.1.65**      "***Other Priority Claim***" means any Claim, other than an Administrative Expense Claim, a Fee Claim, or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

       **1.1.66**      "***Periodic Distribution Date***" means, unless otherwise ordered by the Bankruptcy Court, the date(s) established from time to time by the Liquidation Trustee after the Initial Distribution Date, until liquidation of the Liquidation Trust Assets is complete.

       **1.1.67**      "***Permitted Areas***" means the lands subject to reclamation or remediation in connection with the Remaining Permits.

       **1.1.68**      "***Person***" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

       **1.1.69**      "***Petition Date***" means July 1, 2019 and July 24, 2019, as applicable.

       **1.1.70**      "***Plan***" means the joint chapter 11 plan proposed by the Debtors, including, without limitation, all applicable exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended, or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms of the Plan.

       **1.1.71**      "***Plan Distributions***" means the distributions to be made under the Plan to holders of Allowed Claims.

       **1.1.72**      "***Plan Documents***" means the documents, other than the Plan, to be executed, delivered, assumed, or performed in connection with the consummation of the Plan, including, without limitation, the documents to be included in the Plan Supplement, any and all exhibits to the Plan, the Disclosure Statement, and any and all exhibits to the Disclosure Statement.

       **1.1.73**      "***Plan Supplement***" means the supplemental appendix to the Plan to be filed no later than ten days prior to the deadline for parties to vote to accept or reject the Plan, which may contain, among other things, draft forms, signed copies, or summaries of material terms, as the case may be, of (i) the Liquidation Trust Agreement, (ii) disclosure of the identity of the Liquidation Trustee, (iii) the Reclamation Trust Agreement, (iv) disclosure of the identity of the Reclamation Trustee, (v) the schedule of Remaining Permits, (vi) the Schedule of Assumed Contracts and Leases, and (vii) additional documents filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement.

**1.1.74** "*Priority Tax Claim*" means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.1.75** "*Professional Person(s)*" means (a) all Persons retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals; (b) FTI Consulting Inc. and (c) David J. Beckman, in his capacity as interim Chief Executive Officer and Chief Restructuring Officer for the Debtors.

**1.1.76** "*Reclamation Obligations*" means all reclamation and remediation obligations associated with the Remaining Permits.

**1.1.77** "*Reclamation Trust*" means the trust created pursuant to the Reclamation Trust Agreement on the Effective Date in accordance with the Plan, the Confirmation Order and the Reclamation Trust Agreement.

**1.1.78** "*Reclamation Trust Agreement*" means the Reclamation Trust Agreement to be dated as of the Effective Date establishing the terms and conditions of the Reclamation Trust, substantially in the form attached to the Plan Supplement.

**1.1.79** "*Reclamation Trust Assets*" means the assets to be transferred to the Reclamation Trust on the Effective Date including, without limitation, (i) the Reclamation Trust Reserve, (ii) the Debtors' interest in any bonds issued by the Sureties in connection with the Remaining Permits; (iii) any underlying property rights relating to or associated with the Remaining Permits; (iv) any personal property of the Debtors' remaining on the Permitted Areas; and (v) any Claims or Causes of Action that the Debtors may have against third-parties relative to the performance of the Reclamation Obligations. For the avoidance of doubt, the Reclamation Trust Assets shall not include the Liquidation Trust Assets.

**1.1.80** "*Reclamation Trust Beneficiaries*" means the Sureties and the Impacted States.

**1.1.81** "*Reclamation Trust Reserve*" means, as more fully described in the Reclamation Trust Agreement, Cash in an amount equal to the total bonding in place for the Remaining Permits, which shall be transferred by the Sureties to the Reclamation Trust on the Effective Date to fund the initial operations of the Reclamation Trust.

**1.1.82** "*Reclamation Trustee*" means the person or firm to be appointed to manage the Reclamation Trust pursuant to Section 10.4 of the Plan and the Reclamation Trust Agreement.

**1.1.83** "*Relatives*" means with respect to any natural person, such person's (i) parents, (ii) siblings, (iii) children, (iv) grandparents, (v) grandchildren, (vi) spouses, (vii) spouses of children, (viii) first cousins, (ix) aunts, (x) uncles and (xi) spouse's parents.

**1.1.84** "*Released Parties*" means, collectively, in each case solely in their capacity as such: (a) (1) each Debtor and (2) each of its respective employees, agents, current and

- 10 -

former officers, current and former directors, managers, trustees, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants; provided that the Hoops Parties shall not receive any release under this Plan; (b) (1) the Committee and (2) each of its members, and each of their respective current employees, agents, officers, directors, managers, trustees, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants; and (c) (1) FTI Consulting Inc. and (2) David J. Beckman, individually and in his capacity as interim Chief Executive Officer and Chief Restructuring Officer for the Debtors, to the extent of any purported liability under section 1260(c) of the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201 *et seq.* ("SMCRA") related to Mr. Beckman's or FTI's alleged control, ownership, or operation of the Debtors.

   **1.1.85**  "***Releasing Parties***" means each of the following in its capacity as such: (a) each Released Party; and (b) all holders of Claims against a Debtor who opt in to the release provided by the Plan.

   **1.1.86**  "***Remaining Permits***" means those mining and operating permits remaining with the Debtors' Estates as of the Effective Date, a schedule of which is attached to the Plan Supplement, which shall be deemed extinguished as of the Effective Date.

   **1.1.87**  "***Schedule of Assumed Contracts and Leases***" means a schedule of the Executory Contracts and Unexpired Leases to be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and Article 8.1 of the Plan, which shall be included in the Plan Supplement.

   **1.1.88**  "***Schedules***" means the schedules of assets and liabilities filed in the Chapter 11 Cases, as amended or supplemented from time to time.

   **1.1.89**  "***Secured Claim***" means a Claim: (a) that is secured by a valid, perfected, and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

   **1.1.90**  "***Subsidiary***" means any corporation, association or other business entity of which at least the majority of the securities or other ownership interest is owned or controlled by a Debtor and/or one or more subsidiaries of the Debtor.

   **1.1.91**  "***Sureties***" means Indemnity National Insurance Company, Lexon Insurance Company, XL Specialty Insurance Company, XL Reinsurance American, Inc. and First Surety Corporation.

   **1.1.92**  "***Tax Code***" means the Internal Revenue Code of 1986, as amended.

   **1.1.93**  "***Third-Party Release***" means the release provision set forth in Section 12.4 hereof.

   **1.1.94**  "***Unexpired Lease***" means a lease of nonresidential real property to which any of the Debtors is a party that is subject to assumption or rejection under sections 365 and 1123 of the Bankruptcy Code.

**1.1.95** "*Unimpaired*" means, with respect to a Class of Claims, a Class of Claims that is not Impaired.

**1.1.96** "*United Bank Adversary Proceeding*" means the adversary proceeding commenced by the Debtors against United Bank on June 1, 2020, administered under case number 20-03007.

**1.1.97** "*U.S. Trustee*" means the Acting United States Trustee, Region 4.

**1.1.98** "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.1.99** "*WARN Adversary Proceedings*" means the *David Engelbrecht, Josiah Williamston and Gregory Mefford, on their own behalf and on behalf of all other persons similarly situated v. Blackjewel, LLC*; Adversary Proceeding No. 19-ap-3002 and *Shawn Abner, Jacob Helton and Billy Hatton individually and on behalf of others similarly situated v. Blackjewel, LLC, Revelation Energy, LLC, Lexington Coal Co., LLC, Jeff Hoops, Sr., Jeffery A. Hoops, II*, Adversary Proceeding No. 19-ap-03003.

## 1.2 Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. Any term that is not defined in the Plan, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The captions and headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan. Any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns.

## 1.3 Appendices and Plan Documents.

All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if fully set forth in the Plan. The documents contained in the exhibits to the Plan and in the Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or via the Claims Agent's website at https://cases.primeclerk.com/blackjewel, or may obtain a copy of the Plan Documents by a request to the Claims Agent as follows:

Blackjewel L.L.C.- Ballot Processing
c/o Prime Clerk LLC
60 East 42nd Street, Suite 1440
New York, NY 10165
Telephone: 844-234-1462
Email: blackjewelballots@PrimeClerk.com

# ARTICLE 2.

## UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, Priority Tax Claims, and U.S. Trustee Fees have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

### 2.1     Administrative Expense Claims and Priority Tax Claims.

Each holder of an Allowed Administrative Expense Claim, other than Fee Claims, and Priority Tax Claims, and except to the extent that an Administrative Expense Claim or Priority Tax Claim has already been satisfied during the Chapter 11 Cases or a holder of an Administrative Expense Claim or Priority Tax Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Expense Claim and Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full and in Cash from Distributable Cash until such Claims are satisfied as required by the Bankruptcy Code. For the avoidance of doubt, holders of Allowed Administrative Expense Claims and Priority Tax Claims will not receive any Distribution on the Effective Date and will only receive a Distribution as Distributable Cash becomes available to the Liquidation Trust. Distributions to the holders of Allowed Administrative Expense Claims and Priority Tax Claims shall comply with the priorities of the Bankruptcy Code. Failure to object to confirmation by a holder of an Allowed Administrative Expense Claim or Allowed Priority Tax Claim shall be deemed to be such holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.

### 2.2     Fee Claims.

#### 2.2.1     *Time for Filing Fee Claims.*

Any Professional Person seeking allowance of a Fee Claim must file and serve on the Liquidation Trustee and such other entities as are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than 45 days after the Effective Date; *provided, however,* that the Liquidation Trustee shall pay professionals or other entities retained pursuant to section 9.6.3 of the Plan in the ordinary course of business for any work performed on and after the Effective Date in furtherance of the Plan or as authorized hereunder. Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than 21 days after filing and service of an application for final allowance of fees and expenses.

#### 2.2.2     *Payment of Fee Claims.*

All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim, except to the extent that a Fee Claim has already been satisfied during the Chapter 11 Cases or a holder of a Fee Claim and the applicable Debtor(s) agree to less favorable treatment, shall be paid in full and in Cash, consistent with the priorities of the Bankruptcy Code, as Distributable Cash becomes

available to the Liquidation Trust, *provided*, *however,* that the Liquidation Trustee shall without any further notice to or action, order, or approval of the Bankruptcy Court, first allocate Distributable Cash to payment of Allowed Fee Claims held by Ongoing Professionals. For the avoidance of doubt, holders of Allowed Fee Claims will not receive any Distribution on the Effective Date and will only receive a Distribution as Distributable Cash becomes available to the Liquidation Trust.

### 2.3    U.S. Trustee Fees.

As soon as reasonably practicable following the Initial Distribution Date, the Liquidation Trustee shall pay, in full and in Cash, any U.S. Trustee Fees due as of the Effective Date. On and after the Effective Date, the Liquidation Trustee shall pay the applicable U.S. Trustee Fees as such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Chapter 11 Case.

## ARTICLE 3.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 3.1    Summary.

The Plan constitutes a separate plan of liquidation for each of the Debtors. The Plan does not seek to effect a substantive consolidation or other combination of the separate Estates of each Debtor, but instead provides that creditors of each Debtor will be permitted to assert their Claims only against the Debtor(s) against which they hold Allowed Claims and will receive a recovery based on the value of the related Estate(s).

### 3.2    Classification of Claims and Interests.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan, to the extent applicable, and receiving distributions pursuant to the Plan, to the extent applicable, only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released, withdrawn, or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, U.S. Trustee Fees, and Priority Tax Claims have not been classified.

| Class | Claims | Status | Voting Rights |
|-------|--------|--------|---------------|
| Class 1 | Other Priority Claims | Impaired | Entitled to Vote |
| Class 2 | Secured Claims | Impaired | Entitled to Vote |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | 510 Claims | Impaired | Presumed to Reject |

- 14 -

| Class | Claims | Status | Voting Rights |
|-------|--------|--------|---------------|
| Class 5 | Intercompany Interests | Impaired | Presumed to Reject |
| Class 6 | Non-Intercompany Interests | Impaired | Presumed to Reject |

### 3.3 Treatment of Claims and Equity Interests.

#### 3.3.1 *Class 1—Other Priority Claims.*

(a) *Classification*: Class 1 consists of the Other Priority Claims against each Debtor.

(b) *Treatment*: Except to the extent that a holder of an Allowed Other Priority Claim has already been satisfied during the Chapter 11 Cases or a holder of an Allowed Other Priority Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full and in Cash from Distributable Cash until such Claims are satisfied as required by the Bankruptcy Code. For the avoidance of doubt, holders of Allowed Other Priority Claims will not receive any Distribution on the Effective Date and will only receive a Distribution as Distributable Cash becomes available to the Liquidation Trust. Distributions to the holders of Allowed Other Priority Claims shall comply with the priorities of the Bankruptcy Code. Failure to object to confirmation by a holder of an Allowed Other Priority Claim shall be deemed to be such holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.

(c) *Voting*: Class 1 is Impaired under the Plan and the holders of Allowed Other Priority Claims are entitled to vote to accept or reject the Plan.

#### 3.3.2 *Class 2—Secured Claims.*

(a) *Classification*: Class 2 consists of the Secured Claims against each Debtor.

(b) *Treatment*: Except to the extent that a holder of an Allowed Secured Claim agrees to a less favorable treatment, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed Secured Claim shall receive one of the following treatments, determined at the option of the Debtors or the Liquidation Trustee, as applicable: (i) the Collateral securing such Allowed Secured Claim to the holder of such Claim; (ii) retention of any valid Liens on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; or (iii) such other treatment as may be agreed to by the holder of such Claim and the Debtors or the Liquidation Trustee, as applicable. For the avoidance of doubt, no holder of an Allowed Secured Claim

- 15 -

will receive any Cash unless it has a valid, unavoidable lien on such Cash and Cash is available from Distributable Cash to satisfy such Claim.

(c)     *Voting*: Class 2 is Impaired under the Plan and the holders of Allowed Secured Claims are entitled to vote to accept or reject the Plan.

### 3.3.3     *Class 3—General Unsecured Claims.*

(a)     *Classification*: Class 3 consists of the General Unsecured Claims against each Debtor.

(b)     *Treatment*: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full satisfaction, settlement, and release of, and in exchange for such Claim, each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of remaining Distributable Cash after all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Fee Claims, Allowed Other Priority Claims, and Allowed Secured Claims (to the extent such Claims are entitled to any Distributable Cash) have been satisfied as required by the Bankruptcy Code.  Each holder of an Allowed General Unsecured Claim shall receive an Avoidance Action Release.

(c)     *Voting*: Class 3 is Impaired and the holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 3.3.4     *Class 4—510 Claims.*

(a)     *Classification*: Class 4 consists of all 510 Claims.

(b)     *Treatment*: Holders of 510 Claims shall not receive any Plan Distributions on account of such Claims.

(c)     *Voting*: Class 4 is Impaired and the holders of 510 Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of 510 Claims are not entitled to vote to accept or reject the Plan.

### 3.3.5     *Class 5—Intercompany Interests.*

(a)     *Classification*: Class 5 consists of all Intercompany Interests.

(b)     *Treatment*:  On the Effective Date, all Intercompany Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no Plan Distributions to the holders of Intercompany Interests.

(c)     *Voting*: Class 5 is Impaired and the holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section

1126(g) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

### 3.3.6 Class 6—Non-Intercompany Interests.

(a) *Classification*: Class 6 consists of all Non-Intercompany Interests.

(b) *Treatment*: On the Effective Date, all Non-Intercompany Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no Plan Distributions to the holders of Non-Intercompany Interests.

(c) *Voting*: Class 6 is Impaired and the holders of Non-Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Non-Intercompany Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE 4.

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS

### 4.1 Classes Entitled To Vote.

Classes 1, 2, and 3 are Impaired and entitled to vote to accept or reject the Plan. By operation of law, Classes 4, 5 and 6 are deemed to have rejected the Plan and are not entitled to vote.

### 4.2 Tabulation of Votes on a Non-Consolidated Basis.

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and (10) of the Bankruptcy Code. Notwithstanding the foregoing, the Debtors reserve the right to seek to substantively consolidate any two or more Debtors; *provided*, *however*, that such substantive consolidation does not materially and adversely impact the amount of the Plan Distributions to any Person.

### 4.3 Acceptance by Impaired Classes.

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code, (a) the holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

### 4.4 Elimination of Vacant Classes.

To the extent applicable, any Class that does not contain any Allowed Claims, Allowed Interests, or Claims or Interests temporarily allowed for voting purposes under Bankruptcy Rule 3018 as of the date of commencement of the Confirmation Hearing, for all Debtors or with respect to any

particular Debtor, shall be deemed to have been eliminated from the Plan for all Debtors or for such particular Debtor, as applicable, for purposes of (a) voting to accept or reject the Plan and (b) determining whether such Class has accepted or rejected the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 4.5 Confirmation Pursuant to Section 1129(b) or "Cramdown."

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes. Subject to Sections 14.2 and 14.3 of the Plan, the Debtors reserve the right (i) to alter, amend, modify, revoke, or withdraw the Plan or any Plan Document to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary and (ii) to request confirmation of the Plan, as it may be modified, supplemented, or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

## ARTICLE 5.

## MEANS FOR IMPLEMENTATION

### 5.1 Corporate Existence.

5.1.1 Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan involving the corporate structure of the Debtors will be deemed authorized and approved without any requirement of further action by the Debtors, the Debtors' shareholders or members or the Debtors' boards of directors. On the Effective Date, to the extent not otherwise distributed to the holders of Allowed Claims or otherwise provided for in the Plan, each Debtor's assets will be transferred to the Liquidation Trust, which will liquidate and monetize such assets and make distributions to holders of Allowed Claims pursuant to the terms of the Plan.

5.1.2 To the extent not used in the transfer of Liquidation Trust Assets and not completed prior to the Effective Date, the Debtors (and their respective boards of directors) will dissolve as of the Effective Date, and are authorized to dissolve or terminate the existence of wholly owned non-Debtor subsidiaries following the Effective Date as well as any remaining health, welfare or benefit plans. For the avoidance of doubt, once all assets of a Debtor have been transferred to the Liquidation Trust or Reclamation Trust, as applicable, each such Debtor shall be deemed to have dissolved under applicable non-bankruptcy law without the need for any other action by such Debtor or any governmental authority.

### 5.2 Closing of the Debtors' Chapter 11 Cases.

When (i) all Disputed Claims filed against a Debtor have become Allowed Claims or have been disallowed by Final Order, (ii) all Liquidation Trust Assets that were assets of such Debtor have been liquidated and the proceeds thereof distributed in accordance with the terms of the Plan and (iii) all other actions required to be taken by the Liquidation Trustee under the Plan or the Liquidation Trust Agreement, as applicable, have been taken, the Liquidation Trustee shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules, provided; however, that the Bankruptcy Court shall retain jurisdiction over the Reclamation Trust after closing the Debtors' Chapter 11 Cases.

### 5.3 Plan Funding.

The Plan Distributions to be made in Cash under the terms of the Plan shall be funded from Distributable Cash on hand and the proceeds of Liquidation Trust Assets.

### 5.4 Settlement of Intercompany Matters.

On the Effective Date, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, each Debtor and its respective successors and assigns hereby waives and releases each other and all of its respective successors from any and all Intercompany Claims amongst and between any or all of the Debtors. Such waiver and release shall be effective as a bar to all actions, Causes of Action, suits, Claims, Liens, or demands of any kind with respect to any Intercompany Claim amongst or between any or all of the Debtors. For the avoidance of doubt, the Hoops Parties are not being released under the terms of this Plan.

### 5.5 Release of Avoidance Actions for Holders of Claims in Class 3.

On the Effective Date, in connection with the Distributions to the holders of Allowed General Unsecured Claims in accordance with section 3.2 of this Plan, the Debtors shall grant each holder of an Allowed General Unsecured Claim an Avoidance Action Release, provided that the foregoing shall not apply to the Hoops Parties, United Bank, or settlements of Avoidance Actions approved by the Bankruptcy Court during these Chapter 11 Cases.

### 5.6 Monetization of Assets.

The Liquidation Trustee shall, in an expeditious but orderly manner, monetize and convert the Liquidation Trust Assets to Cash and make timely distributions from Distributable Cash to the Liquidation Trust Beneficiaries in accordance with the Plan and the Liquidation Trust Agreement. In so doing, the Liquidation Trustee shall exercise its reasonable business judgment to maximize recoveries. The Liquidation Trustee shall have no liability to any party for the outcome of its decisions in this regard.

### 5.7 Books and Records.

Books and records for each Debtor shall be maintained by the Liquidation Trustee or Reclamation Trustee, as applicable, to the extent necessary for the administration of the Liquidation Trust and Reclamation Trust. For the avoidance of doubt, to the extent the Debtors' books and records are not necessary for the administration of the Liquidation Trust or Reclamation Trust, and except as previously ordered by the Bankruptcy Court, such books and records may be destroyed or abandoned without further order of the Bankruptcy Court as determined appropriate by the Liquidation Trustee.

### 5.8 Reporting Duties.

The Liquidation Trustee shall be responsible for filing informational returns on behalf of the Debtors and the Liquidation Trust and paying any tax liability of the Debtors and the Liquidation Trust. Additionally, the Liquidation Trustee shall file (or cause to be filed) any other statements,

returns, reports, or disclosures relating to the Debtors or the Liquidation Trust that are required by any governmental unit or applicable law.

### 5.9 Tax Obligations.

The Liquidation Trustee shall have the powers of administration regarding all of the Debtors' and the Liquidation Trust's tax obligations, including filing of returns. The Liquidation Trustee shall (i) endeavor to complete and file each Debtor's final federal, state, and local tax returns, (ii) request, if necessary, an expedited determination of any unpaid tax liability of the Debtors or their Estates under section 505(b) of the Bankruptcy Code for all taxable periods of the Debtors ending after the Petition Date through the dissolution of the Liquidation Trust as determined under applicable tax laws, and (iii) represent the interests and accounts of the Liquidation Trust or the Debtors' Estates before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.

### 5.10 Cancellation of Existing Securities and Agreements.

Except for the purpose of evidencing a right to distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all notes, stock, agreements, instruments, certificates, and other documents evidencing any Claim against or Interest in the Debtors shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be fully released.

### 5.11 Indemnification Obligations.

The Debtors shall assume and assign to the Liquidation Trust their indemnification obligations to current and former directors and officers of the Company (except for any obligations to the Hoops Parties), which shall in no way affect the rights and obligations of the insureds under the "tail" directors and officers insurance coverage purchased prior to the Effective Date.

### 5.12 Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes.

**5.12.1** The Debtors, the Liquidation Trustee, or the Reclamation Trustee subject to the terms of the Liquidation Trust Agreement or Reclamation Trust Agreement, as applicable, may take all actions to execute, deliver, file, or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant thereto. Any officer of each Debtor, the Liquidation Trustee, or the Reclamation Trustee shall be authorized to certify or attest to any of the foregoing actions.

**5.12.2** Before, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the shareholders, directors, managers, or partners of the Debtors or the need for any approvals, authorizations, actions or consents.

**5.12.3**    To the extent permitted by section 1146(a) of the Bankruptcy Code, any post-Confirmation Date transfer from a Debtor to any Person pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (a) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; (b) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest; (c) the making, assignment or recording of any lease or sublease; or (d) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment, in each case to the extent permitted by applicable law, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the transfer of the Liquidation Trust Causes of Action to the Liquidation Trust and (ii) any sale or other transfer of the Debtors' assets in connection with the orderly liquidation of such assets, as contemplated by the Plan.

### 5.13    Comprehensive Settlement of Claims and Controversies.

Pursuant to Bankruptcy Rule 9019 and in consideration for the Plan Distributions and other benefits provided in the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution on account thereof.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtors, the Estates, and their property and stakeholders; and (b) fair, equitable, and reasonable.

## ARTICLE 6.

## PROCEDURES FOR RESOLVING CLAIMS

### 6.1    Allowance of Claims.

After the Effective Date, the Liquidation Trustee shall have and retain any and all rights and defenses, including rights of setoff, that the Debtors had with respect to any Claim.  Except as expressly provided in the Plan or in any order entered in the Debtors' Chapter 11 Cases before the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed an Allowed Claim under the Plan or the Bankruptcy Code or a Final Order has been entered allowing such Claim, including, without limitation, the Confirmation Order.

**6.2    Objections to Claims.**

      **6.2.1**    After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Liquidation Trustee, shall have the exclusive authority to file objections to Claims, settle, compromise, withdraw, or litigate to judgment objections to any and all Claims. From and after the Effective Date, the Liquidation Trustee may settle or compromise any Disputed Claim without any further notice to or action, order, or approval of the Bankruptcy Court. The Liquidation Trustee shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval of the Bankruptcy Court.

      **6.2.2**    Any objections to Claims shall be served and filed on or before the later of: (a) the date that is 180 days after the Effective Date (provided that such date may be extended by up to an additional 180 days upon notice of the Liquidation Trustee without the need for any order of the Bankruptcy Court, and any further extensions thereafter upon a motion by the Liquidation Trustee for cause); and (b) such other later date as may be fixed by the Bankruptcy Court. The Debtors and the Liquidation Trustee may seek extensions of any date set forth in the Plan or established by the Bankruptcy Court for filing objections to Claims. Any Claims filed after the Bar Date or Administrative Bar Date, as applicable, shall be deemed disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Liquidation Trustee, unless the Person seeking to file such untimely Claim has received the Bankruptcy Court's authorization to do so.

**6.3    Estimation of Claims.**

      **6.3.1**    Before the Effective Date, the Debtors, and after the Effective Date, the Liquidation Trustee, may request that the Bankruptcy Court estimate any Claim, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time (including during the pendency of any appeal with respect to the allowance or disallowance of such Claims).

      **6.3.2**    In the event that the Bankruptcy Court estimates any disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the amount of such Allowed Claim or a maximum limitation on the amount of such Allowed Claim. If the estimated amount constitutes a maximum limitation on such Allowed Claim, the Debtors or the Liquidation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Plan Distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 14 days after the date on which such Claim is estimated. All of the Claims objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, resolved, or withdrawn by any mechanism approved by the Bankruptcy Court.

# ARTICLE 7.

# PROVISIONS GOVERNING DISTRIBUTIONS

**7.1** **Satisfaction of Claims.**

Unless otherwise provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete satisfaction, settlement, and release of such Allowed Claims. Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims; *provided, however,* that in no case shall the aggregate value of all property received or retained under the Plan (or from third parties) by a holder of an Allowed Claim exceed 100% of such holder's underlying Allowed Claim plus any post-petition interest on such Claim, to the extent such interest is permitted by Section 7.6 of the Plan.

**7.2** **Distributions on Account of Claims Allowed as of the Effective Date.**

Except as otherwise provided in the Plan or by Final Order, the Liquidation Trustee may, in its discretion, make initial distributions under the Plan on account of Claims that are Allowed Claims as of the Effective Date on the Initial Distribution Date. For the avoidance of doubt, the Debtors do not expect that any Distributable Cash will be available on the Effective Date to distribute to the Holders of Allowed Claims and that such distributions will be made from Distributable cash and the proceeds of the Liquidation Trust Assets following the Effective Date as Cash becomes available. All distributions made by the Liquidation Trustee shall comply with the priorities of the Bankruptcy Code, unless otherwise provided under the Plan.

**7.3** **Distributions on Account of Claims Allowed After the Effective Date.**

**7.3.1** Except as otherwise provided in the Plan or by Final Order, the Liquidation Trustee may, in its discretion, make Plan Distributions on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim. All distributions made by the Liquidation Trustee shall comply with the priorities of the Bankruptcy Code, unless otherwise provided under the Plan.

**7.3.2** Notwithstanding any other provision herein, no partial payments and no partial Plan Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. Furthermore, without a separate order of the Bankruptcy Court, no Plan Distributions shall be made to a claimant from whom property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code until such claimant has paid the amount or returned the property for which it is liable.

**7.4** **Delivery of Plan Distributions.**

**7.4.1** *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the Claims Register shall be closed and there shall be no further changes in the record holders of any Claims or Interests. The Debtors

and the Disbursing Agent shall have no obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal for all purposes under this Plan with only those holders of records as of the close of business on the Distribution Record Date. Additionally, with respect to payment of any cure amounts or any cure disputes in connection with the assumption and assignment of the Debtors' executory contracts and unexpired leases, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

### 7.4.2    *Address for Plan Distributions*.

Plan Distributions to holders of Allowed Claims shall be made by the Disbursing Agent at (a) the addresses of such holders on the books and records of the Debtors or their agent; or (b) the addresses in any written notice of address change delivered to the Debtors or the applicable Disbursing Agent, including any addresses on any filed proofs of Claim or transfers of Claim filed with the Bankruptcy Court.

### 7.4.3    *Setoffs*.

In the event that the value of a Debtor's claim, right or Cause of Action against a particular claimant is undisputed, resolved by settlement, or has been adjudicated by Final Order of any court, the Liquidation Trustee may set off such undisputed, resolved, or adjudicated amount against any Plan Distributions that would otherwise become due to such claimant. Neither the failure to effectuate such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidation Trustee of any claims, rights, or Causes of Action that the Debtors or the Liquidation Trust may possess against such claimant.

### 7.4.4    *De Minimis and Fractional Plan Distributions*.

Notwithstanding anything herein to the contrary, the Liquidation Trustee or Disbursing Agent shall not be required to make on account of any Allowed Claim (a) partial Plan Distributions or payments of fractions of dollars or (b) any Plan Distribution if the amount to be distributed is less than $50.00. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down. Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions. Notwithstanding the foregoing, all Cash shall be distributed in the final distribution of the Liquidation Trust.

### 7.4.5    *Undeliverable Plan Distributions*.

If any Plan Distribution to any holder is returned as undeliverable, no further distributions to such holder shall be made unless and until the Liquidation Trustee has been notified of the then-current address of such holder, at which time such Plan Distribution shall be made as soon as reasonably practicable thereafter without interest, dividends, or accruals of any kind; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of the later of six months from (i) the Effective Date and (ii)

the first Distribution Date after such holder's Claim first becomes an Allowed Claim. After such date, all "unclaimed property" or interests in property shall revert to the Liquidation Trust (notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and the Liquidation Trust Agreement, and the Claim of any holder to such property or interest in property shall be forever barred, estopped, and enjoined from asserting any Claim against any of the Debtors, the Estates, the Liquidation Trust, or the Liquidation Trustee. Nothing contained herein shall require the Liquidation Trustee to attempt to locate any holder of an Allowed Claim.

### 7.4.6  *Failure To Present Checks.*

Any check issued by the Liquidation Trust or the Disbursing Agent on account of an Allowed Claim shall be null and void if not negotiated within 120 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Liquidation Trust by the holder of the relevant Allowed Claim with respect to which such check originally was issued. If any holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within six months after the date the check was mailed or otherwise delivered to the holder, that Allowed Claim shall be released and the holder thereof shall be forever barred, estopped, and enjoined from asserting any Claim against any of the Debtors, the Liquidation Trust or the Liquidation Trustee. In such cases, any Cash held for payment on account of such Claims shall be property of the Liquidation Trust, free of any Claims of such holder with respect thereto, and shall be redistributed to the other holders of Allowed Claims in accordance with the Plan and Liquidation Trust Agreement.

### 7.5  **Claims Paid or Payable by Third Parties.**

### 7.5.1  *Claims Paid by Third Parties.*

To the extent the holder of a Claim receives payment on account of such Claim from a party that is not a Debtor or the Liquidation Trust, the Liquidation Trustee shall reduce the Claim (in full or to the extent of payment by the third party), and such Claim shall be disallowed to the extent of payment from such third party without an objection to such Claim having to be filed and without further notice to, action, order or approval of the Bankruptcy Court. Further, to the extent a holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Liquidation Trust on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the Liquidation Trustee, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Plan Distribution. The failure of such holder to timely repay or return such Plan Distribution shall result in such holder owing the Liquidation Trust annualized interest at the federal judgment rate on such amount owed for each Business Day after the 14-day grace period specified above until such amount is repaid.

### 7.5.2  *Claims Payable by Insurance.*

Holders of Claims that are covered by the Debtors' insurance policies shall seek payment of such Claims from applicable insurance policies, provided that the Debtors and the Liquidation Trust, as applicable, shall have no obligation to pay any amounts in respect of pre-petition deductibles or

self-insured retention amounts. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the Debtors or the Liquidation Trustee, as applicable, may direct the Claims Agent to expunge the applicable portion of such Claim from the Claims Register without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.5.3 *Applicability of Insurance Policies.*

Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except as otherwise, released, enjoined, or exculpated under Article 12 of this Plan against the Released Parties and the Exculpated Parties, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Liquidation Trust, or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 7.6 No Post-Petition Interest on Claims.

Other than as specifically provided in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, post-petition interest shall not accrue or be paid on any pre-petition Claim, and no holder of a pre-petition Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

## ARTICLE 8.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1 Assumption of Executory Contracts and Unexpired Leases.

On the Effective Date, the Debtors shall assume only the Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Contracts and Leases. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in this Section 8.1 pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of such Executory Contract or Unexpired Lease, including objecting to the proposed cure amount related thereto, will be deemed to have consented to such assumption and agreed to the specified cure amount.

### 8.2 Rejection of Executory Contracts and Unexpired Leases.

### 8.2.1 Each Executory Contract and Unexpired Lease shall be deemed automatically rejected in accordance with the provisions of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (a) is listed on the Schedule of Assumed Contracts and Leases or (b) has already been

assumed pursuant to an order of the Bankruptcy Court or is otherwise assumed pursuant to the terms herein; *provided, however*, that any Executory Contracts or Unexpired Leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as provided in the Final Order resolving such motion. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Section 8.2 pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. The Debtors reserve the right to amend the Schedule of Assumed Contracts and Leases at any time before the Effective Date.

**8.2.2**     Non-Debtor parties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including Claims under section 503 of the Bankruptcy Code; *provided* that such Claims must be filed in accordance with the procedures set forth in Section 8.3 of the Plan.

**8.3**     **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

**8.3.1**     All Claims arising from the rejection of Executory Contracts or Unexpired Leases must be filed with the Claims Agent according to the procedures established for the filing of proof of claim or before the later of (i) the applicable Bar Date and (ii) 30 days after the entry of the order approving the rejection of such Executory Contract or Unexpired Lease. All Claims arising from the rejection of Executory Contracts or Unexpired Leases that are evidenced by a timely filed proof of claim, will be treated as General Unsecured Claims. Upon receipt of the Plan Distribution provided in Section 3.3.3 of the Plan, all such Claims shall be satisfied, settled, and released as of the Effective Date, and shall not be enforceable against the Debtors, the Estates, the Liquidation Trust, or their respective properties or interests in property.

**8.3.2**     Any Person that is required to file a proof of claim arising from the rejection of an Executory Contract or Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Estates, the Liquidation Trust, or their respective properties or interests in property, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.

**8.4**     **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

**8.4.1**     Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contract or Unexpired Lease may agree. In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Liquidation Trustee or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

**8.4.2** No later than 14 days prior to the commencement of the Confirmation Hearing, the Debtors shall file a schedule setting forth the proposed cure amount, if any, for each Executory Contract and Unexpired Lease to be assumed pursuant to Section 8.1 of the Plan, and serve such schedule on each applicable counterparty, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to the proposed assumption of an Executory Contract or Unexpired Lease or related cure amount must be filed, served and actually received by the Debtors at least ten days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or cure amount will be deemed to have consented to such assumption and agreed to the specified cure amount.

## ARTICLE 9.

## LIQUIDATION TRUST

### 9.1 Generally.

On the Effective Date, the Liquidation Trust shall be established and become effective for the benefit of Liquidation Trust Beneficiaries. The powers, authority, responsibilities, and duties of the Liquidation Trust and the Liquidation Trustee are set forth in and shall be governed by the Plan and the Liquidation Trust Agreement. In the event of any conflict between the terms of this Agreement and the Plan, the Plan shall control. The Liquidation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Liquidation Trust as a grantor trust and the Liquidation Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes. The Debtors shall transfer, without recourse, to the Liquidation Trust all of their right, title, and interest in the Liquidation Trust Assets. Upon the transfer by the Debtors of the Liquidation Trust Assets to the Liquidation Trust, the Debtors will have no reversionary or further interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust.

### 9.2 Purposes and Establishment of the Liquidation Trust.

**9.2.1** On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purposes of liquidating and administering the Liquidation Trust Assets and making distributions on account thereof as provided for under the Plan. The Liquidation Trust is intended to qualify as a liquidation trust pursuant to Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidation Trust. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement.

**9.2.2** On the Effective Date, the Liquidation Trustee, on behalf of the Debtors, shall execute the Liquidation Trust Agreement and shall take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement and consistent with the Plan.

- 28 -

**9.3** **Liquidation Trust Assets.**

**9.3.1** On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code and pursuant to the terms of the Plan, all right, title and interest in all of the Liquidation Trust Assets, as well as the rights and powers of each Debtor in such Liquidation Trust Assets, shall automatically vest in the Liquidation Trust, free and clear of all Claims and Interests for the benefit of the Liquidation Trust Beneficiaries. Upon the transfer of the Liquidation Trust Assets, the Debtors shall have no interest in or with respect to the Liquidation Trust Assets or the Liquidation Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidation Trust Assets to the Liquidation Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidation Trust shall vest in the Liquidation Trust and its representatives, and the Debtors and the Liquidation Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Liquidation Trustee shall agree to accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, subject to the terms of the Plan and the Liquidation Trust Agreement.

**9.3.2** The Debtors, the Liquidation Trustee, the Liquidation Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidation Trust Assets to be transferred to the Liquidation Trust.

**9.4** **Valuation of Assets.**

**9.4.1** As soon as practicable after the establishment of the Liquidation Trust, the Liquidation Trustee shall, in good faith and using reasonable efforts, determine the value of the assets transferred to the Liquidation Trust, and the Liquidation Trustee shall apprise, in writing, the Liquidation Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Liquidation Trustee and Liquidation Trust Beneficiaries) for all federal income tax purposes.

**9.4.2** In connection with the preparation of the valuation contemplated by the Plan and the Liquidation Trust Agreement, the Liquidation Trust shall be entitled to retain such professionals and advisors as the Liquidation Trust shall determine to be appropriate or necessary, and the Liquidation Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary. The Liquidation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

**9.5** **Appointment of the Liquidation Trustee.**

On the Effective Date and in compliance with the provisions of the Plan and the Liquidation Trust Agreement, the Debtors shall appoint a person or firm as Liquidation Trustee. The salient terms

of the Liquidation Trustee's employment, including the Liquidation Trustee's duties and compensation, to the extent not set forth in the Plan, shall be set forth in the Liquidation Trust Agreement or the Confirmation Order.

### 9.6 Duties and Powers of the Liquidation Trustee.

#### 9.6.1 *Authority*.

The duties and powers of the Liquidation Trustee shall include all powers necessary to implement the Plan with respect to all Debtors and pursue the Liquidation Trust Causes of Action, including the Litigation Proceedings, and monetize, sell, transfer, liquidate and transact with respect to all other Liquidation Trust Assets, including, without limitation, the duties and powers listed herein. The Liquidation Trustee will administer the Liquidation Trust in accordance with the Liquidation Trust Agreement. The Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely Plan Distributions, and not unduly prolong the duration of the Liquidation Trust.

#### 9.6.2 *Claims and Causes of Action*.

The Liquidation Trustee may object to, seek to estimate, seek to subordinate, compromise, or settle any and all Claims against the Debtors and Causes of Action of the Debtors that have not already been deemed Allowed Claims as of the Effective Date. The Liquidation Trustee shall have the absolute right to pursue or not to pursue any and all Liquidation Trust Assets as it determines in the best interests of the Liquidation Trust Beneficiaries, and consistent with the purposes of the Liquidation Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct or gross negligence. Liquidation Trust Causes of Action may only be prosecuted or settled by the Liquidation Trustee, in its sole discretion. The Liquidation Trust Causes of Action will be transferred to the Liquidation Trust on the Effective Date.

#### 9.6.3 *Retention of Professionals*.

The Liquidation Trustee may enter into employment agreements and retain professionals to pursue the Liquidation Trust Causes of Action and otherwise advise the Liquidation Trustee and provide services to the Liquidation Trust in connection with the matters contemplated by the Plan, the Confirmation Order, and the Liquidation Trust Agreement without further order of the Bankruptcy Court. Unless an alternative fee arrangement has been agreed to (either by order of the Bankruptcy Court or with the consent of the Liquidation Trustee), professionals retained by the Liquidation Trustee shall be compensated from the proceeds of the Liquidation Trust Assets.

#### 9.6.4 *Distributions; Withholding*.

As described in article 7 herein, the Liquidation Trustee shall make distributions to the Liquidation Trust Beneficiaries in accordance with the terms of the Liquidation Trust Agreement and the Plan, and consistent with the priorities of the Bankruptcy Code, unless otherwise provided under the Plan. The expenses of the Liquidation Trustee will be given priority over distributions to the Liquidation Trust Beneficiaries.

The Liquidation Trustee may withhold from amounts otherwise distributable to any entity any and all amounts, determined in the Liquidation Trustee's sole discretion, required by the Liquidation Trust Agreement, any law, regulation, rule, ruling, directive, treaty, or other governmental requirement. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution. The Liquidation Trustee or the Disbursing Agent, as applicable, may require, as a condition to the receipt of a Plan Distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within 180 days, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 7.4.5 herein. Further, the Allowed Claim of any such holder shall be deemed released and the holder thereof shall be forever barred, estopped, and enjoined from asserting any Claim against any of the Debtors, the Liquidation Trust or the Liquidation Trustee.

### 9.6.5 *Reasonable Fees and Expenses*.

The Liquidation Trustee may incur and pay any reasonable and necessary expenses in connection with the performance of its duties under the Plan, including in connection with retaining professionals and/or entering into agreements pursuant to Sections 9.6.3 and 9.6.9 hereof. The Liquidation Trustee shall be paid from the proceeds of the Liquidation Trust Assets.

### 9.6.6 *Investment Powers*.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust shall be limited to the right and power to invest in such assets only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended; *provided, however,* that (a) the scope of any such permissible investments shall be further limited to include only those investments that a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) may be permitted to hold and (b) the Liquidation Trustee may expend the Liquidation Trust Assets (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Liquidation Trust Assets during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidation Trust or reasonable fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Liquidation Trust (or to which the Liquidation Trust Assets are otherwise subject) in accordance with the Plan or the Liquidation Trust Agreement.

### 9.6.7 *Liquidation Trustee's Tax Power for Debtors*.

As described in Section 5.9 of the Plan, following the Effective Date, the Liquidation Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns required to be filed or that the Liquidation Trustee otherwise deems appropriate. In the event that the Liquidation Trust shall fail or cease to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), the Liquidation Trustee shall take any and all necessary actions as it shall deem appropriate to have the Liquidation Trust classified as a partnership for federal tax purposes under Treasury Regulation section 301.7701-3, including, if necessary, creating or

converting the Liquidation Trust into a Delaware limited liability partnership or limited liability company that is so classified.

### 9.6.8 *Insurance*.

The Liquidation Trustee will maintain customary insurance coverage for the protection of the Liquidation Trustee on and after the Effective Date.

### 9.6.9 *Agreements and Other Actions*.

The Liquidation Trustee may enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Debtors' and Liquidation Trust's obligations thereunder. The Liquidation Trustee may take all other actions not inconsistent with the provisions of the Plan and the Liquidation Trust Agreement that the Liquidation Trustee deems reasonably necessary or desirable with respect to administering the Plan.

### 9.7 **Funding of the Liquidation Trust.**

On the Effective Date, the Liquidation Trust Reserve shall be transferred to, and vest in, the Liquidation Trust for purposes of funding the Liquidation Trust. Thereafter, the terms of the Liquidation Trust Agreement shall govern the funding of the Liquidation Trust.

### 9.8 **Exculpation; Indemnification.**

The Liquidation Trustee, the Liquidation Trust, the professionals of the Liquidation Trust, and their representatives will be exculpated and indemnified pursuant to the terms of the Liquidation Trust Agreement. The indemnification described in the Liquidation Trust Agreement will exclude fraud, willful misconduct, and gross negligence. Any indemnification claim of the Liquidation Trustee or the other individuals entitled to indemnification under this subsection shall be satisfied solely from the Liquidation Trust Assets and shall be entitled to a priority distribution therefrom, ahead of any other claim to or interest in such assets. The Liquidation Trustee and its representatives shall be entitled to rely, in good faith, on the advice of their retained professionals.

### 9.9 **Federal Income Tax Treatment of Liquidation Trust.**

9.9.1 Pursuant to Revenue Procedure 94-45, for all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date as (i) a transfer of the Liquidation Trust Assets (subject to any obligations relating to those assets) directly to the Liquidation Trust Beneficiaries, in exchange for those Liquidation Trust Beneficiaries relinquishing their claims, followed by (ii) the transfer by the Liquidation Trust Beneficiaries to the Liquidation Trust of the Liquidation Trust Assets (other than the Liquidation Trust Assets allocable to any disputed ownership fund) in exchange for interests in Liquidation Trust. Accordingly, the Liquidation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidation Trust Assets (other than such Liquidation Trust Assets as are allocable to any disputed

ownership fund). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

**9.9.2** Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee may (A) timely elect to treat any Disputed Claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidation Trustee, the Debtors and the Liquidation Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

**9.10    Tax Reporting.**

**9.10.1** The Liquidation Trustee shall file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 9.10. The Liquidation Trustee also will annually send to each Liquidation Trust Beneficiary a separate statement setting forth the Liquidation Trust Beneficiary's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Liquidation Trust) as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Liquidation Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidation Trust that is required by any governmental unit.

**9.10.2** The valuation of the Liquidation Trust Assets prepared pursuant to Section 9.4 of the Plan shall be used consistently by all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) for all federal income tax purposes.

**9.10.4** The Liquidation Trustee shall be responsible for payment, out of the Liquidation Trust Assets, of any taxes imposed on the Liquidation Trust or the Liquidation Trust Assets, including any disputed ownership fund. In the event, and to the extent, any Cash retained on account of Disputed Claims in a disputed ownership fund is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such Taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims or (ii) to the extent that such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidation Trustee as a result of the resolution of such Disputed Claims.

**9.10.5** The Liquidation Trustee may request an expedited determination of Taxes of the Liquidation Trust, including the Disputed Claims Reserve, or the Plan Debtors under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Liquidation Trust or the Plan Debtors for all taxable periods through the dissolution of the Liquidation Trust.

### 9.11 Tax Withholdings by Liquidation Trustee.

The Liquidation Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the Liquidation Trust Beneficiaries. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Liquidation Trust Beneficiaries for all purposes of the Liquidation Trust Agreement. The Liquidation Trustee shall be authorized to collect such tax information from the Liquidation Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and the Liquidation Trust Agreement. In order to receive distributions under the Plan, all Liquidation Trust Beneficiaries will need to identify themselves to the Liquidation Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidation Trustee deems appropriate. This identification requirement may, in certain cases, extend to holders who hold their securities in street name. The Liquidation Trustee may refuse to make a distribution to any Liquidation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a Liquidation Trust Beneficiary, the Liquidation Trustee shall make such distribution to which the Liquidation Trust Beneficiary is entitled, without interest; and, *provided*, *further*, that, if the Liquidation Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidation Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidation Trustee for such liability.

### 9.12 Dissolution.

The Liquidation Trust shall be dissolved at such time as (i) all of the Liquidation Trust Assets have been distributed pursuant to the Plan and the Liquidation Trust Agreement, (ii) the Liquidation Trustee determines that the administration of any remaining Liquidation Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (iii) all distributions required to be made by the Liquidation Trustee under the Plan and the Liquidation Trust Agreement have been made; *provided*, *however*, that in no event shall the Liquidation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court determines that a fixed period extension (not to exceed two years, including any prior extensions) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets. If at any time the Liquidation Trustee determines, in reliance upon such professionals as the Liquidation Trustee may retain, that the expense of administering the Liquidation Trust so as to make a final distribution to the Liquidation Trust Beneficiaries is likely to exceed the value of the remaining Liquidation Trust Assets, the Liquidation Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidation Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation" as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Liquidation Trust, and any insider of the Liquidation Trustee, and (iii) dissolve the Liquidation Trust.

- 34 -

# ARTICLE 10.

# RECLAMATION TRUST

## 10.1    Generally.

On the Effective Date, the Reclamation Trust shall be established and become effective for the benefit of Reclamation Trust Beneficiaries.  The powers, authority, responsibilities, and duties of the Reclamation Trust and the Reclamation Trustee are set forth in and shall be governed by the Plan and the Reclamation Trust Agreement.  In the event of any conflict between the terms of this Reclamation Trust Agreement and the Plan, the Plan shall control.  The Reclamation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances.  The Debtors shall transfer, without recourse, to the Reclamation Trust all of their right, title, and interest in the Reclamation Trust Assets.  Upon the transfer by the Debtors of the Reclamation Trust Assets to the Reclamation Trust, the Debtors will have no reversionary or further interest in or with respect to the Reclamation Trust Assets or the Reclamation Trust.

## 10.2    Purposes and Establishment of the Reclamation Trust.

**10.2.1**    On the Effective Date, the Reclamation Trust shall be established pursuant to the Reclamation Trust Agreement for the exclusive purpose of:  (i) acting as a successor to the Debtors solely for the purpose of performing, managing, and funding satisfaction of the Reclamation Obligations; (ii) own the Reclamation Trust Assets, in a fiduciary capacity; (iii) carry out administrative functions related to reclamation and remediation of the Permitted Areas by the Reclamation Trust and other administrative functions as set forth herein; and (iv) ultimately sell or transfer all or part of the Reclamation Trust Assets, if possible.  The Reclamation Trust is intended to qualify as a qualified settlement fund (for which no grantor trust election has been made) pursuant to the Treasury Regulations under section 468B of the Tax Code and related Treasury Regulations, with no objective to continue or engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Reclamation Trust.  The Reclamation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Reclamation Trust Agreement.

**10.2.2**    On the Effective Date, the Reclamation Trustee, on behalf of the Debtors, shall execute the Reclamation Trust Agreement and shall take all other steps necessary to establish the Reclamation Trust pursuant to the Reclamation Trust Agreement and consistent with the Plan.

**10.2.3**    The Reclamation Trust will not have nor be granted any claims against the Debtors or the Liquidation Trust.  Any payments or distributions made by the Liquidation Trust in respect of any Allowed Claim asserted against the Debtors by the Impacted States or other governmental entities for the cost of completing reclamation of any of the Permitted Areas in excess of the bonded amounts shall be transferred by the Impacted States or other governmental entities to the Reclamation Trust.

### 10.3    Reclamation Trust Assets.

10.3.1    On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code and pursuant to the terms of the Plan, all right, title and interest in all of the Reclamation Trust Assets, as well as the rights and powers of each Debtor in such Reclamation Trust Assets, shall automatically vest in the Reclamation Trust, for the benefit of the Reclamation Trust Beneficiaries.  Upon the transfer of the Reclamation Trust Assets, the Debtors shall have no interest, and shall have no further liability or responsibility of any kind, in or with respect to the Reclamation Trust Assets or the Reclamation Trust.  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Reclamation Trust Assets to the Reclamation Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.  In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Reclamation Trust shall vest in the Reclamation Trust and its representatives, and the Debtors and the Reclamation Trustee are directed to take all necessary actions to effectuate the transfer of such privileges.  The Reclamation Trustee shall agree to accept and hold the Reclamation Trust Assets in the Reclamation Trust for the benefit of the Reclamation Trust Beneficiaries, subject to the terms of the Plan and the Reclamation Trust Agreement, and take all necessary steps to satisfy the Reclamation Obligations.

10.3.2    The Debtors, the Reclamation Trustee, the Reclamation Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Reclamation Trust Assets to be transferred to the Reclamation Trust.

### 10.4    Appointment of the Reclamation Trustee.

On the Effective Date and in compliance with the provisions of the Plan and the Reclamation Trust Agreement, the Debtors in consultation with the Sureties and Impacted States shall appoint a person or firm as Reclamation Trustee.  The salient terms of the Reclamation Trustee's employment, including the Reclamation Trustee's duties and compensation, to the extent not set forth in the Plan Supplement, shall be set forth in the Reclamation Trust Agreement or the Confirmation Order.

### 10.5    Duties and Powers of the Reclamation Trustee.

10.5.1    *Authority*.

The duties and powers of the Reclamation Trustee shall include all powers necessary to (a) implement the provisions of the Plan and Reclamation Trust Agreement with respect to the Reclamation Obligations, (b) transfer, liquidate and transact with respect to all Reclamation Trust Assets, and (c) fund the remediation activities necessary to fulfill the Reclamation Obligations, as necessary.  The Reclamation Trustee will administer the Reclamation Trust in accordance with the Reclamation Trust Agreement.  The Reclamation Trustee shall, in an expeditious but orderly

manner, liquidate or transfer the Reclamation Trust Assets, make timely reclamation and remediation efforts, and not unduly prolong the duration of the Reclamation Trust.

### 10.5.2 *Retention of Professionals.*

The Reclamation Trustee may enter into employment agreements and retain professionals to advise the Reclamation Trustee and provide services to the Reclamation Trust in connection with the matters contemplated by the Plan, the Confirmation Order, and the Reclamation Trust Agreement without further order of the Bankruptcy Court. Unless an alternative fee arrangement has been agreed to (either by order of the Bankruptcy Court or with the consent of the Reclamation Trustee), professionals retained by the Reclamation Trustee shall be compensated from the proceeds of the Reclamation Trust Assets.

### 10.5.3 *Reasonable Fees and Expenses.*

The Reclamation Trustee may incur and pay any reasonable and necessary expenses in connection with the performance of its duties under the Plan, including in connection with retaining professionals and/or entering into agreements pursuant to Sections 10.5.2 and 10.5.6 hereof. The Reclamation Trustee shall be paid from the proceeds of the Reclamation Trust Assets.

### 10.5.4 *Investment Powers.*

The right and power of the Reclamation Trustee to invest the Reclamation Trust Assets, the proceeds thereof, or any income earned by the Reclamation Trust shall be limited to the right and power to invest in such assets only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act of 1940, as amended; *provided, however,* that (a) the scope of any such permissible investments shall be further limited to include only those investments that a qualified settlement fund (for which no grantor trust election has been made) pursuant to the Treasury Regulations under section 468B of the Tax Code and related Treasury Regulations may be permitted to hold, and (b) the Reclamation Trustee may expend the Reclamation Trust Assets (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Reclamation Trust Assets during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Reclamation Trust or reasonable fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Reclamation Trust (or to which the Reclamation Trust Assets are otherwise subject) in accordance with the Plan or the Reclamation Trust Agreement.

### 10.5.5 *Insurance.*

The Reclamation Trustee will maintain customary insurance coverage for the protection of the Reclamation Trustee on and after the Effective Date.

### 10.5.6 *Agreements and Other Actions.*

The Reclamation Trustee may enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Debtors' and Reclamation Trust's obligations thereunder. The Reclamation Trustee may take all other actions not inconsistent with the

provisions of the Plan and the Reclamation Trust Agreement that the Reclamation Trustee deems reasonably necessary or desirable with respect to administering the Plan.

### 10.6 Funding of the Reclamation Trust.

On the Effective Date, the Reclamation Trust Reserve shall be transferred to, and vest in, the Reclamation Trust for purposes of funding the Reclamation Trust. Thereafter, the terms of the Reclamation Trust Agreement shall govern the funding of the Reclamation Trust.

### 10.7 Exculpation; Indemnification.

The Reclamation Trustee, the Reclamation Trust, the professionals of the Reclamation Trust, and their representatives will be exculpated and indemnified pursuant to the terms of the Reclamation Trust Agreement. The indemnification described in the Reclamation Trust Agreement will exclude willful misconduct and gross negligence. Any indemnification claim of the Reclamation Trustee or the other individuals entitled to indemnification under this subsection shall be satisfied solely from the Reclamation Trust Assets and shall be entitled to a priority, ahead of any other claim to or interest in such assets. The Reclamation Trustee and its representatives shall be entitled to rely, in good faith, on the advice of their retained professionals.

### 10.8 Federal Income Tax Treatment of Reclamation Trust.

The Reclamation Trust is intended to be treated as a qualified settlement fund (for which no grantor trust election has been made) pursuant to Treasury Regulations under section 468B of the Tax Code and related Treasury Regulations for federal income tax purposes, and to the extent provided by law, the Reclamation Trust Agreement shall be governed and construed in all respects consistent with such intent. In no event shall the Reclamation Trustee take the position that any portion of the Reclamation Trust or any portion of the Reclamation Trust Assets is a grantor trust owned by any or all of the Debtors.

### 10.9 Tax Reporting.

The Reclamation Trustee shall be the "administrator," within the meaning of Treasury Regulation Section 1.468B-2(k)(3), of the Reclamation Trust. Subject to definitive guidance from the Internal Revenue Service or a judicial decision to the contrary, the Reclamation Trustee shall file tax returns and pay applicable taxes with respect to the Reclamation Trust in a manner consistent with the provisions of Treasury Regulation Section 1.468B-2. All such taxes shall be paid from the Reclamation Trust Assets.

### 10.10 Tax Withholdings by Reclamation Trustee.

The Reclamation Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any distribution from the Reclamation Trust. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed for purposes of the Reclamation Trust Agreement.

### 10.11 Dissolution.

The Reclamation Trust shall be dissolved at such time as (i) all of the Reclamation Trust Assets have been either liquidated, sold or transferred, and/or (ii) the Reclamation Obligations have been satisfied pursuant to the Plan and the Reclamation Trust Agreement; *provided*, *however*, that in no event shall the Reclamation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court determines that a fixed period extension (not to exceed two years, including any prior extensions) is necessary to facilitate or complete the purposes of the Reclamation Trust. To the extent any Cash or other funds remain in the Reclamation Trust at dissolution, such funds shall be distributed to the Sureties on a *pro rata* basis consistent with each Surety's initial contribution to the Reclamation Trust Reserve.

## ARTICLE 11.

## CONDITIONS PRECEDENT TO
## CONSUMMATION OF THE PLAN

### 11.1 Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived by the Debtors pursuant to the provisions of Section 11.2 of the Plan:

**11.1.1** The Confirmation Order shall have been entered, become a Final Order, and remain in full force and effect;

**11.1.2** The Plan Documents, including the Plan Supplement, shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein shall have been satisfied or waived pursuant to the terms of such documents or agreements;

**11.1.3** All material governmental, regulatory, and third-party approvals, authorizations, certifications, rulings, no-action letters, opinions, waivers and consents required in connection with the Plan, if any, shall have been obtained and remain in full force and effect, and there shall exist no Claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the consummation of the Plan;

**11.1.4** The Liquidation Trust shall be established and funded and the Liquidation Trustee shall have been appointed in accordance with the provisions of the Plan and the terms of the Liquidation Trust Agreement; and

**11.1.5** The Reclamation Trust shall be established and the Reclamation Trustee shall have been appointed in accordance with the provisions of the Plan and the terms of the Reclamation Trust Agreement.

**11.2    Satisfaction and Waiver of Conditions Precedent.**

Except as otherwise provided in the Plan, any actions taken on the Effective Date shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  Any of the conditions set forth in Section 11.1 hereof may be waived in whole or part by the Debtors and the Consultation Parties without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

**11.3    Effect of Non-Occurrence of Conditions to the Effective Date.**

Unless the Court rules otherwise, if the Effective Date does not occur on or before 60 days after entry of the Confirmation Order, (i) the Confirmation Order shall be vacated, (ii) no Plan Distributions shall be made, (iii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, (iv) the Debtors' obligations with respect to Claims and Interests shall remain unchanged, and (v) the Plan shall be null and void in all respects.  If the Confirmation Order is vacated pursuant to this Section 11.3, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Person with respect to any matter set forth in the Plan.

# ARTICLE 12.

## EFFECT OF CONFIRMATION

**12.1    Binding Effect.**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

**12.2    Term of Pre-Confirmation Injunctions or Stays.**

Unless otherwise provided in the Plan, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**12.3    Debtor Release.**

**12.3.1    Upon the Effective Date of the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, pursuant to section 1123(b) of the Bankruptcy Code and to the fullest extent permitted by applicable law, the Debtors, their Estates and any Person (including the Liquidation Trustee and the Reclamation Trustee) seeking to exercise the rights of the Debtors or the Debtors' Estates, including, without**

- 40 -

limitation, the Committee, any successor to the Debtors or the Debtors' Estates or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (an "Estate Representative") shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and waived the Released Parties from any and all Claims, Interests, obligations, rights, suits, judgments, damages, demands, debts, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, their Estates or any Person (including the Liquidation Trustee and Reclamation Trustee) seeking to exercise the rights of the Debtors or the Debtors' Estates, including without limitation, the Committee and an Estate Representative, would have been entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Documents, and related agreements, settlements, instruments, or other documents, arising from or related to any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the Debtor Release does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

12.3.2    Upon the Effective Date of the Plan, in connection with the Distributions to the holders of Allowed General Unsecured Claims in accordance with section 3.2 of this Plan, the Debtors, their Estates, and any Person (including the Liquidation Trustee, the Reclamation Trustee, and any Estate Representative) shall grant each holder of an Allowed General Unsecured Claim an Avoidance Action Release.

12.3.3    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article XII, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release and Avoidance Action Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties or the holders of Allowed General Unsecured Claims, as applicable; (2) a good-faith settlement and compromise of such claims; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release or Avoidance Action Release.

**12.4    Third-Party Release.**

**12.4.1    As of the Effective Date,** to the fullest extent permitted by applicable law, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and waived the Liquidation Trust, the Reclamation Trust, and all Released Parties from any and all Claims, Interests, obligations, rights, suits, judgments, damages, demands, debts, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereinafter arising, in law, equity, or otherwise, that such Person would have been entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Documents, and related agreements, settlements, instruments, or other documents, arising from or related to any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud or willful misconduct.  Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release any post-Effective Date obligations of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any indemnification, exculpation, insurance or advancement of expenses obligations, reimbursement of expenses obligations, obligations arising from the ownership of equity or debt securities or other Interests in the Debtors, or any wages, overtime, bonus or employee benefit (including health, welfare, or retirement benefits) obligations owed to any Releasing Party.

**12.4.2    Entry of the Confirmation Order** shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of the claims released by the Third-Party Release; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

**12.5    Exculpation and Limitation of Liability.**

Except as otherwise specifically provided in the Plan and to the extent not prohibited by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, Cause of Action, or liability for any Exculpated Claim; *provided, however*, that the foregoing exculpation shall have no effect on the liability of any Person that results from any such act or omission that is

determined in a Final Order to have constituted gross negligence or willful misconduct; *provided, further*, that in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties (and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys) have complied with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan and the Plan Distributions and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Plan Distributions.

**12.6    Injunction Related to Releases and Exculpation.**

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, or Confirmation Order, all entities who have held, hold, or may hold Claims against or Interests in the Debtors are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, their Estates, the Liquidation Trust, the Disbursing Agent, the Reclamation Trust, the Released Parties, or the Exculpated Parties on account of any such Claims or Interests including, but not limited to: (1) commencing or continuing in any manner any action or other proceeding of any kind; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (3) creating, perfecting, or enforcing any encumbrance of any kind; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors' Estates, the Liquidation Trust, or the Reclamation Trust, notwithstanding an indication in a proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; (5) commencing or continuing in any manner any action or other proceeding of any kind that does not comply with or is inconsistent with the Plan, including any right of action against an Exculpated Party for any Exculpated Claim, obligation, Cause of Action, or liability for any Exculpated Claim; and (6) taking any actions to interfere with the implementation or consummation of the Plan; provided, however, that nothing herein shall preclude any entity from exercising rights pursuant to and consistent with the terms of the Plan or the Confirmation Order.

## ARTICLE 13.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum legally permissible jurisdiction over all matters arising out of, and related to the Chapter 11 Cases or the Plan pursuant to, and for purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, jurisdiction to:

**13.1.1**    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim, the resolution of any and all

objections to the allowance or priority of any Claims and the resolution of any and all issues related to the release of Liens upon payment of a secured Claim;

        **13.1.2**    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

        **13.1.3**    determine any and all disputes among creditors with respect to the priority, amount or secured or unsecured status of their Claims;

        **13.1.4**    resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to adjudicate and, if necessary, liquidate any Claims arising therefrom; (b) any potential contractual obligation under any assumed Executory Contract or Unexpired Lease; and (c) any dispute regarding whether a contract or lease is or was an Executory Contract or Unexpired Lease, as applicable;

        **13.1.5**    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

        **13.1.6**    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

        **13.1.7**    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or Disclosure Statement;

        **13.1.8**    resolve any cases, Claims, controversies, suits, disputes, or causes of action that may arise in connection with the occurrence of the Effective Date, confirmation, interpretation, implementation or enforcement of the Plan or the extent of any entity's obligations incurred in connection with or released under the Plan;

        **13.1.9**    hear and determine all Causes of Action that are pending as of the date hereof or that may be commenced in the future, including, but not limited to, the Liquidation Trust Causes of Action, and the litigation discussed in sections 5.19 and 5.21 of the Disclosure Statement;

        **13.1.10**    issue and enforce injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the Effective Date or the consummation, implementation or enforcement of the Plan, except as otherwise provided in the Plan;

        **13.1.11**    resolve any ambiguities between the Liquidation Trust Agreement and the Plan;

        **13.1.12**    resolve any ambiguities between the Reclamation Trust Agreement and the Plan;

**13.1.13** enforce the terms of the Liquidation Trust Agreement and to decide any claims or disputes that may arise or result from, or be connected with, the Liquidation Trust Agreement, any breach or default under the Liquidation Trust Agreement or the transactions contemplated by the Liquidation Trust Agreement;

**13.1.14** enforce the terms of the Reclamation Trust Agreement and to decide any claims or disputes that may arise or result from, or be connected with, the Reclamation Trust Agreement, any breach or default under the Reclamation Trust Agreement or the transactions contemplated by the Reclamation Trust Agreement;

**13.1.15** resolve any matters related to the Liquidation Trust;

**13.1.16** resolve any matters related to the Reclamation Trust;

**13.1.17** resolve any Disputed Claims;

**13.1.18** resolve any cases, controversies, suits, or disputes with respect to the releases, exculpations, and other provisions contained in article 12 of the Plan and enter such orders as may be necessary or appropriate to implement or enforce all such releases, exculpations, and other provisions;

**13.1.19** recover all assets of the Debtors and property of the Debtors' Estates wherever located;

**13.1.20** hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

**13.1.21** consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including, without limitation, the Confirmation Order;

**13.1.22** enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

**13.1.23** resolve any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

**13.1.24** adjudicate any and all disputes arising from or relating to Plan Distributions;

**13.1.25** determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code, including requests by Professional Persons for payment of accrued professional compensation;

**13.1.26** enforce all orders previously entered by the Bankruptcy Court;

    **13.1.27** hear any other matter not inconsistent with the Bankruptcy Code or related statutory provisions setting forth the jurisdiction of the Bankruptcy Court; and

    **13.1.28** enter a final decree closing the Chapter 11 Cases.

# ARTICLE 14.

## MISCELLANEOUS PROVISIONS

   **14.1** **Dissolution of Committee.**

The Committee shall be automatically dissolved on the Effective Date and, on the Effective Date, each member of the Committee (including each officer, director, employee, agent, consultant, or representative thereof) and each Professional Person retained by the Committee shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to the Debtors and the Chapter 11 Cases; *provided, however,* that the foregoing shall not apply to any matters concerning any Fee Claims held or asserted by any Professional Persons retained by the Committee.

   **14.2** **Modification of Plan.**

The Debtors reserve the right in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, or supplement the Plan before the entry of the Confirmation Order.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, the Liquidation Trustee, or the Reclamation Trustee, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  Subject to the foregoing, a holder of a Claim that had accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

   **14.3** **Revocation or Withdrawal of Plan.**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan in accordance with the preceding sentence prior to the Confirmation Date as to any or all of the Debtors, or if confirmation or the Effective Date does not occur with respect to one or more of the Debtors, then, with respect to such Debtors:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor(s) or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

### 14.4 Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

### 14.5 Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, at the request of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such order by the Bankruptcy Court, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14.6 Governing Law.

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof to the extent such principles would result in the application of the laws of any other jurisdiction.

### 14.7 Inconsistency.

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

### 14.8 Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 14.9 Exhibits.

All exhibits to the Plan are incorporated and are a part of the Plan as if set forth in full in the Plan.

### 14.10 Notices.

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**BLACKJEWEL LLC**
999 17th Street, Suite 700
Denver, Colorado, 80202
Attn: David J. Beckman

-and-

Counsel to the Debtors

**SQUIRE PATTON BOGGS**
Stephen Lerner (admitted *pro hac vice*)
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201

### 14.11 Filing of Additional Documents.

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

Dated:  October 21, 2020

Respectfully submitted,


Blackjewel L.L.C.
on behalf of itself and its affiliated Debtors


By: */s/ David J. Beckman*                                    
        David J. Beckman



**SUPPLE LAW OFFICE, PLLC**
Joe M. Supple
801 Viand Street
Point Pleasant, West Virginia 25550
Telephone: 304.675.6249
Facsimile: 304.675.4372

– and –

**SQUIRE PATTON BOGGS**
Stephen D. Lerner (admitted *pro hac vice*)
Nava Hazan (admitted *pro hac vice*)
Travis A. McRoberts (admitted *pro hac vice*)
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201

## **Exhibit B**

**Confirmation Order**

_____

BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

**Dated: March 22nd, 2021**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Blackjewel, L.L.C., *et al.*, | ) | Case No. 19-30289 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

**PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER (I) APPROVING THE FIRST AMENDED
DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION
FOR BLACKJEWEL, L.L.C. AND ITS AFFILIATED DEBTORS, AND
(II) CONFIRMING THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF
LIQUIDATION FOR BLACKJEWEL, LLC AND ITS AFFILIATED DEBTORS**

Upon consideration of the (i) *First Amended Joint Chapter 11 Plan of Liquidation for
Blackjewel, L.L.C. and Its Affiliated Debtors* [Docket No. 2499] (as the same may be further
amended, supplemented, or modified, the "Plan")[2] filed by Blackjewel, L.L.C. and its affiliated
debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11
cases (the "Chapter 11 Cases"), and (ii) the *First Amended Disclosure Statement for Joint Chapter*

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number
are as follows: Blackjewel, L.L.C. (0823); Blackjewel Holdings L.L.C. (4745); Revelation Energy Holdings,
LLC (8795); Revelation Management Corporation (8908); Revelation Energy, LLC (4605); Dominion Coal
Corporation (2957); Harold Keene Coal Co. LLC (6749); Vansant Coal Corporation (2785); Lone Mountain
Processing, LLC (0457); Powell Mountain Energy, LLC (1024); and Cumberland River Coal LLC (2213). The
headquarters for each of the Debtors is located at P.O. Box 1010, Scott Depot, West Virginia 25560.
[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan and
Disclosure Statement, as applicable. Copies of the Plan and Disclosure Statement are attached hereto as **Exhibit A**
and **Exhibit B**, respectively.

*11 Plan of Liquidation for Blackjewel, L.L.C. and Its Affiliated Debtors* [Docket No. 2500] (as may be supplemented, modified, or amended, the "Disclosure Statement") filed by the Debtors; and this Court, by order dated October 16, 2020 [Docket No. 2470] (the "Solicitation Procedures Order"), having conditionally approved the Disclosure Statement for solicitation purposes only and authorized the Debtors to solicit acceptances of the Plan; and a hearing having been held on March 3, 11, and 16, 2021 regarding the final approval of the Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing"); and upon the evidence proffered, adduced or presented and the arguments of counsel made at the Confirmation Hearing; and this Court having reviewed all documents in connection with confirmation and having heard all parties desiring to be heard, and upon the record compiled in the Chapter 11 Cases; and after due deliberation and consideration of all of the foregoing; and sufficient cause appearing therefor; this Court hereby makes the following:

I.     **FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.     The findings and conclusions set forth herein and on the record of the Confirmation Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law set forth herein constitute findings of fact, they are adopted as such.

B.     The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  Under 28 U.S.C. § 155(a), the Honorable Roger L. Gregory, Chief Judge of the United States Court of Appeals for the Fourth Circuit, assigned and designated Benjamin A. Kahn, United States Bankruptcy Judge, to this Court and to the captioned, jointly

administered cases, together with all associated adversary proceedings. ECF No. 2011. Thereafter, the Honorable Joseph R. Goodwin entered an Order referring these cases and all related proceedings as contemplated by the order entered by the Honorable Roger L. Gregory and under 11 U.S.C. § 157. ECF No. 2014. This is a statutorily core proceeding under 28 U.S.C. § 157(b)(1) and (b)(2)(A), (B), (K), (L) and (O), and this Court has constitutional authority to enter final judgment. Venue is proper in this District under 28 U.S.C. § 1408 and 1409

C.      The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

D.      The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of this Court.

E.      All resolutions of objections to the Plan or Disclosure Statement explained or otherwise described on the record at the Confirmation Hearing are hereby incorporated by reference. All unresolved objections, statements, informal objections, and reservations of rights, if any, related to the final approval of the Disclosure Statement or confirmation of the Plan are overruled on the merits. The objections of the United States and Kentucky Energy and Environment Cabinet (the "Kentucky Cabinet") have been resolved as provided for herein.

F.      On September 25, 2020, the Debtors filed the initial version of the Plan and Disclosure Statement [Docket Nos. 2397, 2398]. On October 21, 2020, the Debtors filed the solicitation version of their Plan and Disclosure Statement [Docket Nos. 2499, 2500]. The filing of the Plan and Disclosure Statement satisfies Bankruptcy Rule 3016.

G.      As evidenced by the affidavit of service filed on October 30, 2020 [Docket No. 2534], the Debtors caused the Ballots to be distributed as required by sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, and all other rules, laws, and

regulations applicable to such solicitation.   The Solicitation Packages were transmitted in

accordance with the Solicitation Procedures Order.  Sufficient time was provided for the Voting

Classes to accept, reject, or object to approval of the Disclosure Statement and confirmation of the

Plan.  Such transmittal and service was adequate and sufficient under the circumstances and no

other or further notice is or shall be required.

   H.   As evidenced by the affidavit of service, the Debtors have provided proper,

adequate, and sufficient notice of the Plan, Disclosure Statement, and the Confirmation Hearing,

as required by Bankruptcy Rule 3017(d), to all holders of Claims and Interests and all other parties

in interest, and no other or further notice is or shall be required.

   I.   On January 22, 2021, the Debtors filed the *Motion of Debtors for Approval

of Notice to Parties Asserting Administrative Expense Claims and Priority Tax Claims* [Docket

No. 2887] (the "Supplemental Service Motion"), pursuant to which the Debtors requested

authority to serve a supplemental notice on parties asserting Administrative Expense Claims and

Priority Tax Claims regarding their treatment under the Plan and afford those parties an

opportunity to affirmatively consent to, or reject, such treatment.  The Court entered an order

[Docket No. 2914] (the "Supplemental Service Order") approving the proposed form of notice (the

"Supplemental Notice") on February 1, 2021.

   J.   As evidenced by the affidavit of service filed on February 16, 2021 [Docket

No. 2954], the Debtors caused the Supplemental Notice to be served on all parties asserting

Administrative Expense Claims and Priority Tax Claims consistent with the Supplemental Service

Order.  The Supplemental Notice was transmitted in accordance with the Supplemental Service

Order.  Sufficient time was provided for Parties asserting Administrative Expense Claims and

Priority Tax Claims to indicate whether they consent to their treatment under the Plan or whether

they object to such treatment.  Such transmittal and service was adequate and sufficient under the circumstances and no other or further notice is or shall be required.

K.     The solicitation of acceptances or rejections of the Plan has been fair, properly conducted, in good faith, and in compliance with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and all other rules, laws, and regulations applicable to such solicitation.

L.     The Disclosure Statement and Plan comply with all of the applicable provisions of the Bankruptcy Code including, but not limited to:  (i) the proper classification of Claims and Interests (sections 1122, 1123(a)(i) of the Bankruptcy Code); (ii) the specification of treatment of Impaired Classes (section 1123(a)(3) of the Bankruptcy Code);[3] (iii) the provision for the equal treatment of each Claim or Interest within a particular class (section 1123(a)(4) of the Bankruptcy Code); (v) the provision for adequate and proper means of implementation (section 1123(a)(5) of the Bankruptcy Code); (vi) the prohibition against the issuance of non-voting equity securities (section 1123(a)(6) of the Bankruptcy Code); (vii) the manner of selection of the Liquidation Trustee (section 1123(a)(7) of the Bankruptcy Code); (viii) the inclusion of additional Plan provisions permitted to effectuate and implement the transactions contemplated by the Plan (section 1123(b) of the Bankruptcy Code); and (ix) the adequacy of the information contained in the Disclosure Statement (section 1125(b) of the Bankruptcy Code); and, thus, the Plan satisfies section 1129(a)(1) of the Bankruptcy Code and the Disclosure Statement provides adequate information and satisfies section 1125 of the Bankruptcy Code.

M.     As required by section 1129(a)(2) of the Bankruptcy Code, the Debtors have complied with the Bankruptcy Code, Bankruptcy Rules, all other rules, laws, and regulations applicable to such solicitation, and all other orders of this Court.

---

[3] There are no Unimpaired Classes under the Plan that would require specification of treatment under section 1123(a)(2) of the Bankruptcy Code.

N.      The Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and not by any means forbidden by law, thus satisfying section 1129(a)(3) of the Bankruptcy Code.

O.      Any payments made or promised by the Debtors for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to approval of this Court, thus satisfying section 1129(a)(4) of the Bankruptcy Code.

P.      The identity of, and the terms of the proposed compensation to be paid to, the proposed Liquidation Trustee are consistent with the interests of holders of Claims and Interests and with public policy and thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

Q.      The provisions of section 1129(a)(6) of the Bankruptcy Code are inapplicable to the Chapter 11 Cases.

R.      As evidenced by the Plan and as presented at the Confirmation Hearing, each holder of a Claim or Interest in each Impaired Class has either accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code on such date.  Thus, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

S.      On March 3, 2021, the Debtors filed the *Second Amended Declaration of Alex Orchowski on Behalf of Prime Clerk Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Joint Chapter 11 Plan of Liquidation for Blackjewel, L.L.C. and Its Affiliated Debtors* [Docket No. 3024] (the "Voting Declaration").  As evidenced by the Voting Declaration

and based on the record before the Court, the procedures used to tabulate Ballots were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations. Holders of Claims in Class 1, Class 2, and Class 3 were eligible to vote on the Plan (collectively, the "Voting Classes"). The Ballots the Debtors used to solicit votes to accept or reject the Plan from holders in the Voting Classes adequately addressed the particular needs of the Chapter 11 Cases and were appropriate for holders in the Voting Classes to vote to accept or reject the Plan. The form of the Ballots was approved by the Court as part of the Solicitation Procedures Order. Holders of Claims or Interests in Class 4, Class 5, and Class 6 are fully Impaired under the Plan and were not entitled to vote to accept or reject the Plan (collectively, the "Non-Voting Classes"). Thus, holders of Claims or Interests in the Non-Voting Classes were conclusively deemed to have rejected the Plan.

T.     Based on the foregoing, and as evidenced by the Voting Declaration, the following classes voted to accept the Plan in accordance with the requirements of sections 1124, 1126, and 1129 of the Bankruptcy Code:

- Class 1: Holders of Class 1 Claims against Debtors Blackjewel, L.L.C., Revelation Energy, LLC and Lone Mountain Processing LLC voted to accept the Plan.[4] No Class 1 Ballots were returned for any other Debtor.

- Class 2: Holders of Class 2 Claims against Debtors Blackjewel, L.L.C., Dominion Coal Corporation and Vansant Coal Corporation voted to accept the Plan. Holders of Class 2 Claims against Debtor Revelation Energy, LLC voted to reject the Plan. No Class 2 Ballots were returned for any other Debtor.

- Class 3: Holders of Class 3 Claims against Debtors Blackjewel, L.L.C., Revelation Energy Holdings, LLC, Revelation Management Corp., Revelation Energy, LLC, Blackjewel Holdings, LLC, Harold Keene Coal Co. LLC, Vansant Coal Corporation and Lone

---

[4] Two purported holders of Class 1 Other Priority Claims initially voted to reject the Plan. As reflected in the Voting Declaration, both such holders, James Edward Slusher [Claim No. 1065] and Michael Foustich [Claim No. 458], have since withdrawn their Claims.

> Mountain Processing, LLC.  No Class 3 Ballots were returned for Debtors Powell Mountain Energy, LLC, Cumberland River Coal LLC and Dominion Coal Corporation.

The Plan does not satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code. Notwithstanding the foregoing, the Plan is confirmable because the Plan satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, and the Plan may be confirmed notwithstanding the fact that holders of Secured Claims against Debtor Revelation Energy, LLC in Class 2 voted to reject the Plan, certain Classes of Claims did not return any Ballots, and Impaired Class 4, Class 5 and Class 6 are deemed to have rejected the Plan.

U.     Further, consistent with the Supplemental Service Order, parties asserting Administrative Expense Claims, including Claims under section 503(b)(9) of the Bankruptcy Code, and Priority Tax Claims received the Supplemental Notice and were afforded an additional opportunity to affirmatively consent to or reject their proposed treatment under the Plan.  Of the parties that received the Supplemental Notice, all parties either consented to their treatment under the Plan, did not respond, or withdrew their objecting vote on the Supplemental Notice.[5]

---

[5] As set forth in the *Declaration of Alex Orchowski of Prime Clerk LLC Regarding the Service and Tabulation of the Notice to Parties Asserting Administrative Expense Claims and Priority Tax Claims Regarding Consent to Plan Treatment as set forth in the First Amended Joint Chapter 11 Plan of Liquidation for Blackjewel, L.L.C. and its Affiliated Debtors* filed on March 2, 2021 [Docket No. 3047], the testimony of Alex Orchowskin on record at the hearing before the Court on March 11, 2021, and the *Declaration of Kyle F. Arendsen of Squire Patton Boggs (US) LLP Regarding Notice to Parties Asserting Administrative Expense Claims and Priority Tax Claims Regarding Consent to Plan Treatment as Set Forth in the First Amended Joint Chapter 11 Plan of Liquidation for Blackjewel L.L.C. and Its Affiliated Debtors* [Docket No. 3094], (i) Buckley Powder Co., (ii) Fairmont Supply Company, (iii) Gillette Steel Center, Inc., (iv) the Commonwealth of Kentucky Labor Cabinet, (v) the U.S. Department of Labor, (vi) the U.S. Department of Labor's Mine Safety & Health Administration, (vii) Bige Brock, (viii) Frank and Jane S. Brock, and (ix) the Lee County Treasurer initially submitted forms rejecting their treatment under the Plan. Each of those parties has subsequently changed its election and now either consents to or has withdrawn its rejection of its treatment under the Plan.  Additionally, First Surety Corporation, ("FSC"), the Department of the Interior, and the Kentucky Energy and Environment Cabinet did not consent to the treatment of Administrative Expense Claims under the Plan, and objected to the treatment of such Claims in the Supplemental Notice.  They have withdrawn their Plan objection and consent to the treatment of Administrative Expense Claims subject to the terms of this Order.  In the event of a conflict between the terms of the Plan and this Order, the terms of this Order shall control.

V.       Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the treatment of Claims under the Plan of the type specified in sections 507(a)(1) and 507(a)(3) through 507(a)(8) of the Bankruptcy Code, as further described in the Disclosure Statement, complies with the provisions of section 1129(a)(9) of the Bankruptcy Code.  Holders of Administrative Expense Claims, have not objected to the Plan, have withdrawn their objection[6], do not have standing to object, or their objection has otherwise been overruled and, therefore, are deemed to consent to the Plan and to accept the treatment of their Claims under the Plan, as further described in the Disclosure Statement, the Supplemental Notice, and Plan, in satisfaction of section 1129(a)(9) of the Bankruptcy Code.

W.       Except with respect to Debtors Cumberland River Coal, LLC ("Cumberland"), and Powell Mountain Energy, LLC ("Powell Mountain"), at least one impaired class of Claims has accepted the Plan as to each Debtor, determined without including any acceptances of the Plan by any insider.  Thus, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code for all Debtors except Cumberland and Powell Mountain.

X.       The Plan provides for adequate means for its implementation and, thus, is feasible and satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

Y.       All fees payable on or before the Effective Date, pursuant to United States Code title 28 section 1930, shall be paid in full in Cash by the Debtors on or before the Effective Date.  All fees payable after the Effective Date shall be paid in full in cash by the Liquidation Trustee from Liquidation Trust Assets until the Chapter 11 Cases are converted, dismissed, or

---

[6] FSC filed an objection to the Plan, and objected to the treatment of Administrative Expense Claims in response to the Supplemental Notice.   FSC has withdrawn its objection to the Plan and the Supplemental Notice pursuant to the terms of this Order.

closed, whichever occurs first. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file a request for allowance of any Administrative Expense Claims.

Z.     Pursuant to the Notice of Determination issued by the Pension Benefit Guaranty Corporation, the Cumberland River Coal Company Pension Plan for Bargaining Unit Employees was terminated effective September 30, 2019. *See* Docket No. 1987. Accordingly, the Debtors do not have any ongoing retiree benefits within the meaning of Sections 1114 and 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

AA.    No Debtor was required to pay a domestic support obligation or is an individual. Accordingly, sections 1129(a)(14)–(15) of the Bankruptcy Code are inapplicable.

BB.    The Debtors are moneyed, business, or commercial corporations. Accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable.

CC.    No other chapter 11 plan has been proposed for confirmation.

DD.    The primary purpose of the Plan is not the avoidance of taxes or the requirements of Section 5 of the Securities Act of 1933.

EE.    Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors.

FF.    The Debtors have acted in good faith with respect to the formulation, solicitation, and confirmation of the Plan pursuant to section 1125(e) of the Bankruptcy Code.

GG.    Holders of Secured Claims against Debtor Revelation Energy, LLC in Class 2 did not accept the Plan. Holders of Interests in Class 4, Class 5, and Class 6 are deemed to have rejected the Plan, and certain Classes of Claims at specific Debtors did not return any ballots. Based on the evidence proffered, adduced, or presented at the Confirmation Hearing and applicable law as noted in the *Debtors' Memorandum of Law in Support of Confirmation of First Amended*

*Joint Chapter 11 Plan of Liquidation for Blackjewel, L.L.C. and Its Affiliated Debtors* [Docket No. 2659] (the "Confirmation Brief"), the Plan does not discriminate unfairly and is fair and equitable with respect to Classes 4, 5 and 6 and Class 2 Claims against Debtor Revelation Energy, LLC. The Plan satisfies sections 1129(b)(1) and (b)(2) of the Bankruptcy Code. Thus, the Plan may be confirmed notwithstanding the rejection by the holders of Secured Claims against Debtor Revelation Energy, LLC in Class 2 and the deemed rejection of the Plan by the holders of Claims or Interests in Class 4 (510 Claims), Class 5 (Intercompany Interests) and Class 6 (Non-Intercompany Interests). Further the Plan is fair and equitable and does not discriminate unfairly against the Holders of Claims in Classes that did not return any Ballots.

HH. The other transactions contemplated pursuant to the Plan are essential elements of the Plan, proposed in good faith, critical to the Plan, and in the best interests of the Debtors, their Estates, all holders of Claims, all holders of Interests, and all other parties-in-interest. All of the documents to be executed and delivered in connection with such transactions were negotiated and proposed, and will be or have been entered into, in good faith, without collusion, and from arm's-length bargaining positions. All of such documents are, or will be, valid, binding, and enforceable agreements, and are not in conflict with any applicable federal or state law.

II. The conditions to the occurrence of the Effective Date in Article 11 of the Plan are reasonably likely to be satisfied or waived in accordance with the Plan.

JJ. With respect to any and all Executory Contracts and Unexpired Leases of the Debtors that have not been assumed or assumed and assigned by the Debtors as of the Effective Date or otherwise designated for assumption and assignment to the Liquidation Trust in the Plan

Supplement, such Executory Contracts and Unexpired Leases are burdensome to the Estates and

rejection of such Executory Contracts and Unexpired Leases is in the best interests of the Estates.

KK.     This Court has jurisdiction under 28 U.S.C. §§1334(a) and (b) to approve

the releases set forth in Article 12 of the Plan, as well as the related injunctions or stays provided

for therein.  Section 105(a) of the Bankruptcy Code permits approval of such releases and

injunctions because, as has been established by the Debtors, based upon the record in the Chapter

11 Cases and the evidence proffered, adduced or presented at the Confirmation Hearing, the

releases described in Article 12 of the Plan are:  (i) given in exchange for the good and valuable

consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the

claims released by Article 12 of the Plan; (iii) integral to the agreements among the various parties-

in-interest and essential to the formulation and implementation of the Plan, as provided in section

1123 of the Bankruptcy Code; (iv) in the best interests of the Debtors and their Estates; (v) fair,

equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; and

(vii) a bar to any entity asserting any claim or Cause of Action released by Article 12 of the Plan.

LL.     The releases in Article 12 of the Plan, including, without limitation, the

Third-Party Release in section 12.4 of the Plan are consensual in nature. The Third-Party Release

is consensual with respect to the Releasing Parties.  Specifically, the Ballots distributed to the

Voting Classes included clear and bolded language that (i) directed parties to the pages of the

Ballot referring to the Third-Party Release and related definitions, and (ii) notified such parties

that those sections may affect their legal rights.  Further, the Ballots stated that the Third-Party

Release would only apply to claimants who opted into the Third-Party Release by checking the

"opt-in" box.  Holders of Claims or Interests in Class 4, Class 5 and Class 6, which are deemed to

reject the Plan, will not be deemed to have granted the Third-Party Release to the extent of their

Claims or Interests in those Classes. Thus, all affected parties have been provided with more than adequate notice regarding the consequences of their decision to opt-in to the Third-Party Release and unambiguously afforded the opportunity to opt-in to the Third-Party Release. Accordingly, for the reasons set forth herein and at the Confirmation Hearing, the Third-Party Release (i) is an essential means of implementing the Plan, (ii) is fair, equitable, and reasonable and in exchange for the good and valuable consideration provided by the Released Parties, (iii) is a good-faith settlement and compromise of the Claims and Causes of Action released thereby, (iv) is materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, (v) is fair, equitable, and reasonable, (vi) is given and made after due notice and opportunity for hearing, (vii) is consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code, (viii) is an integral and non-severable element of the Plan and the transactions incorporated therein, (ix) confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and all holders of Claims and Interests, (x) is specific in language and scope, and (xi) is important to the overall objectives of the Plan to finally resolve Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors.

MM.    The exculpation in Section 12.5 (the "Exculpation") is an essential provision of the Plan. The Exculpation is appropriate under applicable law because it was proposed in good faith, was formulated following good-faith, arm's-length negotiations with the Debtors and the Exculpated Parties, and was agreed upon in return for the Exculpated Parties providing benefits to the Debtors. The Exculpation appropriately affords protection to those parties who constructively participated in and contributed to the Debtors' chapter 11 process and it is appropriately tailored to protect the Exculpated Parties from inappropriate litigation. The Exculpation granted under the Plan is reasonable in scope as it does not relieve any party of liability

13

for an act or omission to the extent such act or omission is determined by final order to constitute actual fraud, willful misconduct, or gross negligence.

NN.     The injunction in Section 12.6 of the Plan (the "Injunction") is essential to the Plan and is necessary to implement the Plan and to preserve and enforce the Debtor Release, the Third-Party Release, the Exculpation, and release provisions in Article 12 of the Plan. The Injunction is appropriately tailored to achieve those purposes.

OO.     The record of the Confirmation Hearing is sufficient to support the Debtor Release, the Third-Party Release, the Exculpation, and the Injunction. Accordingly, based upon the representations of the parties and the evidence proffered, adduced, or presented at the Confirmation Hearing and in the Confirmation Brief, the Debtor Release, Third-Party Release, Exculpation, and Injunction are consistent with the Bankruptcy Code and applicable law.

PP.     Upon the Effective Date, those surface mining permits identified on Exhibit C (the "Residual Permits") shall be revoked by the applicable regulatory authority and the Debtors and the applicable Sureties will agree not to contest such revocation; *provided*, *however*, that the consensual revocation of the Residual Permits shall not preclude the applicable Surety from exercising its right to conduct reclamation in lieu of bond forfeiture or to contest bond forfeiture in accordance with applicable non-bankruptcy law. In addition, nothing in this Order shall preclude any governmental unit (as defined in section 101(27) of the Bankruptcy Code ("Governmental Unit(s)")) from implementing its customary process for revocation, including issuing notices related thereto.

QQ.     Any Department of the Army Clean Water Act Section 404 permits/authorizations which relate to a Residual Permit shall be deemed revoked by the Army on the Effective Date and the Debtors shall agree not to contest such revocation; such permits shall

be treated similarly to Residual Permits under this Order. Any Department of the Army Clean Water Act Section 404 permits/authorizations which relate to a Pending and Disputed Permit (as hereinafter defined) shall be deemed revoked by the Army at the end of the Pre-Dissolution Period (as hereinafter defined) and the Debtors shall agree not to contest such revocation; such permits shall be treated similarly to Pending and Disputed Permits under this Order.

RR.    The Office of Surface Mining Reclamation and Enforcement ("OSMRE") may continue with its already initiated bond forfeiture process for TN Permit No. 3298 and 3299 (collectively the "TN Permits"), and this process shall not be impacted by any provision of the Plan or this Order. Upon OSMRE's receipt of the bond proceeds from the Surety or Sureties, OSMRE may administratively terminate the TN Permits. With respect to the TN Permits, such permits shall be treated similarly to a Pending and Disputed Permits under this Order, except that such permits are expected to be terminated rather than revoked.

SS.    All Governmental Units reserve their rights under: (1) the Consent Decree entered by the Southern District of West Virginia in *United States, et al. v. Arch Coal, Inc., et al.*, 2:11-CV-00133; and (2) the Administrative Compliance Order on Consent, Docket No. SDWA-04-2018-1250 and the Safe Drinking Water Act 42 U.S.C. §300f *et seq.* with respect to Pond Creek #1 and Pond Creek #2 underground injection control wells.

TT.    Those mining permits identified on Exhibit D (the "Pending and Disputed Permits" and collectively with the Residual Permits, the "Permits") shall remain property of Blackjewel, L.L.C, Lone Mountain Processing, LLC, Revelation Energy, LLC, Dominion Coal Corporation; or Harold Keene Coal Co. LLC's (collectively, the "Hosting Debtors") post-confirmation bankruptcy estates, as applicable (and shall not constitute or become Liquidation Trust Assets), subject to the limitations of liability set forth below. Notwithstanding sections 3.3.6

and 5.1 of the Plan, each Hosting Debtor, as permittee of the Pending and Disputed Permits, shall

continue to exist as a separate corporate entity for the limited purpose of facilitating the transfer of

the Pending and Disputed Permits, and the Non-Intercompany Interests of each Hosting Debtor

shall not be cancelled, until the earlier of (1) the date that is 180 days after the Effective Date

(provided that such date may be extended by an order of the Bankruptcy Court for cause shown

for a maximum of an additional 90 days) or (2) the date as of which all of the Pending and Disputed

Permits have either been revoked by the applicable regulatory authority or transferred in

compliance with applicable law to a third party, including a purchaser of any of such Pending and

Disputed Permits pursuant to an order entered by the Bankruptcy Court during the Chapter 11

Cases (each, a "Purchaser") (the period from the Effective Date until the first to occur of (1) and

(2) above is referred to as the "Pre-Dissolution Period").  Nothing contained in this Order shall

relieve, alter, or affect each Purchaser's obligations, including the obligations to reclaim the

permits according to the approved reclamation plan and satisfy other liabilities, including

insurance, and mitigation obligations under the Department of the Army Clean Water Act Section

404 permits/authorizations, assumed pursuant to the sale documentation and approval order

entered by the Court with respect to each Purchaser's purchase of assets of the Debtors.  The

Hosting Debtors shall immediately dissolve upon the end of the Pre-Dissolution Period without

the need for any further action by any party or an order of the Bankruptcy Court.  Each Purchaser

shall be designated by the Hosting Debtors, pursuant to a resolution of the Board of Directors of

the Debtors, as a person in control, as provided in the Surface Mining Control and Reclamation

Act of 1977 (SMCRA), 30 U.S.C. §§ 1201, *et seq.*, and any implementing statutes, rules, and

regulations, including 405 KAR 8:001 Section 1(76), 4 VAC 25-130-700.5, 30 CFR 701.5, and

W. Va. CSR § 38-2-2.83, with respect to each Pending and Disputed Permit previously acquired

16

by such Purchaser during the Pre-Dissolution Period. Each Purchaser shall have responsibility to fulfill Purchaser's obligations related to the transfer and maintenance of any Pending and Disputed Permits acquired by such Purchaser. Upon, or prior to, the Effective Date, each Hosting Debtor shall grant to Indemnity National Insurance Company ("INIC") and Lexon Insurance Company ("Lexon" and collectively with INIC, the "Designated Sureties") a limited power of attorney authorizing the Designated Sureties to execute any and all documents and to take such actions as may be reasonably necessary to effectuate the sale, transfer, assignment, release, or revocation of any Pending and Disputed Permit bonded by such Surety.

UU. FSC is the surety on certain reclamation bonds naming Debtor Revelation Energy, LLC ("Revelation"), as principal, and the WVDEP, as obligee, in connection with permit numbers S300404, S300499 and S300905 (the "Rush Creek Permits" and the related surety bonds, the "Rush Creek Bonds").[7] On or about October 22, 2020, the WVDEP revoked the Rush Creek Permits pursuant to West Virginia Code 22-3-17(b) (the "Revoked Rush Creek Permits"). Revelation is also the named permittee under National Pollutant Discharge Elimination System ("NPDES") permit numbers WV10211745, WV1019121 and WV1021877, that relate to the Rush Creek Permits and that expired prior to the date hereof (the "NPDES Permits"). In accordance with the limited power of attorney provided in Section 13 of that certain Coal Reclamation Bond Agreement dated July 14, 2011 ("CRBA"), Revelation hereby appoints FSC or its duly appointed designee its true and lawful attorney-in-fact or attorneys-in-fact with full power and authority in Revelation's name place and stead, to execute, acknowledge, deliver, swear to, file and record any such documents as the WVDEP may request to assign or transfer the Rush Creek Permits and the

---

[7] The Rush Creek Bonds included Bond Nos. 10630-CR-WV, 10631-CR-WV, 10632-CR-WV, 10636-CR-WV, 10635-CR-WV, 10647-CR-WV, 10638-CR-WV, 10639-CR-WV, 10640-CR-WV, 10641-CR-WV, 10642-CR-WV, 10634-CR-WV, and 10633-CR-WV.

NPDES Permits, or, if necessary, to reinstate the Rush Creek Permits, or the NPDES Permits solely

to assign and/or transfer the Rush Creek Permits and the NPDES Permits. Additionally, the

Debtors release any and all right, title and interest in and to any collateral held by FSC (the "FSC

Collateral") as security for any of the Debtors' obligations to FSC under the Rush Creek Bonds,

the CRBA, or any other indemnity agreement, or coal reclamation bond agreement executed by

any Debtors or non-Debtors (collectively, the "FSC Indemnity Documents"); *provided*; *however*,

that in the event that FSC's claims under the FSC Indemnity Documents and/or the Rush Creek

Bonds are less than the FSC Collateral, then FSC shall return the FSC Collateral in excess of such

claims to the Liquidation Trustee. Nothing in this Order or the Plan, including the exculpation,

release and injunction provisions contained in Article 12 of the Plan, shall enjoin, release or

prohibit FSC from exercising any rights in the FSC Collateral, under the Rush Creek Bonds, the

CRBA, or any other indemnity agreement, or coal reclamation bond agreement executed by any

Debtors or non-Debtors, or any subrogation rights. On November 1, 2019, FSC filed its

Application and Request for Payment of Administrative Expense Claims [Docket No. 1316], and

thereafter, on January 14, 2021, filed its Amended Application and Request for Payment of

Administrative Expense Claims [Docket No. 2825] (collectively, the "FSC Administrative

Expense Request"). FSC shall supplement the FSC Administrative Expense Request pursuant to

the procedure set forth in paragraph 10 of this Order. All parties reserve all arguments as to the

amount, priority, or precedence of any Claim or Cause of Action against the Debtors for or related

to obligations under the Rush Creek Permits, the NPDES Permits, the Rush Creek Bonds, and the

FSC Administrative Expense Request, and nothing in this Order or in the Plan shall modify, alter,

limit, or enlarge, the applicable standard for the allowance or disallowance of such Claim or Cause

of Action, including, without limitation, the FSC Administrative Expense Request.

VV.   The Liquidation Trust's responsibility, obligation or liability (including,

without limitation, reclamation or environmental liabilities), if any, to any person or entity

(including Governmental Units) with respect to, related to, or arising as a result of the Permits

shall be as provided in paragraph WW.  Neither the Liquidation Trustee nor the Liquidation Trust's

employees, agents, representatives, attorneys, and advisors shall have any personal liability to any

person or entity (including Governmental Units) relating to the Permits because the Permits are

not to be held by the Liquidation Trust; *provided*, *however*, that nothing herein shall release or

impair any liability of a Liquidation Trust employee, agent, representative, attorney, or advisor on

account of its capacity other than with respect to the Liquidation Trust.  With respect to the

Exculpated Parties, all Governmental Units reserve all rights, claims, and causes of action existing

prior to the Effective Date, and Exculpated Parties reserve, subject to paragraph 35, all defenses

relating to the Permits including, but not limited to, for reclamation or other environmental

liability.  For the avoidance of doubt, the Exculpated Parties shall not be considered to be owners

or persons in control as provided in the Surface Mining Control and Reclamation Act of 1977

(SMCRA), 30 U.S.C. §§ 1201, *et seq*., and any implementing statutes, rules, and regulations,

including 405 KAR 8:001 Section 1(76), 4 VAC 25-130-700.5, 30 CFR 701.5, W. Va. CSR § 38-

2-2.83, or similar regulations of any Governmental Units, or otherwise an agent or manager after

the Effective Date and their liability, if any, shall be limited to being former agents, managers,

owners, or persons in control subject to all defenses that they might allege.  Neither the Hosting

Debtors nor the Liquidation Trust shall be required to file monthly operating reports during the

Pre-Dissolution Period.  Notwithstanding that the dissolution of the Hosting Debtors will be

delayed until the conclusion of the Pre-Dissolution Period, the current officers and directors of the Hosting Debtors shall be deemed to have resigned in their capacity as directors and officers on or before the Effective Date of the Plan, it being understood that the Purchasers will have their responsibilities during the Pre-Dissolution Period with respect to all matters related to the Pending and Disputed Permits and the Designated Sureties will have that authority related to the Pending and Disputed Permits granted to them by the Debtors.

WW.   Notwithstanding the agreed revocation of the Residual Permits and the retention of the Pending and Disputed Permits, any Claim or Cause of Action against the Debtors asserted by any party arising out of or related to the Permits, including any Claim or Cause of Action against the Debtors for reclamation and mitigation obligations associated with the Permits, shall be considered and ruled upon by the Bankruptcy Court as if the Permits were abandoned pursuant to section 554 of the Bankruptcy Code and no longer property of the estate as of the Effective Date; *provided*, *however*, that (1) all parties reserve all arguments as to amount, priority, or precedence of any Claim or Cause of Action against the Debtors for or related to reclamation obligations, (2) the parties agree not to contend that the fact that the Residual Permits were revoked rather than abandoned as of the Effective Date, or that the Pending and Disputed Permits remain property of the Hosting Debtors' bankruptcy estates rather than being abandoned as of the Effective Date, alters the applicable standard for administrative expense treatment of a liability, and (3) entry of this Order shall not constitute a determination (a) that the facts related to any Permit and applicable laws and regulations meet or do not meet the standard for administrative expense liability or abandonment and, to the extent relevant, to the amount, priority, or precedence of any Claim or Cause of Action against the Debtors for or related to reclamation obligations and (b) subject to subpart 2 of this paragraph above, of the applicable standard for administrative

20

expense liability or abandonment. In accordance with the Plan and this Order, any Claim or Cause of Action against the Debtors asserted by any party arising out of or related to the Permits, including any Claim or Cause of Action against the Debtors for reclamation obligations associated with the Permits shall be administered by the Liquidation Trust and the Liquidation Trust shall be responsible for the satisfaction of any such Allowed Claim and compliance with any judgment on any such Cause of Action against the Debtors as provided in the Plan, this Order and the Liquidation Trust Agreement. No such Claim or Cause of Action may be brought directly against the Liquidation Trust; *provided*, *however*, that neither the Debtors nor the Liquidation Trust shall contend that the Liquidation Trust is an indispensable party or raise any defense regarding the lack of joinder of the Liquidation Trust.

XX. Because the Residual Permits will be revoked and the Pending and Disputed Permits shall remain with the corresponding Hosting Debtors during the Pre-Dissolution Period, no Reclamation Trust is necessary. Accordingly, Article 10 of the Plan is of no force and effect and notwithstanding Article 10 and section 11.1.5 of the Plan, no Reclamation Trust shall be established and the defined terms in the Plan exclusively relating to the Reclamation Trust, including, "Reclamation Trust", "Reclamation Trust Agreement", "Reclamation Trust Assets", "Reclamation Trust Beneficiaries", "Reclamation Trust Reserve", "Reclamation Trustee", and "Remaining Permits", are deleted. Furthermore, because all of the Permits will either be revoked or shall remain with the Hosting Debtors, the Debtors have withdrawn the *Notice of De Minimis Asset Abandonment* [Docket No. 2747], and are not requesting, pursuant to the Plan, this Order, or otherwise, the abandonment of any permits pursuant to section 554 of the Bankruptcy Code. For the avoidance of doubt, notwithstanding the elimination of a Reclamation Trust, the Permits shall not constitute Liquidation Trust Assets and, except as provided in the last two sentences of

paragraph WW above, the Liquidation Trustee shall have no responsibility for or related to the

Permits.

YY.      The definition of "Exculpated Claim" in section 1.1.38 of the Plan is deleted

and replaced in its entirety with the following:

> "***Exculpated Claim***" means any Claim related to any act or omission in connection
> with, relating to, or arising out of the Debtors' post-petition restructuring efforts,
> post-petition operation and administration of the Debtors' assets, the Chapter 11
> Cases, formulation, preparation, dissemination, negotiation, filing, solicitation of
> acceptances, confirmation, approval, implementation, or administration of the
> Disclosure Statement, the Plan, the settlements and agreements contained in the
> Plan, the property to be distributed under the Plan or any contract, instrument,
> release, or other agreement or document created or entered into in connection with
> the Disclosure Statement or the Plan, the pursuit of entry of a Confirmation Order,
> the distribution of property under the Plan, or any other related agreement;
> provided, however, that Exculpated Claims shall not include any act or omission
> that is determined in a Final Order to have constituted willful misconduct or gross
> negligence. For the avoidance of doubt, no Claim, Cause of Action, obligation, or
> liability expressly set forth in or preserved by the Plan constitutes an Exculpated
> Claim.

ZZ.      The definition of "Released Parties" in section 1.1.84 of the Plan is deleted

and replaced in its entirety with the following:

> "***Releasing Parties***" means all holders of Claims against a Debtor who opt in to the
> release provided by the Plan.

AAA.   The Debtors, as proponents of the Plan, have met their burden of proving

the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the

evidence, which is the applicable evidentiary standard.  This Court also finds that the Debtors have

satisfied the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code under the clear and

convincing standard of proof.

BBB.   As a result of the foregoing, the Plan satisfies all applicable confirmation

requirements and the Disclosure Statement contains adequate information.

CCC.  This Court properly may retain jurisdiction over the matters set forth in Article 13 of the Plan.

DDD.  Under the circumstances, it is appropriate that the 14-day stay imposed by Bankruptcy Rules 3020(e) and 7062(a) be waived.

## II.    ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1.    The Plan is approved and confirmed on a final basis, except with respect to Debtors Cumberland and Powell Mountain, pursuant to section 1129 of the Bankruptcy Code; *provided*, *however*, that, if there is any conflict between the terms of the Plan and the terms of the Disclosure Statement, the terms of the Plan Shall control; *provided*, *further*, *however*, if there is any conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.  The terms of the Plan are incorporated by reference into, and are an integral part of, this Confirmation Order.  Any objections to confirmation of the Plan, or any reservations of rights thereto, to the extent not withdrawn, waived, or resolved herein, are hereby overruled and denied on the merits.  Confirmation of the Plan is denied with respect to Debtors Cumberland and Powell Mountain.

2.    The Disclosure Statement is approved on a final basis as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, and any objections to the adequacy of the information contained in the Disclosure Statement not otherwise consensually resolved are overruled.

3.    Subject to the provisions of the Plan and this Confirmation Order, in accordance with section 1141(a) of the Bankruptcy Code, and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon, and inure to the benefit of:  (i) the Debtors; (ii) the

Liquidation Trust; (iii) any and all holders of Claims or Interests (irrespective of whether any of such Claims or Interests are Impaired under the Plan or whether the holders of such Claims or Interests accepted, rejected, or are deemed to have accepted or rejected the Plan, or whether such holders filed a proof of claim or interest); (iv) any other entity giving, acquiring, or receiving property under the Plan; (v) any and all non-debtor parties to any Executory Contract or Unexpired Lease; (vi) the Liquidation Trustee, in his capacity as such; and (vii) and the respective officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents, and other representatives (including their respective officers, directors, employees, members, and professionals) (collectively, the "Representatives") of any of the foregoing.

4.      For the avoidance of doubt, the Plan shall not become effective unless and until the conditions set forth in Section 11.1 of the Plan have been satisfied or waived pursuant to Section 11.2 of the Plan.

5.      The Debtors shall remain debtors-in-possession under the Bankruptcy Code until the Effective Date.  The Debtors and the Liquidation Trustee are hereby authorized to wind up the Debtors' affairs and may make Plan Distributions after the Effective Date in accordance with this Confirmation Order, the Plan, and the Liquidation Trust Agreement.

6.      The appointment of David J. Beckman as Liquidation Trustee and the terms of the proposed compensation in the Liquidation Trust Agreement are hereby approved.  The Liquidation Trustee shall have such rights, powers, and duties and shall receive such compensation as is provided for in the Plan, this Confirmation Order, and the Liquidation Trust Agreement.

7.      Except as otherwise expressly provided under the Plan or under this Confirmation Order, any and all Executory Contracts and Unexpired Leases that have not been

assumed or assumed and assigned by the Debtors as of the Effective Date, or otherwise designated for assumption on the Effective Date in the Plan Supplement, shall be deemed rejected effective as of the Effective Date.

8. Any insurance policies of the Debtors in which the Debtors are or were insured parties (including any policies covering managers' or officers' conduct), or any related insurance agreement issued prior to the Petition Date, shall be treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed and assigned to the Liquidation Trust all insurance policies and any agreements, documents, and instruments relating to the coverage thereunder, including the coverage of all insured Claims.

9. On the Effective Date of the Plan, the Committee shall be dissolved as provided by section 14.1 of the Plan, subject to the rights set forth therein.

10. Unless required to be filed by an earlier date pursuant to another order of this Court, any holder of an Administrative Expense Claim incurred from October 15, 2019 through the Effective Date must file with this Bankruptcy Court (and not the Claims Agent, which will be insufficient) and serve on (i) the Liquidation Trustee, (ii) the U.S. Trustee, and (iii) all parties requesting notice pursuant to Bankruptcy Rule 2002, a request for payment of such Administrative Expense Claim by completing the one-page *Request for Payment of Administrative Expense Claim*, which will be attached to the Debtors' notice of the Effective Date, so as to be received by the Administrative Bar Date, which shall be 45 calendar days after the Effective Date. Such request must include at a minimum: (i) the name of the Debtor(s) that are purported to be liable for the Administrative Expense Claim; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the

Administrative Expense Claim; and (v) all supporting documentation for the Administrative

Expense Claim, provided however, that Governmental Units may submit documentation in support

of any Administrative Expense Claim in accordance with the discovery procedures to be

established by the Court.  On November 4, 2019, the Kentucky Cabinet filed its Application for

Administrative Expenses [Docket No. 1350].  The Kentucky Cabinet shall supplement its

Application for Administrative Expenses pursuant to the procedure set forth in paragraph 10 of

this Order.  Any Administrative Expense Claim that is not timely filed as set forth above will be

forever barred, and holders of such Administrative Expense Claims will not be able to assert such

Claims in any manner against the Liquidation Trustee, the Liquidation Trust, the Debtors, their

Estates, or their respective Representatives, successors, assigns, or any of the foregoing parties'

respective property except to the extent otherwise ordered by the Court.  For the avoidance of

doubt, any Allowed and unpaid Administrative Expense Claim and Fee Claim as of the Effective

Date shall be paid by the Liquidation Trustee from the Liquidation Trust Assets on a pro rata basis,

as provided in this Order and the Plan. Upon execution of a mutually acceptable surety reclamation

agreement by and between the Kentucky Cabinet and INIC for the Residual Permits, INIC hereby

agrees to assign to the Kentucky Cabinet any and all proceeds, whether arising from INIC's right

of equitable subrogation or otherwise, received by INIC from the Liquidating Trust on account of

any bonded-increment of any Residual Permit that is forfeited rather than reclaimed by INIC in

lieu of bond forfeiture.  It is understood that INIC does not have rights of subrogation to the Claim

of the Kentucky Cabinet to the extent that such Claim seeks payment for fees or penalties, and/or

the costs of reclamation / regulatory compliance in excess of the applicable INIC bond amount.

11.     Unless required to be filed by an earlier date by another order of this Court,

any Professional Person seeking allowance of a Fee Claim must file and serve on (i) the

Liquidation Trustee, (ii) the U.S. Trustee, and (iii) all parties requesting notice pursuant to Bankruptcy Rule 2002, an application for final allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date and in connection with the preparation and prosecution of such final application no later than 45 days after the Effective Date. Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Plan and this Confirmation Order no later than 21 days after filing and service of an application for final allowance of fees and expenses. After notice and a hearing (if a final fee application is objected to within 21 calendar days after service of such application), this Court shall determine the Allowed amounts of such Fee Claims. Any request for payment of a Fee Claim that is not timely filed as set forth above will be forever barred, and holders of such Fee Claims will not be able to assert such Claims in any manner against the Liquidation Trustee, the Liquidation Trust, the Debtors, their Estates, or their respective Representatives, successors, assigns, or any of the followings parties' respective property. Notwithstanding the foregoing, the Liquidation Trustee shall pay professionals or other entities retained pursuant to section 9.6.3 of the Plan in the ordinary course of business for any work performed on and after the Effective Date in furtherance of the Plan or as authorized under the Plan, this Confirmation Order or the Liquidation Trust Agreement.

12. All parties' rights under section 506 of the Bankruptcy Code are expressly preserved. Claims and causes of action under section 506(c) of the Bankruptcy Code are expressly preserved by the Debtors and will be assigned to the Liquidation Trust on the Effective Date, and any actions thereunder may be pursued by the Liquidation Trustee. In the event that neither the Debtors nor the Liquidation Trustee pursues a Claim or Cause of Action under section 506(c), or a Claim or Cause of Action under section 506(c) is pursued by the Debtors or the Liquidation

Trustee and the Debtors or the Liquidation Trustee abandons such Claim or Cause of Action, the rights of any holder of an Administrative Expense Claim, Fee Claim, Priority Tax Claim or Other Priority Claim to seek derivative standing to assert a Cause of Action under section 506(c) of the Bankruptcy Code are expressly preserved.

13.     Notwithstanding anything contained in the Plan, the Plan Supplement, the Plan Documents, or this Confirmation Order to the contrary, nothing in the Plan, the Plan Supplement, the Plan Documents or this Confirmation Order shall discharge, release, impair, enjoin, exculpate or otherwise preclude or diminish: (a) any liability to any Governmental Unit that is not a "claim" within the meaning of 11 U.S.C. § 101(5) of the Bankruptcy Code; (b) any liability to any Governmental Unit arising after the Confirmation Date; (c) any liability or obligation to, or any Claim or Cause of Action by, a Governmental Unit under police or regulatory law or environmental law to which any entity is subject as the owner, lessor, lessee, permittee, controller, or operator of real property or a mine (including any idled, closed, and inactive mines, associated impoundments, disposal areas and wells, and treatment plants) or other facility after the Effective Date (whether or not such liability, obligation, Claim or Cause of Action is based in whole or in part on acts or omissions prior to the Effective Date), including, but not limited to, liability for reclamation; plugging and abandonment; restoration; dam safety; water treatment; stream and wetland mitigation; underground injection control; contamination; pollution; hazardous or toxic substances; mine drainage; water supply protection; mine subsidence remediation; protection of the environment; and impacts on human health, safety, and welfare; (d) any liability to any Governmental Unit of any non-debtor.  Nothing in this Confirmation Order or the Plan shall impair any setoff or recoupment rights of any Governmental Unit.

14. Nothing in this Confirmation Order, the Plan, the Plan Documents, or the Plan Supplement authorize the transfer or assignment of any governmental (i) lease, (ii) license, (iii) permit, (iv) registration, (v) authorization, (vi) certification, or (vii) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy laws, regulations, and rules (including police or regulatory law or environmental law, or otherwise).

15. Nothing in the Plan, the Plan Supplement, the Plan Documents, or this Confirmation Order shall be interpreted as releasing or compromising, and no Governmental Unit releases or compromises: (i) any claims arising under criminal law; or (ii) any statutory or common law Cause of Action for fraud against the Debtor(s). No suit or action brought to enforce the claims and causes of action described in this paragraph 15 shall be enjoined by the Plan, the Plan Supplement, the Plan Documents, or this Confirmation Order.

16. Nothing in the Plan, the Plan Supplement, the Plan Documents, or this Confirmation Order shall exculpate any third party or non-debtor from any liability owed to, or Claim, action, proceeding, or Cause of Action of a Governmental Unit, except to the extent that such non-Debtor is exculpated for acting in its fiduciary capacity to the Debtors' estates, subject to paragraph 35 of this Order.

17. Nothing contained in the Plan, the Plan Supplement, the Plan Documents, or this Confirmation Order shall be construed as a compromise or settlement of any Claim, interest, or Cause of Action of the United States under or affecting the treatment of any interest in contracts, leases, covenants, operating rights agreements, rights-of-use and easement, and rights-of-way or other interests or agreements with the federal government involving federal land or minerals (collectively, the "Federal Lease(s)"). Nothing in the Plan, the Plan Supplement, the Plan

Documents, or this Confirmation Order shall be interpreted to release the Debtors or their

successors and assigns, from any reclamation, plugging and abandonment, or other operational

requirement under applicable Federal laws or to address, or otherwise affect, any decommissioning

obligations, financial assurance or other regulatory or contractual requirements under the Federal

Leases.   Nothing in the Plan, the Plan Supplement, the Plan Documents, or this Confirmation

Order shall be interpreted to set cure amounts.

18.     For purposes of the section 8.2.1 of the Plan, (i) *Debtors' Motion for an*

*Order Authorizing the Private Sale of Certain Assets to Black Mountain Resources, L.L.C. Free*

*and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances and Granting*

*Related Relief* [Docket No. 1146], and (ii) *Debtors' Motion for an Order Authorizing the Private*

*Sale of the Western Assets to Eagle Specialty Materials, LLC Free and Clear of All Claims, Liens,*

*Liabilities, Rights, Interests and Encumbrances and Granting Related Relief* [Docket No. 1157]

(together, the "Federal Lease Sale Motions") shall be considered pending separate motions to

assume Unexpired Leases under section 365 of the Bankruptcy Code as the corresponding sale

orders, Docket No. 1187 and Docket No. 1217 (the "Federal Lease Sale Orders") require additional

orders under section 365 to complete assumption and assignment.   To the extent an order granting

the *Debtors' Motion for Entry of an Order (I) Approving the Compromise and Settlement*

*Agreement By and Among the United States of America, Eagle Specialty Materials, LLC, and the*

*Debtors, and (II) Granting Related Relief* [Docket No. 2965] (the "Federal Lease Settlement

Motion") has not been entered by the Effective Date, the Court shall retain post-Effective Date

jurisdiction over the Federal Lease Sale Motions and the Federal Lease Settlement Motion, and

subject to an extension approved by the Court, the Unexpired Leases encompassed by the Federal

Lease Sale Motions shall be deemed rejected unless this Court issues orders approving assumption and assignment within 90 days of the Effective Date.

19.     Nothing contained in this Confirmation Order, the Plan Documents or the Plan: (i) shall grant any relief to any Entity that the Court is prohibited from granting by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a); (ii) release or discharge any claim for federal taxes against any Entity other than the Debtors, or enjoin the collection or assessment of such taxes; or (iii) grant the Debtors a release or discharge of any claims for federal taxes except as provided by 11 U.S.C. §§ 524 and 1141(d), or enjoin the collection or assessment of such taxes except as provided by those provisions.

20.     Notwithstanding any other provision of the Plan or this Confirmation Order, the right(s) of setoff and recoupment of the United States and Kentucky and its agencies under 11 U.S.C. §§ 553, 1129 and other applicable federal law are preserved.

21.     Without limiting the foregoing but for the avoidance of doubt, nothing in the Plan, the Plan Documents or this Confirmation Order shall affect the ability of any Governmental Unit to make demand on, recover funds and damages against, be paid by or otherwise pursue any sureties, insurers, and/or bonding companies that are jointly and severally liable with the Debtors or have an obligation to pay Governmental Units for any debts or sums not paid by or obligations not performed by the Debtors for any liabilities of the Debtors to any Governmental Unit.  All rights of Governmental Units against sureties, insurers, and/or bonding companies that are jointly and severally liable with the Debtors or have an obligation to pay Governmental Units for any debts or sums not paid by or obligations not performed by the Debtors for any liabilities of the Debtors to Governmental Units are preserved and not affected by the Plan, the Plan Documents or this Confirmation Order.

22.     Notwithstanding any provision to the contrary in the Plan, the Plan Documents or this Confirmation Order, except as provided in section 12.5 of the Plan and paragraph 35 of this Order, as to the Governmental Units, nothing in the Plan, the Plan Documents or this Confirmation Order shall, subject to section 12.5 of the Plan and paragraph 35 of this Order: (a) affect the rights of Governmental Units to assert setoff and recoupment and such rights are expressly preserved; (b) release, enjoin, impair, or discharge any non-Debtor from any Claim, liability, suit, right, or Cause of Action of Governmental Units against such non-Debtor; (c) require Governmental Units to file an administrative claim in order to receive payment for any liability described in section 503(b)(1)(B) and (C) pursuant to section 503(b)(1)(D) of the Bankruptcy Code; (d) affect or impair the exercise of any Governmental Unit's police and regulatory powers against the Debtors, the Liquidation Trust, or any non-Debtor; (e) modify the scope of section 502 of the Bankruptcy Code with respect to the claims of Governmental Units, or automatically disallow or expunge any claim, including, but not limited to claims amended in accordance with applicable law, by Governmental Units on or after the Effective Date (*provided*, *however*, that nothing herein affects the right of the Debtors or Liquidation Trustee to object to any such claims on any and all bases); (f) be construed as a settlement or compromise of any Claim, liability, suit, Cause of Action, or interest of Governmental Units; or (g) confer exclusive jurisdiction to the Bankruptcy Court with respect to Governmental Unit's claims, liabilities, and/or causes of action, except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code).

23.     Allowed Administrative Expense Claims of any Governmental Unit allowed pursuant to the Plan or the Bankruptcy Code shall be paid as provided in the Plan and shall accrue interest and penalties as provided by non-bankruptcy law until paid in full.  To the

extent the Priority Tax Claims of the United States (including any Priority Tax Claims for penalties, interest, or additions to tax) allowed pursuant to the Plan or Bankruptcy Code are not paid in full in cash on the Effective Date (to the extent allowed as of the Effective Date), then such Priority Tax Claims shall accrue interest commencing on the Effective Date and shall be paid in accordance with section 1129(a)(9)(C) and section 511 of the Bankruptcy Code as provided in the Plan. Penalty claims of the United States that are allowed and paid according to the provisions of the Plan or the Bankruptcy Code shall be assessable by the United States and accrue interest commencing in accordance with applicable law. Moreover, nothing in the Plan or this Confirmation Order shall effect a release, injunction, or otherwise preclude any claim whatsoever against any Debtor or any of the Debtors' estates by or on behalf of the United States for any liability arising: (a) out of prepetition or postpetition tax periods for which a return has not been filed; or (b) as a result of a pending audit or audit that may be performed with respect to any prepetition or postpetition tax period for which a claim is or will be allowed. Further, nothing shall enjoin the United States from amending any claim to the extent permitted by applicable law against any Debtor or any of the Debtors' estates with respect to any tax liability: (a) arising out of prepetition or postpetition tax periods for which a tax return has not been filed; or (b) from a pending audit or audit that may be performed with respect to any prepetition or postpetition tax period for which a claim is or will be allowed. Any liability arising: (a) out of prepetition or postpetition tax periods for which a return has not been filed; or (b) as a result of a pending audit or audit which may be performed with respect to any prepetition or postpetition tax period shall, if allowed, be paid in accordance with section 1129(a)(9)(A) and (C) of the Bankruptcy Code as provided in the Plan. Without limiting the foregoing, but for the avoidance of doubt, nothing contained in the Documents shall be deemed to bind the United States to any characterization of

any transaction for tax purposes or to determine the tax liability of any person or entity, including, but not limited to, the Debtors and the Debtors' estates, nor shall the Documents be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in the Plan, the Plan Documents or this Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under section 505 of the Bankruptcy Code.

24. By thirty (30) days following the entry of this Confirmation Order, the Liquidation Trustee will deny, on an interim basis, because of a lack of funds, the unadjudicated claims (the "Unadjudicated Claims") under the Debtors' Self-Funded Health Plan, as such term is defined in United HealthCare Services, Inc.'s ("UHSI") Objection to the Adequacy of the First Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for Blackjewel L.L.C. and its Affiliated Debtors and Objection to Confirmation of the First Amended Joint Chapter 11 Plan of Liquidation for Blackjewel L.L.C. and its Affiliated Debtors (the "UHSI Objection") by instructing UHSI to deny all Unadjudicated Claims.[8]  Consistent with such instruction, UHSI will (i) deny each Unadjudicated Claim, (ii) issue a customized Explanation of Benefits ("EOB") to members and providers upon the denial of the Unadjudicated Claims directing them to submit the EOB to a designated email address (in accordance with the language previously agreed to by UHSI and the Debtors, but not reviewed by the U.S. Department of Labor ("DOL")), and (iii) deliver to the Liquidation Trustee reporting showing for each Unadjudicated Claim, among other things, the claim number, the member's name, the member's identification number, the date of service, the provider's name, and the billed charges for each member (in accordance with the language

---

[8] For the sake of clarity, according to UHSI, the Unadjudicated Claims are the claims currently subject to the Claim Hold, as described in the UHSI Objection.

previously agreed to by UHSI and the Debtors, but not by the DOL). Prior to delivering the reporting, UHSI will make a reasonable attempt to add the plan reporting variation code to the report *provided*, *however*, UHSI will not be required to add the plan reporting variation code to the report if adding such code would require UHSI to manually enter the code for each individual Unadjudicated Claim; provided that if UHSI cannot provide the code, then UHSI shall cooperate and respond to the Liquidation Trustee's  and the DOL's reasonable requests for information necessary to determine how to properly allocate the Unadjudicated Claims between (a) Debtors' covered employees and dependents and (b) covered employees and dependents in the following "Bill Groups": (1) Bill Group 2- JBLCO, LLC, (2) Bill Group 3- Active Medical, (3) Bill Group 4- Forrest Machine, LLC, (4) Bill Group 6- Lexington Coal, (5) Bill Group 8- Grand Patrician Resort LLC, (6) Bill Group 9- Construction & Reclamation Services, and (7) Bill Group 10- Prep Plant Solutions LLC (collectively, the "Non-Debtor Bill Groups").  The Liquidation Trustee shall promptly provide the DOL and the employers in the Non-Debtor Bill Groups with copies of any information on the Unadjudicated Claims provided to it by UHSI. Subject to the Liquidation Trustee and Black Diamond reaching agreement on mutually acceptable terms and conditions (including with respect to compensation and/or reimbursement for Black Diamond's services), the Liquidation Trustee and Black Diamond shall enter into a services agreement with Black Diamond Insurance Group LLC ("Black Diamond") providing that Black Diamond shall (1) maintain the EOBs forwarded to the MedicalBillClaims@MiningEOB.com address referenced in the EOBs and forward such EOBs to the Liquidation Trustee and the Independent Fiduciary (as defined below) upon request, and (2) provide commercially reasonable assistance to the Liquidation Trustee and the Independent Fiduciary in the review of Unadjudicated Claims and in responding to the Liquidation Trustee's and the Independent Fiduciary's requests for Self-Funded Health Plan

information. Black Diamond shall have the right to seek relief in the Bankruptcy Court from any such request for assistance it deems to be unreasonable and which it cannot resolve consensually with the Liquidation Trustee and/or Independent Fiduciary, as applicable. Black Diamond likewise reserves the right to seek additional reasonable compensation and/or reimbursement for any extra work required to separate claims as a result of UHSI not providing the plan reporting variation code with its claims data. The Bankruptcy Court shall retain jurisdiction to adjudicate any such disputes.

25.    Notwithstanding the Bar Date Order, the Unadjudicated Claims which were submitted to UHSI as of the date of the Confirmation Order shall be considered timely filed.

26.    When a material amount of funds become available to the Liquidation Trustee to satisfy a material amount of the Unadjudicated Claims or claims related to the Debtors' 401(k) plan (the "401(k) Plan"), the Liquidation Trustee shall cooperate with the DOL in seeking a United States District Court ("District Court") order appointing one or more independent fiduciaries (the "IF" or "Independent Fiduciary") to the 401(k) Plan and the Self-Funded Health Plan including establishing the reasonable compensation of the Independent Fiduciary along with procedures for the Independent Fiduciary to request reimbursement of reasonable expenses approved by the District Court. The Liquidation Trustee, in consultation with the Independent Fiduciary and the DOL, shall determine the amount of funding available for the Unadjudicated Claims. Any difference between the billed amount of Unadjudicated Claims and the amount agreed upon herein shall be treated as a Disputed Claim. If a consensual agreement is not reached on such amount, such amount shall be determined by the Court. The Liquidation Trustee and UHSI (with respect to the Self-Funded Health Plan) shall retain  the 401(k) Plan and Self-Funded Health Plan records to the extent required by ERISA and until at least such time needed by the Independent

Fiduciary to adjudicate claims. The Liquidation Trustee and UHSI (in accordance with the immediate next paragraph set forth below), shall make such records available to the Independent Fiduciary.

27.     With respect to the Self-Funded Health Plan, in order to determine the reasonable amount of funds to be transferred from the Liquidation Trust to the Self-Funded Health Plan (the "Transferred Funds"), the Liquidation Trustee, and the Independent Fiduciary shall first cooperate, in good faith, to review the reporting provided by UHSI above in order to remove from consideration the amount of Unadjudicated Claims that appear without detailed examination not eligible for coverage  (such as, because  they are duplicative claims, claims for services subsequent to August 31, 2019 or such other facially apparent reasons). Thereafter, the Independent Fiduciary shall adjudicate and distribute the Transferred Funds on all valid claims under the Debtors' Self-Funded Health Plan. UHSI shall (1) agree to be subject to the jurisdiction of the District Court that appoints the Independent Fiduciary for purposes of the enforcement of the parties' rights in connection with the Self-Funded Health Plan and (2) confer with the Independent Fiduciary and respond to any reasonable requests (including considerations of cost) by the Independent Fiduciary that UHSI is obligated to respond to under applicable law, under any agreement which it has with any of the Debtors, or by an order entered by the District Court, provided that any such response may be subject to UHSI and the Independent Fiduciary entering into a mutually agreed upon confidentiality agreement.  With respect to the Unadjudicated Claims only, the second sentence of section 6.3.2 of the Plan shall be revised to read as follows: "If the estimated amount constitutes a maximum limitation on such Allowed Claim, the Debtors, the Liquidation Trustee, the DOL, or the Independent Fiduciary, as applicable, may elect to pursue any supplemental proceedings with respect to any ultimate Plan Distribution on account of such Claim, *provided however* that the

Liquidation Trustee shall continue to make distributions on the Allowed Claims, as provided in

the Plan, during any supplemental proceedings pursued by the Independent Fiduciary, subject to

compliance with paragraph 27 of the Confirmation Order." With respect to the Unadjudicated

Claims only, the third sentence of section 6.3.2 of the Plan shall be inapplicable and will be

replaced by the following sentence: "Notwithstanding section 502(j) of the Bankruptcy Code, with

respect to Unadjudicated Claims that have been estimated pursuant to section 502(c) of the

Bankruptcy Code or could otherwise be the subject of reconsideration of such estimation, in no

event shall the Debtors, Liquidation Trustee, the DOL and/or the Independent Fiduciary be entitled

to seek reconsideration of such estimation unless such party has filed a motion requesting the right

to seek such reconsideration on or before 60 days after the date on which such Unadjudicated

Claim is estimated."

      28.     To the extent any of the Hoops Parties, as such term is defined in the Plan,

agrees to assume liability for payment of any of the claims under the Debtors' Self-Funded Health

Plan, these terms may be adjusted in accordance with this change of circumstances; *provided*,

*however*, that nothing shall alter the obligations of UHSI described herein absent an agreement

between the Liquidation Trustee, the Independent Fiduciary and UHSI or an order of the District

Court; and provided further that nothing in paragraphs 24 through 28 of this Order creates binding

obligations upon any of the Hoops Parties and nothing in this Order shall prohibit, impair or

otherwise affect the ability of any of the Hoops Parties from agreeing with DOL upon a separate

mechanism for processing and paying Unadjudicated Claims attributable to the Non-Debtor Bill

Groups. The Debtors and the Liquidation Trustee shall reasonably cooperate in the establishment

and operation of such a mechanism for processing and paying Unadjudicated Claims attributable

to the Non-Debtor Bill Groups. Any independent fiduciary appointed as part of the Hoops Parties'

separate process with the DOL shall be afforded the same rights as the Independent Fiduciary
described in Paragraphs 24-30 of this Order, as applicable.

29.    Notwithstanding anything to the contrary set forth in the foregoing process
for resolving the Unadjudicated Claims or claims relating to the 401(k) Plan, the claims of the
DOL against the Debtors with respect to the Self-Funded Health Plan and the 401(k) Plan,
including the amounts of those claims, shall not be determined other than by an order of the
Bankruptcy Court or by a filed claim that is not subject to dispute.

30.    Any claims for the violation of ERISA are excluded from the scope of
section 12.5 of the Plan.

31.    The *Agreed Order Granting Emergency Motion of Caterpillar Financial
Services Corporation for Relief from the Automatic Stay under 11 U.S.C. § 362(d)* [Docket No.
1143] (the "Agreed Order"), entered on September 27, 2019, granted Caterpillar Financial Services
Corporation ("CFSC") relief from the automatic stay to take possession of its equipment collateral
and dispose of the same under Article 9 of the Uniform Commercial Code.  CFSC is in the process
of liquidating its collateral, and such Agreed Order requires CFSC to file an amended proof of
claim to reflect its deficiency claim, if any, that remains after the sale of the
collateral.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order,
(a) CFSC is permitted to file amended proof(s) of claim asserting any deficiency claim(s) against
any Debtor(s) on or before the date that is 30 days prior to the latest deadline for filing and serving
objections to claims established under Section 6.2.2 of the Plan, or such other date to which CFSC
and the Liquidation Trustee may otherwise agree in writing, (b) the Liquidation Trustee shall take
all action required to amend the Claims Register to reflect CFSC's filing of such proof(s) of claim;
and (c) the Liquidation Trustee, the Debtors, and the Disbursing Agent shall recognize CFSC as

the holder of the claims asserted in said proof(s) of claim, except to the extent otherwise validly transferred by CFSC to a third-party and the receipt by the Liquidation Trustee, the Debtors and the Disbursing Agent of notice of such transfer. Further, if CFSC timely files amended proof(s) of claim asserting deficiency claim(s), and those deficiency claim(s) become Allowed Claim(s) under the terms of the Plan, the claim(s) shall be treated as Allowed General Unsecured Claim(s) in Class 3 under the Plan. The foregoing shall be without prejudice to the rights of the Liquidation Trustee to object to any proof of claim filed by CFSC on any basis.

32. Notwithstanding anything to the contrary in the Plan, the Plan Documents or the Confirmation Order, the Fee Claims of the Debtors' Professional Persons incurred on or before the Effective Date shall be paid consistent with the priorities of the Bankruptcy Code. The definition of "Ongoing Professionals" as well as the provisions of the Plan that provided for priority of payment of the Fee Claims of Ongoing Professionals ahead of similarly situated creditors are hereby deleted. The professional fees and expenses of professionals retained by the Liquidation Trustee and incurred after the Effective Date shall be paid consistent with the terms of the Plan and the Liquidation Trust Agreement.

33. The Liquidation Trustee shall establish a segregated, interest-bearing account, designated as a "Disputed Claim Reserve," for the benefit of holders of Disputed Claims. When making distributions from Distributable Cash to Holders of Allowed Claims following the Effective Date, the Liquidation Trustee shall deposit in the Disputed Claim Reserve the amount that each holder of a Disputed Claim would otherwise be entitled to receive pursuant to the Plan if its Disputed Claim were an Allowed Claim at the time of the Distribution (or such other amount as is ordered by the Court or agreed to by the Liquidation Trustee and the holder of a Disputed Claim). Amounts deposited in the Disputed Claim Reserve shall remain in the Disputed Claim

Reserve until such time as a Disputed Claim becomes an Allowed Claim or the Disputed Claim is disallowed and expunged by entry of a final order by the Court (with the Liquidation Trustee being authorized to transfer any amounts related to disallowed Disputed Claims back to the main Liquidation Trust operating account).

34.     The treatment of Class 2 Secured Claims set forth in the Plan is hereby modified as follows:  Each holder of an Allowed Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for such Allowed Secured Claim, either: (i) the surrender of Collateral securing such Allowed Secured Claim by Debtors or the Liquidation Trustee, as applicable, to the holder of such Allowed Secured Claim at a valuation mutually agreeable to the holder of such Allowed Secured Claim and the Debtors or Liquidation Trustee, as applicable; or (ii)  such other treatment as may be agreed to by the holder of such Claim and the Debtors or the Liquidation Trustee, as applicable.

35.     Notwithstanding anything to the contrary in the Plan, the Plan Documents, or this Confirmation Order, with respect to U.S. EPA, U.S. Department of Interior, U.S. Army Corp of Engineers and the Kentucky Cabinet, an "Exculpated Claim" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' post-petition restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, filing, solicitation of acceptances, confirmation, approval, implementation, or administration of the Disclosure Statement, the Plan, the settlements and agreements contained in the Plan, the property (other than the Permits and the real property associated, impacted, and/or related to the Permits) to be distributed under the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the pursuit of entry of a Confirmation Order, the distribution of property (other than the Permits and

41

the real property associated, impacted, and/or related to the Permits) under the Plan, or any other related agreement; *provided*, *however*, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted willful misconduct or gross negligence. For the avoidance of doubt, no Claim, Cause of Action, obligation, or liability expressly set forth in or preserved by the Plan or this Order constitutes an Exculpated Claim.

36.     Notwithstanding anything to the contrary in the Plan, the Plan Documents, or this Confirmation Order, the current and former officers, directors, members, partners, and shareholders of the Debtors that served in such capacities both before the Petition Date and between the Petition Date and the Effective Date shall not be released or exculpated as set forth in Article 12 of the Plan, or otherwise, against claims, penalties, rights of enforcement, and causes of action asserted by the Commonwealth of Kentucky Labor Cabinet (the "Labor Cabinet"), whether now or in the future, for violations of KRS 337.020, KRS 337.200, KRS 341.260, or other statute under which the Labor Cabinet has authority to bring claims, assess penalties, bring causes of action, or which the Labor Cabinet is entitled to enforce.  For the avoidance of doubt, the Debtors' Professional Persons, excepting David J. Beckman in his capacity as an officer or director of the Debtors, the members of the Committee and the Committee's Professional Persons shall be exculpated consistent with provisions of the Plan.

37.     Any suit, action or proceeding based on any matter arising out of or in connection with, the interpretation of Exculpated Claims, as modified in this Order, may be brought before the Bankruptcy Court, provided that nothing in this Order or the Plan divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or the Plan to adjudicate any defense asserted under this Order or the Plan; *provided; however*, that

Exculpated Parties shall have the right to seek a determination by the Bankruptcy Court regarding whether an asserted claim is an Exculpated Claim.

38.     This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan.  Each federal, state, commonwealth, local, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan and this Confirmation Order.

39.     The Debtors are hereby authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such other actions, as may be necessary or appropriate to effectuate, implement, or further evidence the terms and conditions of the Plan.  The Debtors shall cooperate with any Governmental Unit in executing, delivering, filing, or recording such documents, contracts, instruments, releases, and other agreements, and in taking such other actions, as may be necessary or appropriate to effectuate, implement, or further evidence the terms and conditions of the Plan or this Order.  On and after the Effective Date, the Liquidation Trustee is authorized and empowered to issue, execute, file, and deliver or record such documents, contracts, instruments, releases, and other agreements in the name of and on behalf of the Debtors.

40.     Each term and provision of the Plan, as it may have been altered or interpreted by the terms of this Confirmation Order, is:  (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan; and (iii) non-severable and mutually dependent.

41.     This Court hereby retains jurisdiction of the Chapter 11 Cases and all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan (i) as provided

for in Article 13 of the Plan, (ii) as provided for in this Confirmation Order, and (iii) for the

purposes set forth in sections 1127 and 1142 of the Bankruptcy Code. Additionally, this Court

shall have authority to modify any deadlines set forth in the Plan upon notice and opportunity to

be heard without need to modify the Plan or Confirmation Order.

42. Except as modified herein, the release, exculpation, injunction, and

indemnification provisions contained in the Plan including, without limitation, those set forth in

Article 12 of the Plan, are expressly incorporated into this Confirmation Order as if set forth in full

and are hereby authorized and approved and shall be effective and binding on all persons or

entities, to the extent provided therein. For the avoidance of doubt, the holders of Claims in the

Non-Voting Classes shall not be deemed Releasing Parties to the extent of their Claims in the Non-

Voting Classes.

43. The failure to reference or discuss any particular provision of the Plan in

this Confirmation Order shall have no effect on the validity, binding effect, and enforceability or

such provision and such provision shall have the same validity, binding effect, and enforceability

as every other provision of the Plan.

44. The provisions of Federal Rule of Civil Procedure 62, as applicable

pursuant to Bankruptcy Rule 7062, and Bankruptcy Rule 3020(e) shall not apply to this

Confirmation Order. The period in which an appeal with respect to this Confirmation Order must

be filed shall commence immediately upon the entry of this Confirmation Order.

45. Pursuant to Bankruptcy Rule 2002(f)(7) and 3020(c), the Debtors shall

serve the notice of the Effective Date, in accordance with Section 10.3 of the Plan, no later than

60 calendar days after entry of the Confirmation Order.

46.     This Confirmation Order shall be deemed to be a separate confirmation order with respect to each Debtor and it shall be sufficient for the purposes thereof that the Clerk of this Court enters this Confirmation Order in the docket of the above-captioned jointly administered case.

47.     Subject to the occurrence of the Effective Date, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, 8001, or otherwise, immediately upon the entry of this Confirmation Order, the terms of the Plan and this Confirmation Order shall be, and hereby are, immediately effective and enforceable.

48.     The Debtors are authorized to consummate the Plan at any time after the entry of the Confirmation Order, subject to satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date as set forth in Article 10 of the Plan.  On the Effective Date, the Plan shall be deemed to be substantially consummated within the meaning in section 1101 of the Bankruptcy Code and pursuant to section 1127(b) of the Bankruptcy Code.

Submitted By:

**SUPPLE LAW OFFICE, PLLC**

Joe M. Supple, Bar. No. 8013
801 Viand St.
Point Pleasant, WV 25550
Telephone: 304.675.6249
Facsimile: 304.675.4372
joe.supple@supplelawoffice.com

– and –

**SQUIRE PATTON BOGGS (US) LLP**

*/s/ Stephen D. Lerner*
Stephen D. Lerner (admitted *pro hac vice*)
Scott A. Kane (admitted *pro hac vice*)
Travis A. McRoberts  (admitted *pro hac vice*)

201 E. Fourth St., Suite 1900
Cincinnati, Ohio 45202
Telephone: 513.361.1200
Facsimile: 513.361.1201
stephen.lerner@squirepb.com
scott.kane@squirepb.com
travis.mcroberts@squirepb.com

*Co-Counsel to the Debtors and
Debtors-in-Possession*

**EXHIBIT A**

<u>Plan</u>

(As filed on the Docket at Docket No. 2499)

**EXHIBIT B**

Disclosure Statement

(As filed on the Docket at Docket No. 2500)

**EXHIBIT C**

<u>Residual Permits</u>

(Attached)

Blackjewel LLC

| | | | | | | |
|---|---|---|---|---|---|---|
| **Unsold Permits to be Revoked** | | | | | | |
| **Permit#** | **Mine Location** | **County** | **State** | **Bonding Co.** | **Total Bond Amount - (Company and Surety Records)** | **Buyer** |
| 807-0450 | KY9 #9 | Bell | Kentucky | INIC | 869,400 | None |
| 807-5263 | Big Run HWM UG | Bell | Kentucky | INIC | 107,740 | None |
| 813-0387 | Risner #2 | Breathitt | Kentucky | INIC | 413,900 | None |
| 813-0388 | Calhoun #12 | Breathitt | Kentucky | Lexon & INIC | 2,335,000 | None |
| 813-0390 | South #12 | Breathitt | Kentucky | INIC | 5,001,600 | None |
| 813-0403 | Harbert #57 | Breathitt | Kentucky | INIC | 75,000 | None |
| 813-8029 | Wolverine Loadout | Breathitt | Kentucky | INIC | 248,900 | None |
| 836-0437 | Frasure Branch | Floyd | Kentucky | INIC | 1,714,100 | None |
| 836-0440 | Job South | Floyd | Kentucky | INIC | 322,000 | None |
| 836-5641 | Neds #132 | Floyd | Kentucky | INIC | 30,900 | None |
| 836-5642 | Hall #133 | Floyd | Kentucky | INIC | 313,900 | None |
| 848-0347 | Foresters #25 | N/A | Kentucky | INIC | 6,371,800 | None |
| 848-5553 | Bull Horn Mine | Harlan | Kentucky | INIC | 75,000 | None |
| 848-5562 | Foresters Creek | N/A | Kentucky | INIC | 197,500 | None |
| 848-5563 | Puckett #5 | N/A | Kentucky | INIC | 150,000 | None |
| 848-7049 | Foresters #24 | N/A | Kentucky | INIC | 132,100 | None |
| 848-8091 | Foresters Creek | N/A | Kentucky | INIC | 181,900 | None |
| 848-8092 | Dayhoit | N/A | Kentucky | Lexon | 121,000 | None |
| 860-0554 | Schutte | Knott | Kentucky | INIC | 238,400 | None |
| 860-5393 | Big #144 | Knott | Kentucky | INIC | 75,000 | None |
| 866-5174 | Marion Branch Face up | Leslie | Kentucky | INIC | 75,000 | None |
| 866-5178 | Portals # 18 #18 | Leslie | Kentucky | INIC | 248,500 | None |
| 866-9013 | John Miniard Br Refuse & #7 | Leslie | Kentucky | INIC | 992,500 | None |
| 867-0511 | Goose #6 | Letcher | Kentucky | Lexon & INIC | 781,100 | None |
| 867-0512 | Little #6 | Letcher | Kentucky | Lexon & INIC | 1,293,100 | None |
| 867-0521 | Cumberland #17 | Letcher | Kentucky | INIC | 2,851,500 | None |
| 867-0544 | Cumberland #17 | N/A | Kentucky | INIC | 5,651,400 | None |
| 867-9031 | Cumberland #17 | N/A | Kentucky | INIC | 1,580,500 | None |
| 897-0518 | Candle #1 | Perry | Kentucky | INIC | 988,600 | None |
| 897-0521 | Dusty #3 | Perry | Kentucky | Lexon & INIC | 2,851,500 | None |
| 897-0532 | Buckhorn | Perry | Kentucky | INIC | 600,900 | None |
| 897-0554 | Pig #4 | Perry | Kentucky | INIC | 132,900 | None |
| 898-8161 | Stonecoal Loadout | Pike | Kentucky | INIC | 169,200 | None |

**EXHIBIT D**

<u>Pending and Disputed Permits</u>

(Attached)

Blackjewel LLC

| Permit# | Mine Location | County | State | Bonding Co. | Total Bond Amount - (Company and Surety Records) | Buyer |
|---|---|---|---|---|---|---|
| | | | | **Pending and Disputed Permits to be Held by the Hosting Debtors** | | |
| 3298 | Cabin Hollow Haul Rd | N/A | Tennessee | INIC | 10,000 | Bell Energy |
| 3299 | Cabin Hollow | N/A | Tennessee | INIC | 5,420 | None |
| 89038 | Jewell #12 | Buchanan | Virginia | N/A | - | Eagle Specialty Materials |
| 1101878 | PINE CREEK #1 | Russell | Virginia | Lexon | 813,100 | Eagle Specialty Materials |
| 1102023 | PINE CREEK #2 | Russell | Virginia | Lexon | 2,680,600 | None |
| 1102128 | LOUIs LOWE MINE | Buchanan | Virginia | Lexon | 4,821,500 | Eagle Specialty Materials |
| 1102135 | Jones Fork | Buchanan | Virginia | Lexon | 2,000,900 | Eagle Specialty Materials |
| 1102136 | Jones Fork | Buchanan | Virginia | Lexon | 2,114,700 | Eagle Specialty Materials |
| 1102210 | NINE #6 | Wise | Virginia | INIC | 2,800,700 | Kopper Glo Mining |
| 1102213 | NINE #5 | Wise | Virginia | INIC | 1,200,200 | Kopper Glo Mining |
| 1200194 | ORA #3 | Buchanan | Virginia | Lexon | 177,400 | Eagle Specialty Materials |
| 1200354 | WINSTON MINE #9 | Buchanan | Virginia | Lexon | 527,100 | Eagle Specialty Materials |
| 1200614 | DJ COAL, #1 | Russell | Virginia | Lexon | 448,300 | Eagle Specialty Materials |
| 1201273 | MINE #14 | Buchanan | Virginia | Lexon | 149,900 | Eagle Specialty Materials |
| 1201345 | MINE #16 | Buchanan | Virginia | Lexon | 563,100 | Eagle Specialty Materials |
| 1201442 | DOMINION #26 | Buchanan | Virginia | Lexon | 95,200 | Eagle Specialty Materials |
| 1201497 | SOUTHERN CReSCENT MINE | Russell | Virginia | Lexon | 67,900 | Eagle Specialty Materials |
| 1201508 | DOMINION #36 | Buchanan | Virginia | Lexon | 270,000 | None |
| 1201540 | DOMINION #32 | Buchanan | Virginia | Lexon | 192,600 | Eagle Specialty Materials |
| 1201919 | HATFIELD #252 | Russell | Virginia | Lexon | 177,600 | Eagle Specialty Materials |
| 1202036 | DOMINION MINE #43 | Buchanan | Virginia | Lexon | 320,600 | Eagle Specialty Materials |
| 1202086 | WHITT #255 | Buchanan | Virginia | Lexon | 804,200 | Eagle Specialty Materials |
| 1202211 | PHILLIPS #188 | Wise | Virginia | Lexon | 522,400 | None |
| 1202250 | JSCC #4 | Buchanan | Virginia | INIC | 79,300 | Civil |
| 1202263 | Powell Mountain | N/A | Virginia | Lexon | 238,200 | Eagle Specialty Materials |
| 1301786 | DOCK #2 | Russell | Virginia | Lexon | 10,000 | Eagle Specialty Materials |
| 1302285 | Gardner Plant | N/A | Virginia | Lexon | 660,900 | Eagle Specialty Materials |
| 1401493 | MINE #29 | Buchanan | Virginia | Lexon | 10,000 | Eagle Specialty Materials |
| 1601982 | THE bANNER MINE | Russell | Virginia | Lexon | 462,000 | Eagle Specialty Materials |
| 11-0188-95 | LM10 | N/A | Virginia | N/A | 5,000 | Kopper Glo Mining |
| 807-0443 | Hignite | Bell | Kentucky | INIC | 113,600 | Bell Energy |
| 807-5251 | Garmeada | Bell | Kentucky | INIC | 348,000 | Bell Energy |
| 807-5252 | BC-1 Fan Portal @ #1 | Bell | Kentucky | INIC | 39,000 | Bell Energy |
| 807-5253 | Ma#5 | Bell | Kentucky | INIC | 136,500 | Bell Energy |
| 807-5254 | Mine Sites 1 & 2, Cabin Hollow | Bell | Kentucky | Lexon | 198,100 | Eagle Specialty Materials |
| 807-5255 | Stray Seam-Sowder Creek | Bell | Kentucky | INIC | 131,200 | Bell Energy |
| 807-5257 | Mason Seam-Beans Fork | Bell | Kentucky | Lexon | 93,400 | Eagle Specialty Materials |
| 807-5258 | Clear Fork Jellico Seam Mines | Bell | Kentucky | Lexon | 94,400 | Eagle Specialty Materials |
| 807-5262 | KY3 #3 | Bell | Kentucky | Lexon | 739,600 | Eagle Specialty Materials |
| 807-5264 | KY4 Stoney Fork UG #4 | Bell | Kentucky | INIC | 165,000 | KAMCO |
| 807-5277 | Jellico | N/A | Kentucky | INIC | 127,700 | Bell Energy |
| 807-7028 | Hignite | Bell | Kentucky | INIC | 75,000 | Bell Energy |
| 807-7029 | Ben Howard Haulroad | Bell | Kentucky | INIC | 262,500 | KAMCO |
| 807-8078 | M.B. #209 | Bell | Kentucky | Lexon | 583,500 | Eagle Specialty Materials |
| 807-8079 | M.B. #210 | Bell | Kentucky | Lexon | 2,790,000 | Eagle Specialty Materials |
| 807-8080 | Vial #9 | Bell | Kentucky | Lexon | 384,000 | Eagle Specialty Materials |
| 807-8081 | Alamo Tipple #212 | Bell | Kentucky | INIC | 75,000 | KAMCO |
| 807-8086 | Hignite | N/A | Kentucky | INIC | 335,000 | Bell Energy |
| 807-9007 | Hignite | Bell | Kentucky | INIC | 75,000 | Bell Energy |
| 807-9008 | Hignite | Bell | Kentucky | Lexon | 4,501,700 | Eagle Specialty Materials |
| 813-0406 | HWM-1 | Breathitt | Kentucky | INIC | 505,380 | Alden Resources |
| 813-0407 | Arch South Fork | Breathitt | Kentucky | INIC | 2,228,700 | Alden Resources |
| 813-5040 | Mine #3 | Breathitt | Kentucky | Lexon | 160,900 | Eagle Specialty Materials |
| 813-5041 | Mine #5 | Breathitt | Kentucky | Lexon | 303,100 | Eagle Specialty Materials |
| 813-5042 | Mine #1 | Breathitt | Kentucky | INIC | 275,800 | Alden Resources |
| 813-5043 | Mine #2 | Breathitt | Kentucky | INIC | 711,300 | Alden Resources |
| 813-7044 | Ridgeline #66 | Breathitt | Kentucky | INIC | 124,400 | Alden Resources |
| 813-8038 | P1-Flint ridge Plant | Breathitt | Kentucky | Lexon | 2,230,800 | Eagle Specialty Materials |
| 826-0697 | Lick Fork HWM #227 | Clay | Kentucky | Lexon | 545,300 | Eagle Specialty Materials |
| 826-5075 | Laurel Fork UG #229 | Clay | Kentucky | INIC | 165,200 | None |
| 836-0434 | Frasure Branch | Floyd | Kentucky | Lexon | 197,600 | Eagle Specialty Materials |
| 836-0435 | Frasure Branch | Floyd | Kentucky | Lexon | 1,675,400 | Eagle Specialty Materials |

Blackjewel LLC

| | Pending and Disputed Permits to be Held by the Hosting Debtors | | | | | |
|---|---|---|---|---|---|---|
| Permit# | Mine Location | County | State | Bonding Co. | Total Bond Amount - (Company and Surety Records) | Buyer |
| 836-0436 | Frasure Branch | Floyd | Kentucky | Lexon | 3,587,800 | Eagle Specialty Materials |
| 836-0441 | Job #17 | Floyd | Kentucky | Lexon | 260,000 | Eagle Specialty Materials |
| 836-0442 | Bevins Branch | N/A | Kentucky | Lexon | 3,059,300 | LCC |
| 836-5643 | Hoods #130 | Floyd | Kentucky | INIC | 871,000 | None |
| 848-0344 | Wallins #25 | N/A | Kentucky | INIC | 491,000 | None |
| 848-0345 | Puckett #24 | N/A | Kentucky | INIC | 503,500 | None |
| 848-0346 | Foresters #27 | N/A | Kentucky | INIC | 459,000 | None |
| 848-0348 | Foresters #24 | N/A | Kentucky | INIC | 872,500 | None |
| 848-0349 | Upperlick Surface Mine | Harlan | Kentucky | INIC | 15,500 | Kopper Glo Mining |
| 848-0350 | Stillhouse | Harlan | Kentucky | Lexon | 618,800 | Kopper Glo Mining |
| 848-0351 | Benham Spur Surface and #29 | Harlan | Kentucky | Lexon | 1,847,900 | Kopper Glo Mining |
| 848-0354 | KY6 Salt #6 | Harlan | Kentucky | Lexon | 3,833,300 | Eagle Specialty Materials |
| 848-0355 | KY8 Airplane Ridge | Harlan | Kentucky | INIC | 507,300 | KAMCO |
| 848-0357 | Peters Knob HWM | Harlan | Kentucky | INIC | 129,900 | None |
| 848-0384 | Haulroad/#3 Surfae | N/A | Kentucky | Lexon | 116,900 | Kopper Glo Mining |
| 848-5564 | Maggard Br. #160 | Harlan | Kentucky | Lexon | 160,500 | Kopper Glo Mining |
| 848-5565 | Coldiron Owl Mine | Harlan | Kentucky | INIC | 305,000 | Kopper Glo Mining |
| 848-5566 | High Splint, Low Splint #162 | Harlan | Kentucky | INIC | 631,240 | Kopper Glo Mining |
| 848-5568 | Cave Br. Mines #2 | Harlan | Kentucky | INIC | 278,000 | Kopper Glo Mining |
| 848-5570 | Winifrede #1 | Harlan | Kentucky | INIC | 235,200 | Kopper Glo Mining |
| 848-5572 | Pounding #166 | Harlan | Kentucky | INIC | 172,400 | Kopper Glo Mining |
| 848-5574 | Berham #167 | Harlan | Kentucky | Lexon | 21,600 | Kopper Glo Mining |
| 848-5575 | Timbertree Harlan, Owl #168 | Harlan | Kentucky | Lexon | 217,100 | Kopper Glo Mining |
| 848-5576 | Coldiron Kellioka Mine | Harlan | Kentucky | INIC | 130,900 | Kopper Glo Mining |
| 848-5577 | Looney Creek #170 | Harlan | Kentucky | INIC | 10,000 | Kopper Glo Mining |
| 848-5590 | Clover Fork #1 | Harlan | Kentucky | Lexon | 112,500 | Kopper Glo Mining |
| 848-5591 | Darby Fork #1 | Harlan | Kentucky | Lexon | 10,000 | Kopper Glo Mining |
| 848-5592 | Slopes/Shafts & Days #1 | Harlan | Kentucky | Lexon | 1,421,000 | Kopper Glo Mining |
| 848-5593 | Wax #2 | Harlan | Kentucky | Lexon | 150,000 | Kopper Glo Mining |
| 848-5594 | Middle #30 | Harlan | Kentucky | Lexon | 143,300 | Kopper Glo Mining |
| 848-5596 | Middle Splint | Harlan | Kentucky | Lexon | 20,000 | Kopper Glo Mining |
| 848-5599 | Panther Mine | Harlan | Kentucky | INIC | 848,200 | Kopper Glo Mining |
| 848-5600 | Clover Lick Mine | Harlan | Kentucky | INIC | 285,500 | Kopper Glo Mining |
| 848-5601 | Cave Branch Prep Plant | N/A | Kentucky | INIC | 1,245,800 | Kopper Glo Mining |
| 848-5602 | Stillhouse | N/A | Kentucky | Lexon | 89,400 | Kopper Glo Mining |
| 848-7050 | Foresters Creek Surface #24 | N/A | Kentucky | Lexon | 75,000 | Eagle Specialty Materials |
| 848-8094 | Clover Tipple | Harlan | Kentucky | INIC | 586,000 | Black Mountain Resources |
| 848-9035 | Foresters #6 | N/A | Kentucky | Lexon | 1,296,300 | Eagle Specialty Materials |
| 848-9041 | Cave Branch Prep Plant | N/A | Kentucky | INIC | 2,800,000 | Kopper Glo Mining |
| 858-0246 | Long #22 | Johnson | Kentucky | Lexon | 1,533,200 | Eagle Specialty Materials |
| 858-0247 | Canel #22 | Johnson | Kentucky | Lexon | 365,600 | Eagle Specialty Materials |
| 860-0557 | Combs #138 | Knott | Kentucky | Lexon | 481,300 | Eagle Specialty Materials |
| 860-0561 | Trace Fork | Knott | Kentucky | Lexon | 4,802,500 | Eagle Specialty Materials |
| 860-5391 | Collins #142 | Knott | Kentucky | Lexon | 75,000 | Eagle Specialty Materials |
| 860-8026 | Sunny Knott Tipple | Knott | Kentucky | Lexon | 259,600 | Eagle Specialty Materials |
| 866-0364 | Britton Branch #104 | Leslie | Kentucky | Lexon | 2,603,500 | Eagle Specialty Materials |
| 866-0366 | Stonecoal II Impoundment | Leslie | Kentucky | Lexon | 661,200 | Eagle Specialty Materials |
| 866-0367 | Dollar #107 | Leslie | Kentucky | Lexon | 630,900 | Eagle Specialty Materials |
| 866-5167 | Portals & Fan #4 | Leslie | Kentucky | INIC | 184,400 | Black Mountain Resources |
| 866-5168 | Mine 10-2/2R #2 | Leslie | Kentucky | INIC | 75,000 | Black Mountain Resources |
| 866-5169 | Portals for 10-4 #4 | Leslie | Kentucky | INIC | 176,500 | Black Mountain Resources |
| 866-5170 | Mine #60 Access #60 | Leslie | Kentucky | INIC | 21,100 | Black Mountain Resources |
| 866-5171 | Mine #67 | Leslie | Kentucky | INIC | 75,000 | Black Mountain Resources |
| 866-5175 | Dug Fork Mine | Leslie | Kentucky | Lexon | 106,400 | Eagle Specialty Materials |
| 866-5176 | Right Fork Mine UG Old #103 | Leslie | Kentucky | INIC | 294,900 | None |
| 866-5177 | Beech Fork | Leslie | Kentucky | Lexon | 141,700 | Black Mountain Resources |
| 866-5180 | Beech Fork | Leslie | Kentucky | Lexon | 153,500 | Black Mountain Resources |
| 866-5183 | Beech Fork #3 | Leslie | Kentucky | INIC | 1,144,600 | Black Mountain Resources |
| 866-8014 | Halfmile #109 | Leslie | Kentucky | Lexon | 1,710,300 | Black Mountain Resources |
| 866-8015 | Prep Pland | Leslie | Kentucky | Lexon | 226,100 | Black Mountain Resources |
| 866-8016 | BL1 Prep Plant | Leslie | Kentucky | INIC | 545,100 | Black Mountain Resources |
| 866-9014 | Adams Fork impoun Impoundn | Leslie | Kentucky | Lexon | 790,500 | Black Mountain Resources |

Blackjewel LLC

| Permit# | Mine Location | County | State | Bonding Co. | Total Bond Amount - (Company and Surety Records) | Buyer |
|---------|---------------|--------|-------|-------------|--------------------------------------------------|-------|
| | | | | Pending and Disputed Permits to be Held by the Hosting Debtors | | |
| 866-9017 | Right #4 | N/A | Kentucky | Lexon | 1,685,500 | Black Mountain Resources |
| 867-0523 | Cumberland #17 | Letcher | Kentucky | Lexon | 7,180,700 | Eagle Specialty Materials |
| 867-0540 | Cumberland #17 | Letcher | Kentucky | INIC | 1,736,200 | 4th Gen Fuels |
| 867-0546 | Cumberland #17 | N/A | Kentucky | INIC | 136,000 | Alden Resources |
| 867-5338 | Colliers Creek #1 | Letcher | Kentucky | INIC | 75,000 | Kopper Glo Mining |
| 867-5339 | Creech & F #6 | Letcher | Kentucky | Lexon | 110,700 | Kopper Glo Mining |
| 867-5340 | Owl & #5 | Letcher | Kentucky | INIC | 166,200 | Kopper Glo Mining |
| 867-5341 | Kelly-Imboden mine | Letcher | Kentucky | INIC | 160,000 | Kopper Glo Mining |
| 867-5343 | Guest #174 | Letcher | Kentucky | INIC | 75,000 | Kopper Glo Mining |
| 867-5360 | East-Kellioka | Letcher | Kentucky | INIC | 125,900 | Kopper Glo Mining |
| 867-5361 | Dorchester | Letcher | Kentucky | Lexon | 10,000 | Kopper Glo Mining |
| 867-5362 | Meadow Branch #1 | N/A | Kentucky | Lexon | 108,300 | Coking Coal, LLC |
| 867-5364 | Trace Fork #1 | N/A | Kentucky | Lexon | 354,200 | Coking Coal, LLC |
| 867-7034 | Letcher #12 | Letcher | Kentucky | Lexon | 300,000 | Kopper Glo Mining |
| 867-7035 | Trace #176 | Letcher | Kentucky | INIC | 75,000 | Kopper Glo Mining |
| 874-8006 | Prep #196 | McCreary | Kentucky | Lexon | 2,567,800 | Eagle Specialty Materials |
| 874-9006 | Refuse #196 | McCreary | Kentucky | Lexon | 348,800 | Eagle Specialty Materials |
| 880-0253 | Seng Branch | N/A | Kentucky | Lexon | 810,597 | LCC |
| 880-0264 | Laurel #147 | Martin | Kentucky | Lexon | 276,700 | LCC |
| 880-5192 | Aldridge #73 | N/A | Kentucky | Lexon | 1,644,600 | LCC |
| 880-5193 | White Cabin 9 Pegasus | N/A | Kentucky | Lexon | 841,400 | LCC |
| 880-5194 | Excel Mine #1 | N/A | Kentucky | Lexon | 364,000 | LCC |
| 880-5195 | Vanlear #78 | N/A | Kentucky | Lexon | 10,000 | LCC |
| 880-7037 | Seng Branch | N/A | Kentucky | Lexon | 602,500 | LCC |
| 895-0196 | Gay #2 | Owsley | Kentucky | INIC | 75,000 | None |
| 897-0534 | Buckhorn | Perry | Kentucky | Lexon | 75,000 | Eagle Specialty Materials |
| 897-0581 | Mid Fork-coal Branch | Perry | Kentucky | Lexon | 616,825 | Eagle Specialty Materials |
| 897-0582 | Mid #68 | Perry | Kentucky | Lexon | 635,000 | Eagle Specialty Materials |
| 898-0890 | Daugherty #233 | N/A | Kentucky | Lexon | 170,689 | LCC |
| 898-0892 | Calloway #4 | N/A | Kentucky | Lexon | 5,317,000 | LCC |
| 898-0903 | Pompey #1 | N/A | Kentucky | Lexon | 2,575,400 | LCC |
| 898-0935 | Pompey #84 | N/A | Kentucky | Lexon | 105,000 | LCC |
| 898-0936 | Pompey Haul Road | N/A | Kentucky | Lexon | 3,131,400 | LCC |
| 898-0937 | Pompey Haul Road | N/A | Kentucky | Lexon | 2,669,200 | LCC |
| 898-0938 | Pompey #85 | N/A | Kentucky | Lexon | 1,544,450 | LCC |
| 898-0951 | Mine #2A | N/A | Kentucky | Lexon | 82,000 | LCC |
| 898-0981 | Mare #23 | Pike | Kentucky | Lexon | 1,131,400 | Eagle Specialty Materials |
| 898-0985 | Bevins Branch | N/A | Kentucky | Lexon | 5,179,900 | LCC |
| 898-4480 | Majestic #88 | N/A | Kentucky | Lexon | 75,000 | LCC |
| 898-4492 | Mine #1A | N/A | Kentucky | Lexon | 97,000 | LCC |
| 898-4515 | Berkley #89 | N/A | Kentucky | Lexon | 163,100 | LCC |
| 898-4516 | Eclipse #90 | N/A | Kentucky | Lexon | 169,500 | LCC |
| 898-7104 | Pompey Haul Road | N/A | Kentucky | Lexon | 174,300 | LCC |
| U-4005-05 | Vansant #5 | McDowell | W. Virginia | Lexon | 18,760 | Eagle Specialty Materials |
| U-4010-94 | VANSANT #1 | McDowell | W. Virginia | Lexon | 41,400 | Ramaco |
| U-4013-94 | VANSANT #2 | McDowell | W. Virginia | Lexon | 51,840 | Ramaco |
| U-4014-95 | VANSANT #3 | McDowell | W. Virginia | Lexon | 11,696 | Eagle Specialty Materials |

# Notice Recipients

District/Off: 0425-3                 User: jjr                    Date Created: 3/22/2021

Case: 3:19-bk-30289                  Form ID: pdf001               Total: 2

**Recipients of Notice of Electronic Filing:**

aty     Kyle F. Arendsen        kyle.arendsen@squirepb.com
aty     Travis A. McRoberts     travis.mcroberts@squirepb.com

TOTAL: 2

## **Exhibit C**

**Trust Agreement**

# TRUST AGREEMENT

This Liquidating Trust Agreement (this "Agreement") is made this [_]<sup>th</sup> day of [_____], 2020 by and among (i) Blackjewel, L.L.C. and its debtor affiliates, in the chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of West Virginia (the "Bankruptcy Court"), jointly administered under Case Number 19-30289 (BAK) (collectively, the "Debtors") and (ii) David J. Beckman, as the trustee (together, with any successor appointed under the terms hereof, the "Trustee," and together with the Debtors, the "Parties"). Capitalized terms used in this Agreement and not defined herein have the meanings ascribed to them in the *First Amended Joint Chapter 11 Plan of Liquidation for Blackjewel, L.L.C. and Its Affiliated Debtors* (the "Plan").[1]

# RECITALS

A.     The Bankruptcy Court entered an order on [_____], 2020 confirming the Plan;

B.     The Liquidation Trust (as defined below) is established pursuant to the Plan as a liquidating trust in accordance with Treasury Regulation Section 301.7701-4(d) with no objective to continue or engage in the conduct of a trade or business except, to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust and the Plan;

C.     The Liquidation Trust is established for the purpose of liquidating the Liquidation Trust Assets in an expeditious but orderly manner for the benefit of the Liquidation Trust Beneficiaries; and

D.     The Liquidation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes pursuant to Sections 671-677 of the Internal Revenue Code of 1986, as amended, (the "Tax Code") with the Liquidation Trust Beneficiaries treated as the grantors and owners of the trust.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements contained herein and in the Plan, the Debtors and the Trustee agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Definitions.

"Allowed Claim" (with respect to a specific type of Claim, if applicable) means (a) any Claim (or a portion thereof) against a Debtor as to which no action to dispute, deny, or otherwise limit recovery with respect thereto, or alter the priority thereof (including a claim objection), has been timely commenced within the applicable period of limitation fixed by the Plan or applicable

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed in the Plan.

law, or, if an action to dispute, deny, equitably subordinate, or otherwise limit recovery with respect thereto, or alter priority thereof, has been timely commenced, to the extent such Claim has been allowed (whether in whole or in part) by a Final Order of a court of competent jurisdiction with respect to the subject matter or (b) any Claim against a Debtor or portion thereof that is allowed (i) in any contract, instrument, or other agreement entered into in connection with the Plan, (ii) pursuant to the terms of the Plan, (iii) by Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim (x) that was incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases to the extent due and owing without defense, offset, recoupment, or counterclaim of any kind and (y) that is not otherwise disputed.

"Avoidance Actions" means any and all avoidance, recovery, subordination or other actions or remedies that have been or may be brought on behalf of the Debtors or the Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code.

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under 28 U.S.C. § 2075, as amended from time to time, as applicable to the Chapter 11 Cases, and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of West Virginia.

"Business Day" means any day other than a Saturday, Sunday, or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a)(6).

"Cash" means the legal currency of the United States and equivalents thereof.

"Causes of Action" means, subject to the releases, exculpations, and injunctions set forth in the Plan, any and all actions, causes of action (including Avoidance Actions), suits, accounts, controversies, obligations, judgments, damages, demands, debts, rights, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and Claims, whether known or unknown, reduced to judgment or not, liquidated or unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or tort, arising in law, equity, or otherwise.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Commencement Date" means July 1, 2019 and July 24, 2019, as applicable.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Debtors' Chapter 11 Cases.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan, including all exhibits, appendices, supplements, and related documents.

"Disputed" means, with respect to any Claim against a Debtor, including any portion thereof, any Claim (a) that is listed on the Schedules as contingent, unliquidated, or disputed, as to which the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and Bankruptcy Rules or that is otherwise disputed by any Debtor or the Trustee in accordance with applicable law, which objection, request for estimation, or dispute has not been determined by a Final Order, or (b) with respect to which a proof of claim was required to be filed by order of the Bankruptcy Court but as to which such proof of claim was not timely or properly filed.

"Distribution Date" means the Initial Distribution Date or any of the Periodic Distribution Dates, as applicable.

"Effective Date" has the meaning ascribed to it in the Plan.

"Final Order" means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered on the docket in the Debtors' Chapter 11 Cases (or on the docket of such other court of competent jurisdiction), which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided, however,* that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment; *provided, further,* that the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

"Liquidation Trust" means the trust created pursuant to this Agreement on the Effective Date in accordance with the Plan, the Confirmation Order and the Liquidation Trust Agreement.

"Liquidation Trust Assets" means the assets to be transferred to the Liquidation Trust on the Effective Date including, without limitation, the Liquidation Trust Causes of Action, the Liquidation Trust Reserve, and all other remaining property and assets of the Debtors, including account receivables and royalty streams, but excluding the Reclamation Trust Assets.

"Liquidation Trust Beneficiaries" means the holders of the Liquidation Trust Interests.

"Liquidation Trust Causes of Action" means collectively the Causes of Action of the Debtors transferred to the Liquidation Trust on the Effective Date and any defense or

counterclaim to any Disputed Claim, but excluding any and all Causes of Action released and/or exculpated pursuant to the terms of the Plan or orders of the Bankruptcy Court.

"Liquidation Trust Interests" means the uncertified beneficial interests in the Liquidation Trust representing the right of each holder of an Allowed Claim to receive Cash distributions from the Liquidation Trust on account of such Liquidation Trust Interests in accordance with the terms of the Plan and this Agreement.

"Liquidation Trust Reserve" means, as more fully described in this Agreement, the Cash transferred to the Liquidation Trust on the Effective Date, including (i) approximately $100,000 in Cash; and (ii) the sum of $2,155,000 held in an escrow account with United Bank pending resolution of *United Bank's Motion for Adequate Protection* [Docket No. 1285], to the extent the Bankruptcy Court determines those funds are property of the Debtors.

"Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"Reclamation Trust" means the trust created pursuant to the Reclamation Trust Agreement in accordance with the Plan, and as more fully described therein, for the purpose of acting as a successor to the Debtors for the purpose of performing, managing, and funding satisfaction of the Reclamation Obligations; (ii) own the Reclamation Trust Assets, in a fiduciary capacity.

"Reclamation Trust Agreement" means the agreement to be dated as of the Plan Effective Date establishing the terms and conditions of the Reclamation Trust.

"Reclamation Trust Assets" means the assets to be transferred to the Reclamation Trust on the Effective Date including, without limitation, (i) the Reclamation Trust Reserve, (ii) the Debtors' interest in any bonds issued by the Sureties in connection with the Remaining Permits; (iii) any underlying property rights relating to or associated with the Remaining Permits; (iv) any personal property of the Debtors' remaining on the Permitted Areas; and (v) any Claims or Causes of Action that the Debtors may have against third-parties relative to the performance of the Reclamation Obligations. For the avoidance of doubt, the Reclamation Trust Assets shall not include the Liquidation Trust Assets.

"Schedules" means the schedules of assets and liabilities filed in the Chapter 11 Cases, as amended or supplemented from time to time.

"Trust Advisory Board" means the board established and constituted as provided in Article VI of this Agreement for the purpose of overseeing, reviewing and guiding the activities and performance of the Trustee, and having the rights and responsibilities set forth in this Agreement.

## ARTICLE II
## TRUSTEE

2.1 Appointment.

The Debtors hereby designate David J. Beckman to serve as the initial Trustee under the Plan, and David J. Beckman hereby accepts such appointment and agrees to serve in such capacity, effective upon the Effective Date of the Plan.

2.2 Generally.

The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Liquidation Trust and not otherwise. The Trustee shall have the authority to bind the Liquidation Trust, but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually.

2.3 Scope of Authority.

Subject to the oversight and direction of the Trust Advisory Board and the provisions of the Plan and this Agreement, the Trustee shall:

(i) have the power and authority to hold, manage, convert to Cash or non-Cash Liquidation Trust Assets obtained through the exercise of its power and authority, and distribute the Liquidation Trust Assets, including prosecuting and resolving the Liquidation Trust Causes of Action;

(ii) hold the Liquidation Trust Assets for the benefit of the Liquidation Trust Beneficiaries who are entitled to distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date;

(iii) have the power and authority to object to, prosecute objections to, compromise and settle Disputed Claims; and

(iv) have such other responsibilities as are vested in the Trustee on behalf of the Liquidation Trust pursuant to the Plan or Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan. In all circumstances, the Trustee shall act in the best interests of the Liquidation Trust Beneficiaries and in good faith with respect to the Liquidation Trust Beneficiaries, and in furtherance of the purpose of the Liquidation Trust. The Trustee shall use its reasonable best efforts to comply promptly with an affirmative direction from the Trust Advisory Board.

2.4 Retention of Professionals.

The Trustee may retain and compensate attorneys and other professionals, with the consent of the Trust Advisory Board, to assist in its duties as Trustee on such terms as the

Trustee deems appropriate without Bankruptcy Court approval. Without limiting the foregoing, the Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

2.5    Other Activities.

The Trustee, other than in its capacity as Trustee, shall be entitled to perform services for and be employed by third parties; *provided*, *however*, that such performance or employment affords the Trustee sufficient time to carry out its responsibilities as Trustee. The Trustee may, with the consent and oversight of the Trust Advisory Board, delegate the performance of its services under this Agreement and the fulfillment of responsibilities to other persons reasonably acceptable to the Trust Advisory Board. Such persons shall be entitled to be compensated and to be reimbursed for out-of-pocket disbursements in the same manner as the Trustee.

2.6    Limitation of the Trustee's Authority.

(a)    The Trustee shall not and is not authorized to engage in any trade or business with respect to the Liquidation Trust Assets or any proceeds therefrom and shall engage only in activity reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust and shall take such actions consistent with the expeditious but orderly liquidation of the Liquidation Trust Assets as is required by applicable law and consistent with the treatment of the Liquidation Trust as a liquidating trust under Treasury Regulation Section 301.7701-4(d), and such actions permitted therein.

(b)    The Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code ("Permitted Investments"), *provided*, *however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities. Any Permitted Investment made as provided for herein must have a maturity date not in excess of three months from the date of the acquisition of the Permitted Investment. The Trustee shall deposit all Cash comprising the Liquidation Trust Assets in interest-bearing accounts maintained with a domestic bank or other financial institution having a shareholders' equity or equivalent capital of not less than Five Hundred Million Dollars. The Trustee shall not be liable for interest or obligated to produce income on any moneys received by the Liquidation Trust hereunder and held for distribution or payment, except as such interest or other income shall actually be received by the Trustee.

(c)    The Trust Advisory Board may from time to time, by majority vote, restrict the Trustee from taking or initiating certain actions determined by the Trust Advisory Board to be contrary to the best interests of the Liquidation Trust.

2.7    Liability of Trustee.

Except as otherwise specifically provided herein, the Trustee, the Trustee's employees, the Liquidation Trust's employees, and the Trustee's or Liquidation Trust's professionals or

representatives shall not be held personally liable for any claim asserted against the Liquidation Trust, the Trustee, the Trustee's employees, the Liquidation Trust's employees or any of the Trustee's or Liquidation Trust's professionals or representatives. Without limiting the generality of the foregoing, the Trustee, the Trustee's employees, the Liquidation Trust's employees and any of the Trustee's or Liquidation Trust's professionals or representatives shall not be liable for any error of judgment made in good faith, or with respect to any action taken or omitted to be taken in good faith, except to the extent that the action taken or omitted to be taken by the Trustee, the Trustee's employees, the Liquidation Trust's employees or any of the Trustee's or Liquidation Trust's professionals or representatives are determined by a final order of the Bankruptcy Court to be due to their own respective gross negligence or willful misconduct.

2.8     Reliance by Trustee.

Except as otherwise provided in Section 2.7 hereof:  (i) the Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties; (ii) the Trustee may consult with legal counsel, financial or accounting advisors and other professionals to be selected by it and may rely, in good-faith, on the advice thereof, and the Trustee shall not be liable for any action taken or omitted to be taken by it in accordance with the advice thereof; and (iii) persons dealing with the Trustee shall look only to the applicable Liquidation Trust Assets to satisfy any liability incurred by the Trustee to such person in carrying out the terms of this Agreement and neither the Trustee nor its employees or the Trustee's professionals or representatives shall have any personal obligation to satisfy any such liability.

2.9     Compensation of the Trustee and Other Employees.

The Trustee shall be entitled to receive the following compensation:

(a)     A base monthly fee, which shall be $25,000 per month;

(b)     Compensation for reasonable services rendered by employees of the Liquidation Trust, *provided*, *however*, that the terms of such compensation shall be approved by the Trust Advisory Board; and

(c)     Reimbursement of reasonable costs and expenses.

The compensation set forth above shall be payable from the Liquidation Trust Assets after presentation of detailed invoices therefor to the Trust Advisory Board.  Costs and expenses of the Liquidation Trust shall include (i) reasonable fees and expenses incurred in connection with the prosecution and settlement of any Liquidation Trust Causes of Action, (ii) reasonable fees and expenses incurred in connection with the Claims resolution process, and (iii) actual reasonable out-of-pocket fees and expenses of the Trustee and its retained professionals including, without limitation, office rent, necessary travel, travel lodging, postage, personal computers and printers, photo copying, telephone and facsimile charges upon receipt of periodic billings.

2.10   Exculpation; Indemnification.

The Trustee and the Trustee's employees, agents and professionals shall be and hereby are exculpated by all Persons, including without limitation, all of the Liquidation Trust Beneficiaries, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Trustee by the Plan, this Agreement or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by Final Order of the Bankruptcy Court to have arisen out of gross negligence or willful misconduct after the Effective Date.  No holder of a Claim or other party in interest, including a holder of a General Unsecured Claim, will have or be permitted to pursue any claim or cause of action against the Trustee, the Liquidation Trust or the employees, professionals or representatives of either the Trustee or the Liquidation Trust for making payments in accordance with the Plan or for implementing the provisions of the Plan.  To the fullest extent permitted by applicable law, the Liquidation Trust shall, (i) indemnify, defend and hold harmless the Trustee and the Trustee's employees, agents and professionals from and against any and all of its actions or inactions in its capacity as, or on behalf of, the Trustee, except for actions or inactions involving fraud, willful misconduct, or gross negligence and (ii) reimburse the Trustee and the Trustee's agents and professionals for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Trustee, except for actions or inactions involving willful misconduct or gross negligence.  Any action taken or omitted to be taken with the express approval of (y) the Bankruptcy Court, or (y) the Trust Advisory Board will conclusively be deemed not to constitute gross negligence or willful misconduct; *provided*, *however*, that the Trustee shall not be obligated to comply with a direction of the Trust Advisory Board, whether or not express, which would result in a change to the distribution provisions of this Agreement and the Plan.

2.11   Termination.

The duties, responsibilities and powers of the Trustee will terminate on the date the Liquidation Trust is dissolved pursuant to Article IX of this Agreement, under applicable law in accordance with the Plan, or by an Order of the Bankruptcy Court or by entry of a final decree closing the Debtors' Chapter 11 Cases before the Bankruptcy Court; *provided that* Sections 2.9 and 2.10 above shall survive such termination, dissolution and entry.  In the event the then-appointed Trustee dies, is terminated, or resigns for any reason, the Trust Advisory Board shall promptly designate a successor trustee.

2.12   No Bond.

The Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Trustee is so otherwise ordered, all reasonable costs and expenses of procuring any such bond or surety shall be borne by the Liquidation Trust Assets.

## ARTICLE III
## ESTABLISHMENT OF THE LIQUIDATION TRUST

3.1     Transfer of Assets to Liquidation Trust.

(a)     Pursuant to the Plan, the Debtors and the Trustee hereby establish the Liquidation Trust on behalf of the Liquidation Trust Beneficiaries. The Trustee agrees to, subject to the terms of the Plan and this Agreement, accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries.

(b)     Pursuant to Revenue Procedure 94-45, for all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date as (i) a transfer of the Liquidation Trust Assets (subject to any obligations relating to those assets) directly to the Liquidation Trust Beneficiaries, in exchange for those Liquidation Trust Beneficiaries relinquishing their claims, followed by (ii) the transfer by each such class of Liquidation Trust Beneficiaries to the Liquidation Trust of the Liquidation Trust Assets (other than the Liquidation Trust Assets allocable to any disputed ownership fund) in exchange for beneficial interests in the Liquidation Trust to which such assets relate. The Liquidation Trust shall be considered a grantor trust for U.S. federal income tax purposes. Accordingly, the Liquidation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their shares of the Liquidation Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

3.2     Funding the Liquidation Trust.

On the Effective Date, the Debtors shall deposit into a segregated Liquidation Trust account Cash in the amount of approximately $100,000 to fund the operations of the Liquidation Trust.

3.3     Valuation of Assets.

As soon as practicable after the Effective Date, the Trustee shall in good faith and using reasonable efforts, determine the value of the Liquidation Trust Assets, and such valuation shall be made available from time to time, in writing, to the Liquidation Trust Beneficiaries and shall be used consistently by all parties (including, without limitation the Trustee and the Liquidation Trust Beneficiaries) for all federal income tax purposes. In connection with the preparation of the valuation contemplated by the Plan and the Liquidation Trust Agreement, the Liquidation Trust shall be entitled to retain such professionals and advisors as the Liquidation Trust shall determine to be appropriate or necessary, and the Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary. The Liquidation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

3.5    Powers.

The powers of the Trustee shall, without any further Bankruptcy Court approval, but subject to the direction and oversight of the Trust Advisory Board, and as limited by the Plan and this Agreement, include the authority:

1.    to receive, manage, invest, supervise, protect, and liquidate the Liquidation Trust Assets, withdraw and make distributions from and pay taxes and other obligations owed by the Liquidation Trust from funds held by the Trustee and/or the Liquidation Trust in accordance with the Plan, as long as such management is consistent with the Liquidating Trust's status as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) and which actions are merely incidental to its liquidation and dissolution;

2.    to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such actions, as it may deem to be reasonably necessary or appropriate to effectuate and implement the terms and conditions of the Plan;

3.    to calculate and implement distributions of the Liquidation Trust Assets contemplated by the Plan and in accordance with the interests of the Liquidation Trust Beneficiaries and to make distributions in accordance with the Plan;

4.    to object to, prosecute objections to, compromise and settle Disputed Claims and causes of action on behalf of or against the Liquidation Trust in accordance with Section 3.6 hereof in accordance with the interest of the applicable Liquidation Trust Beneficiaries;

5.    to vote any Claim or interest held by the Liquidation Trust in a case under the Bankruptcy Code and receive any distribution therefrom for the benefit of the Liquidation Trust;

6.    to protect and enforce the rights to the Liquidation Trust Assets vested in the Liquidation Trust by this Agreement by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

7.    to compromise, adjust, arbitrate, sue on or defend, abandon, or otherwise resolve or settle, in accordance with the terms hereof, claims in favor of or against the Liquidation Trust as the Liquidation Trust shall deem advisable;

8.    to determine and satisfy any and all liabilities created, incurred or assumed by the Liquidation Trust;

9.       to file, if necessary, any and all tax and information returns with respect to the Liquidation Trust and pay taxes properly payable by the Liquidation Trust, if any;

10.     prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all other tax returns required to be filed or that the Liquidating Trustee otherwise deems appropriate;

11.     request any appropriate tax determination, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

12.     to pay all reasonable expenses and make all other payments relating to the Liquidation Trust Assets;

13.     to obtain insurance coverage with respect to the liabilities and obligations of the Trustee and the Liquidation Trust (in the form of an errors and omissions policy, fiduciary policy or otherwise);

14.     to obtain insurance coverage with respect to real and personal property which may become Liquidation Trust Assets, if any;

15.     to retain and pay such law firms as counsel to the Liquidation Trust to aid the prosecution of any claims that constitute the Liquidation Trust Assets, and to perform such other functions relating thereto as may be appropriate;

16.     to retain and pay a public accounting firm to perform such reviews and/or audits of the financial books and records of the Liquidation Trust as may be appropriate in the Trustee's reasonable discretion or otherwise required hereby, and to prepare and file any tax returns or informational returns for the Liquidation Trust.  The Trustee may commit the Liquidation Trust to, and the Liquidation Trust shall pay, such accounting firm's reasonable compensation for services rendered and expenses incurred;

17.     to retain and pay such third parties, including, without limitation, one or more paying agents, as the Trustee may deem necessary or appropriate to assist the Liquidation Trust in carrying out its powers and duties under this Agreement. The Trustee may commit the Liquidation Trust to and shall pay all such Persons compensation for services rendered and expenses incurred, as well as commit the Liquidation Trust to indemnify any such parties in connection with the performance of services;

18.     to invest any moneys held as part of the Liquidation Trust Assets in accordance with the terms of Section 2.6(b) hereof;

19.     in the event that either of the separate pools of assets held by the Liquidation Trust shall fail or cease to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), to take any and all necessary actions

as it shall deem appropriate to have such assets treated as held by an entity classified as a partnership for federal tax purposes; and

20.     to exercise such other powers as may be vested in or assumed by the Liquidation Trust or the Trustee pursuant to the Plan, Bankruptcy Court order or as may be necessary and proper to carry out the provisions of the Plan.

Subject to (i) the direction and oversight of the Trust Advisory Board, and (ii) express provisions of this Agreement and the Plan, the Trustee shall have absolute discretion to pursue or not to pursue any and all claims, rights, or causes of action, or defenses as it determines is in the best interests of the Liquidation Trust Beneficiaries and consistent with the purposes of the Liquidation Trust, and shall have no liability for the outcome of its decision. The Trustee may incur any reasonable and necessary expenses in liquidating and converting the Liquidation Trust Assets to Cash. Neither the Trustee nor its successors or assigns shall fund or be obligated to fund (whether directly or indirectly) the costs of pursuing any Claim. No person dealing with the Liquidation Trust shall be obligated to inquire into the authority of the Trustee in connection with the protection, conservation or disposition of Liquidation Trust Assets.

3.6     Prosecution of Liquidation Trust Causes of Action.

(a)     Authority to Prosecute and Settle Liquidation Trust Causes of Action. After the Effective Date, only the Trustee shall have the authority to maintain, prosecute, settle, dismiss, abandon, or otherwise dispose of the Liquidation Trust Causes of Action. The Trustee may enter into and consummate settlements and compromises of the assets of the Liquidation Trust Causes of Action without notice to or approval by the Bankruptcy Court.

(b)     Standard of Conduct. The Trustee shall, including in prosecuting and settling any Liquidation Trust Cause of Action, act in the best interests of the Liquidation Trust Beneficiaries and in good faith with respect to the Liquidation Trust Beneficiaries.

(c)     Estimation of Claims. With respect to Claims to receive distributions from the Liquidation Trust, including Allowed Fee Claims, Allowed Administrative Expense Claims, Allowed U.S. Trustee Fees, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims, the Trustee, may at any time request that the Bankruptcy Court estimate any contingent Claim, unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or any other Person previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent Claim, unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be

estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

3.7    Rights of Debtors.

The Debtors shall have no Claim to or right or interest in, whether direct, residual, contingent or otherwise, in the Liquidation Trust Assets once such assets have been transferred to the Liquidation Trust.

## ARTICLE IV
## LIQUIDATION TRUST BENEFICIARIES

4.1    Rights of Beneficiaries.

Each Liquidation Trust Beneficiary will be entitled to participate in the rights due to a Liquidation Trust Beneficiary hereunder. Each Liquidation Trust Beneficiary shall take and hold its uncertificated beneficial interest subject to all of the terms and provisions of this Agreement, the Confirmation Order, and the Plan. The interest of a Liquidation Trust Beneficiary in the Liquidation Trust is in all respects personal property, and the death, insolvency, or incapacity of an individual Beneficiary, shall not terminate or affect the validity of this Agreement. A Liquidation Trust Beneficiary shall have no title to, right to, possession of, management of, or control of, the Liquidation Trust Assets except as herein expressly provided. No surviving spouse, heir or devisee of any deceased Liquidation Trust Beneficiary shall have any right of dower, homestead, or inheritance, or of partition, or any other right, statutory or otherwise, in the Liquidation Trust Assets, but the whole title to all the Liquidation Trust Assets shall be vested in the Trustee and the sole interest of the Liquidation Trust Beneficiaries shall be the rights and benefits given to such persons under this Agreement.

4.2    Limit on Transfer of Interests of Beneficiaries.

The interest of the Liquidation Trust Beneficiaries in the Liquidation Trust, which are reflected only on the records of the Liquidation Trust maintained by the Trustee, are not negotiable and shall not be transferable except: (a) pursuant to applicable laws of descent and distribution (in the case of a deceased individual Liquidation Trust Beneficiary) or (b) by operation of law. The Trustee shall not be required to record any transfer in favor of any transferee who, in the sole discretion of the Trustee, is or might be construed to be ambiguous, or to create uncertainty as to the holder of the interest in the Liquidation Trust. Until a transfer is in fact recorded on the books and records maintained by the Trustee for the purpose of identifying Liquidation Trust Beneficiaries, the Trustee, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make distributions and send communications to Liquidation Trust Beneficiaries, as though it has no notice of any such transfer, and in so doing the Trustee shall be fully protected and incur no liability to any purported transferee or any other Person.

4.3     Identification of Beneficiaries.

In order to determine the actual names, addresses, and tax identification numbers of the Liquidation Trust Beneficiaries, the Trustee shall be entitled to conclusively rely on the names, address, and tax identification numbers set forth in the Debtors' Schedules, filed proofs of claim, or other register of beneficial holders created by the applicable agent or trustee. Each Liquidation Trust Beneficiary shall furnish in writing its name, address, and tax identification number to the Trustee within 30 days of a written request from the Trustee. In the event that any such Liquidation Trust Beneficiary fails to provide the information required by the preceding sentence within six months of such request, the Claim of such holder shall be discharged and forever barred; *provided*, *however*, that any such distributions shall revert to the Liquidation Trust (notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and this Agreement or used to pay ordinary course expenses of the Liquidating Trust. Each distribution by the Trustee to the Liquidation Trust Beneficiaries shall be made in accordance with the terms set forth in the Plan, any order of the Bankruptcy Court, and this Agreement. In the event of any inconsistency between the Plan and this Agreement, the terms of this Agreement shall govern.

# ARTICLE V
# PURPOSE, AUTHORITY, LIMITATIONS AND DISTRIBUTIONS

5.1     Purpose of the Liquidation Trust.

The Liquidation Trust shall be established for the sole purpose of liquidating, administering and distributing its assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business and shall engage only in activities reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Trustee, in an expeditious but orderly manner, shall liquidate and convert to cash the Liquidation Trust Assets, make timely distributions and not unduly prolong the duration of the Liquidation Trust. The liquidation of the Liquidation Trust Assets may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all Claims, rights, Causes of Action, or otherwise. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan or in this Agreement.

5.2     Books and Records.

The Trustee shall maintain, in respect of the Liquidation Trust estate and the Liquidation Trust Beneficiaries and all others to receive distributions under this Agreement, books and records relating to the assets and income of the Liquidation Trust and the payment of expenses of, and liabilities of, claims against or assumed by, the Liquidation Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof in accordance with Article VIII hereof and to comply with applicable provisions of law, *provided that* separate books and records shall be maintained with respect to the Liquidation Trust Assets. Except as provided in Section 8.1 hereof, nothing in this Agreement

requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Liquidation Trust, or as a condition for making any payment or distribution out of the Liquidation Trust Assets. Liquidation Trust Beneficiaries shall have the right upon 30 days' prior written notice delivered to the Trustee to inspect such books and records, that relate to the assets for which such Liquidation Trust Beneficiary is a beneficiary, *provided that*, if so requested, such Liquidation Trust Beneficiary shall have entered into a confidentiality agreement satisfactory in form and substance to the Trustee.

5.3    <u>Payment of Distribution Amounts</u>.  The Trustee shall make distributions to the applicable Liquidation Trust Beneficiaries of all Cash on hand from the Liquidation Trust Assets that relate to such Liquidation Trust Beneficiaries, in accordance with this Agreement (including any Cash received from the Debtors on the Effective Date, and treating as Cash for purposes of this section any permitted investments under the Plan), except such amounts (i) that would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved), (ii) that are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Liquidation Trust during liquidation, (iii) that are necessary to pay reasonable expenses of the Liquidation Trust (including, but not limited to, any taxes imposed on the Liquidation Trust or in respect of its assets), and (iv) that are necessary to satisfy other liabilities incurred by the Liquidation Trust in accordance with the Plan or this Agreement.

5.4    <u>Payment of Compensation of Trustee.</u>  The Trustee may pay the compensation of the Trustee and other costs and expenses of the Liquidation Trust before approving or making distributions to or for the Liquidation Trust Beneficiaries.

5.5    <u>Administration of Distributions</u>.

(a)    <u>Manner of Payment</u>.  At the option of the Trustee, any Cash payment to be made hereunder may be made by a check or wire transfer.

(b)    <u>Interest on Claims</u>.  Unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Commencement Date on any Claim.

(c)    <u>Setoffs and Recoupment</u>.   The Trustee may, but shall not be required to, setoff against or recoup from any Claim any Claims of any nature whatsoever that the Trustee may have against the claimant, *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Trustee or their respective successors of any such Claim it may have against such claimant.

(d)    <u>Unclaimed Distributions</u>.  In the event that any distribution to any Liquidation Trust Beneficiary is returned as undeliverable and/or the distribution check is not cashed within 120 days of the issuance of such check, the Trustee shall use commercially reasonable efforts to determine the current address of such Liquidation Trust Beneficiary, but no distribution to such Liquidation Trust Beneficiary shall be made unless and until the Trustee has determined the

then-current address of such Liquidation Trust Beneficiary, at which time such distribution shall be made to such Liquidation Trust Beneficiary without interest; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall be returned to the Trustee, and shall revert to the Liquidation Trust and the Claim of any Liquidation Trust Beneficiary to such property or interest in property shall be discharged and forever barred; *provided*, *however*, that unclaimed distributions made by the Trustee shall revert to the Liquidation Trust (notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and this Agreement or used to pay ordinary course expenses of the Liquidating Trust.

(e)     Compliance with Laws. Any and all distributions of Liquidation Trust Assets shall be in compliance with applicable laws, including but not limited to, applicable federal and state securities and tax laws.

(f)     Abandonment. With the approval of the Trust Advisory Board, the Trustee may abandon in any commercially reasonable manner (including abandonment or donation to a charitable organization of the Trustee's choice) any property that the Trustee reasonably concludes is of no benefit to the applicable Liquidation Trust Beneficiaries.

5.6     Periodic Evaluation.
(a)     Claims Analysis and Claims Reconciliation Process. On the first anniversary of the Effective Date, and every six months thereafter, the Trustee shall (a) with respect to each Claim or cause of action held by the Liquidation Trust (i) estimate the potential recovery relating to such Claim or cause of action, (ii) estimate the cost to the Liquidation Trust to achieve such result, (iii) estimate the time required to obtain such a result and (b) prepare a report to the Trust Advisory Board containing such information. The Trust Advisory Board shall instruct the Trustee to settle or abandon those Claims or causes of action which, in the sole discretion of the Trust Advisory Board are no longer economical to pursue. Every six months after the Effective Date, the Trustee shall also prepare a report to the Trust Advisory Board containing an update with respect to the Claims reconciliation process.

## ARTICLE VI
## TRUST ADVISORY BOARD

6.1     Trust Advisory Board.
(a)     The Trust Advisory Board shall be comprised of three members initially selected by [_____]. The Trust Advisory Board shall have the authority and responsibility to oversee, review, and guide the activities and performance of the Liquidation Trust and shall have the authority to remove the Trustee for any reason. Without limiting the foregoing, in addition to the other powers and duties of the Trust Advisory Board set forth separately in the Plan or this Agreement, the Trust Advisory Board shall have the authority at any meeting of the Trust Advisory Board to (i) make any determination in accordance with this Agreement with respect to or restriction on the use or disposition of the Liquidation Trust Assets, (ii) make any determination with respect to (x) the compensation of the Trustee for its services rendered under this Agreement and the Plan or (y) the reimbursement of expenses incurred by the Trustee in

performing its duties under this Agreement and the Plan; and (iii) vote with respect to an amendment of this Agreement pursuant to Section 10.1 of this Agreement. The Trustee shall consult with and provide information to the Trust Advisory Board.

(b)     Notwithstanding anything in this Article VI, the Trust Advisory Board shall not take any action which will cause the Liquidation Trust to fail to qualify as one or more "liquidating trusts" for U.S. federal income tax purposes.

6.2     Manner of Acting.

(a)     A majority of the total number of members of the Trust Advisory Board then in office shall constitute a quorum for the transaction of business at any meeting of the Trust Advisory Board. The affirmative vote of a majority of the members of the Trust Advisory Board present at a meeting at which a quorum is present shall be the act of the Trust Advisory Board except as otherwise required by law or as provided in this Agreement. Any or all of the members of the Trust Advisory Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any member of the Trust Advisory Board participating in a meeting by this means is deemed to be present in person at the meeting.

(b)     Any member of the Trust Advisory Board who is present at a meeting of the Trust Advisory Board when action is taken is deemed to have assented to the action taken unless: (i) such member of the Trust Advisory Board objects at the beginning of the meeting (or promptly upon his/her arrival) to holding it or transacting business at the meeting; or (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice of his/her dissent or abstention to the Trust Advisory Board before its adjournment. The right of dissent or abstention is not available to any member of the Trust Advisory Board who votes in favor of the action taken.

6.3     Trust Advisory Board's Action Without a Meeting. Any action required or permitted to be taken by the Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Trust Advisory Board as evidenced by one or more written consents describing the action taken, signed by the Trust Advisory Board and filed with the minutes or proceedings of the Trust Advisory Board.

6.4     Tenure, Removal, and Replacement of the members of the Trust Advisory Board. The authority of the members of the Trust Advisory Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Liquidation Trust is dissolved in accordance with Section 9.1. The service of the members of the Trust Advisory Board will be subject to the following:

(a)     The members of the Trust Advisory Board will serve until death or resignation pursuant to subsection (b) below, or removal pursuant to subsection (c) below;

(b)     A member of the Trust Advisory Board may resign at any time by providing a

written notice of resignation to the remaining members of the Trust Advisory Board. Such resignation will be effective when a successor is appointed as provided herein;

(c)      The members of the Trust Advisory Board may be removed, and in the event of a vacancy in such member's position (whether by removal, death or resignation) a new member may be appointed, by the unanimous vote of the remaining members of the Trust Advisory Board. The appointment of a successor member of the Trust Advisory Board will be evidenced by the filing with the Bankruptcy Court of a notice of appointment, which notice will include the name, address, and telephone number of the successor member of the Trust Advisory Board;

(d)      Immediately upon appointment of any successor member of the Trust Advisory Board, all rights, powers, duties, authority, and privileges of the predecessor member of the Trust Advisory Board hereunder will be vested in and undertaken by the successor member of the Trust Advisory Board without any further act; and the successor member of the Trust Advisory Board will not be liable personally for any act or omission of the predecessor member of the Trust Advisory Board.

6.5      Out-of-Pocket Expenses. Each member of the Trust Advisory Board shall be entitled to reimbursement by the Trustee from the Liquidation Trust Assets for actual, reasonable out-of-pocket fees and expenses incurred in their capacity as a member of the Trust Advisory Board (which shall not include legal or other professional advisors). Except as provided for in this Section 6.5, the members of the Trust Advisory Board shall not be entitled to receive any other form of compensation.

6.6      Liability of Trust Advisory Board. Except as otherwise specifically provided herein, the members of the Trust Advisory Board shall not be held personally liable for any claim asserted against any such Person, the Liquidation Trust, the Trustee, the Trustee's employees, the Liquidation Trust's employees, or any of the Trustee's or Liquidation Trust's professionals or representatives. Without limiting the generality of the foregoing, the members of the Trust Advisory Board shall not be liable for any error of judgment made in good faith, or with respect to any action taken or omitted to be taken in good faith, except to the extent that the action taken or omitted to be taken by is determined by a Final Order of the Bankruptcy Court to be due to their own respective intentional breach of this Agreement, gross negligence, or willful misconduct.

6.7      Exculpation; Indemnification. The members of the Trust Advisory Board shall be and hereby are exculpated by all Persons, from any and all claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such members of the Trust Advisory Board by the Plan, this Agreement, or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by Final Order of the Bankruptcy Court to be due to their own respective intentional breach of this Agreement, gross negligence, or willful misconduct after the Effective Date. No Liquidation Trust Beneficiary or other party in interest will have or be permitted to pursue any claim or cause of action against the members of the Trust Advisory Board for making or authorizing payments in accordance with the Plan or for implementing the provisions of the Plan. To the fullest extent permitted by applicable law, the Liquidation Trust shall, from the Liquidation Trust Assets, (i) indemnify,

defend, and hold harmless the members of the Trust Advisory Board from and against any and all of their actions or inactions in their capacities as such, except for actions or inactions involving fraud, willful misconduct, or gross negligence and (ii) reimburse the members of the Trust Advisory Board for fees and expenses incurred in defending any and all of their respective actions or inactions in their capacities as such, except for actions or inactions involving willful misconduct or gross negligence. Any action taken or omitted to be taken with the express approval of the Bankruptcy Court will conclusively be deemed not to constitute gross negligence or willful misconduct.

## ARTICLE VII
## SUCCESSOR TRUSTEE

### 7.1  Resignation.

The Trustee may resign by giving not less than ninety (90) days prior written notice thereof to the Trust Advisory Board.

### 7.2  Removal.

The Trustee may be removed upon the unanimous vote of the Trust Advisory Board with or without cause. Any removal of the Trustee shall become effective on such date as may be specified by the Trust Advisory Board. In the event of the removal of the Trustee, the Trustee shall be entitled to immediate payment of all compensation earned by the Trustee through and including the date of such removal.

### 7.3  Acceptance of Appointment by Successor Trustee.

Any successor Trustee shall be appointed by the Trust Advisory Board by an acknowledged written instrument delivered to the successor Trustee, or if the Trust Advisory Board fails to timely appoint such successor, the Bankruptcy Court. Any successor Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Liquidation Trust records. Thereupon, such successor Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts, and duties of his predecessor in the Liquidation Trust with like effect as if originally named herein; *provided*, *however*, that a removed or resigning Trustee shall, nevertheless, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Liquidation Trust all the estates, properties, rights, powers, and trusts of such predecessor Trustee.

## ARTICLE VIII
## TAX MATTERS

### 8.1  Tax Reporting.

(a)  Tax Returns and Statements. The Trustee shall file tax returns for the Liquidation Trust treating the Liquidation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 8.1 and Section 9.10 of the Plan, for the benefit of

the Liquidation Trust Beneficiaries. The Trustee also will annually send to each Liquidation Trust Beneficiary a separate statement setting forth the Liquidation Trust Beneficiary's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Liquidation Trust) as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidation Trust that is required by any governmental unit.

(b)     Allocations of Liquidation Trust Taxable Income.  Subject to the provisions of Section 8.2(a) hereof, allocations of Liquidation Trust taxable income among the Liquidation Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all its assets (valued at their tax book value) to the Liquidation Trust Beneficiaries, in each case up to the tax book value of the assets treated as contributed by the Liquidation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust. Taxable loss of the Liquidation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the Liquidation Trust Assets. The tax book value of the Liquidation Trust Assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable tax regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)     Payment of Taxes.  The Trustee shall be responsible for payments, out of the Liquidation Trust Assets, of any taxes imposed on the trust or its assets including any Disputed Claims reserve with respect to Liquidation Trust Assets. In the event, and to the extent, any Cash retained on account of Disputed Claims in a Disputed Claims reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Trustee as a result of the resolutions of such Disputed Claims; *provided*, *however*, that any taxes that reduce distributions pursuant to the foregoing clauses (i) and (ii) shall, for all purposes of this Agreement, be treated as amounts distributed to those holders of Claims whose distributions are so reduced.

8.2     Tax Treatment of Disputed Claims Reserve.  Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Trustee of a private letter ruling if the Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Trustee), the Trustee may (A) timely elect to treat any Disputed Claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax

20

purposes. All parties (including the Trustee and the Liquidation Trust Beneficiaries) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.

8.3     Withholding. The Trustee may withhold from amounts otherwise distributable to any entity any and all amounts, determined in the Trustee's sole discretion, required by the Liquidation Trust Agreement, any law, regulation, rule, ruling, directive, treaty, or other governmental requirement. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Trustee may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within 180 days, such distribution shall be deemed an unclaimed distribution and treated in accordance with Section 5.5(e) of this Agreement.

8.4     Valuation. The valuation of the Liquidation Trust Assets prepared pursuant to Section 9.4 of the Plan shall be used consistently by all parties (including the Trustee and the Liquidation Trust Beneficiaries) for all federal income tax purposes.

8.5     Expedited Determination of Taxes. The Trustee may request an expedited determination of taxes of the Debtors or the Liquidation Trust, including any Disputed Claims reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors or the Liquidation Trust for all taxable periods through the dissolution of the Liquidation Trust.

## ARTICLE IX
## DISSOLUTION

9.1     Dissolution of Liquidation Trust.

The Liquidation Trust shall be dissolved, in accordance with this section and at such time as (i) all of the Liquidation Trust Assets have been distributed pursuant to the Plan and this Agreement, (ii) the Trustee determines that the administration of any remaining Liquidation Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (iii) all distributions required to be made by the Trustee under the Plan and this Agreement have been made; provided, however, that in no event shall the Liquidation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court determines that a fixed period extension (not to exceed two years, including any prior extensions) is necessary to facilitate or complete the recovery and liquidation of the Liquidation Trust Assets. If at any time the Trustee determines, in reliance upon such professionals as the Trustee may retain, that the expense of administering the Liquidation Trust so as to make a final distribution to the Liquidation Trust Beneficiaries is likely to exceed the value of the remaining Liquidation Trust

Assets, the Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidation Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation" as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Liquidation Trust, and any insider of the Trustee, and (iii) dissolve the Liquidation Trust.

## ARTICLE X
## AMENDMENT AND WAIVER

10.1    Amendment; Waiver.

(a)    The Trustee, with the prior approval of the majority of the members of the Trust Advisory Board, may amend, supplement, or waive any provision of this Agreement without notice to or the consent of any Liquidation Trust Beneficiary or the approval of the Bankruptcy Court: (i) to cure any ambiguity, omission, defect or inconsistency in this Agreement; *provided that* such amendments, supplements or waivers shall not adversely affect the distributions to be made under this Agreement to any of the Liquidation Trust Beneficiaries, or adversely affect the U.S. federal income tax status of the Liquidation Trust as a "liquidating trust;" (ii) to comply with any requirements in connection with the U.S. Federal income tax status of the Liquidation Trust as two separate "liquidating trusts;" (iii) to comply with any requirements in connection with maintaining that the Liquidation Trust is not subject to registration or reporting requirements of the Exchange Act, or the Investment Company Act; (iv) to make the Liquidation Trust a reporting entity and, in such event, to comply with or seek relief from any requirements in connection with satisfying the registration or reporting requirements of the Exchange Act or the Investment Company Act; and (v) to evidence and provide for the acceptance of appointment hereunder by a successor trustee in accordance with the terms of this Agreement and the Plan.

(b)    Any substantive provision of this Agreement may be amended or waived by the Trustee, subject to the prior approval of a majority of the members of the Trust Advisory Board, with the approval of the Bankruptcy Court upon notice and an opportunity for a hearing; *provided*, *however*, that no change may be made to this Agreement that would adversely affect the distributions to be made under this Agreement to any of the Liquidation Trust Beneficiaries, or adversely affect the U.S. Federal income tax status of the Liquidation Trust as two separate "liquidating trusts." Notwithstanding this Section 10.1, any amendments to this Agreement shall not be inconsistent with the purpose and intention of the Liquidation Trust to liquidate in an expeditious but orderly manner the Liquidation Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d).

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1    Intention of Parties to Establish Grantor Trust.

This Agreement is intended to create a grantor trust with respect to the Liquidation Trust Beneficiaries for United States federal income tax purposes, for the benefit of the Liquidation Trust Beneficiaries to the extent provided by law.

Case 25-90089 Document 602 Filed in TXSB on 02/21/25 Page 171 of 175
Case 25-90089 Document 260-1 Filed in TXSB on 02/20/25 Entered 02/21/25 16:42:27 Desc Main
Document Exhibit A Page 241 of 275

11.2    <u>Preservation of Privilege</u>.

In connection with the Liquidation Trust Causes of Action, any applicable privilege or immunity of the Debtors (or Debtors), including but not limited to any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral), and all defenses, claims, counterclaims, and rights of setoff or recoupment shall vest in the Liquidation Trust and may be asserted by the Trustee. Notwithstanding the Debtors' providing any privileged information to the Trustee, the Liquidation Trust, or any party or person associated with the Liquidation Trust, such privileged information shall remain privileged. The Liquidation Trust shall have no right to waive the attorney-client privilege, work product, or other protection or immunity of any information received from the Debtors. The Debtors retain the right to waive their own privileges or immunities.

11.3    <u>Debtors' Cooperation and Supply of Information and Documentation</u>.

Upon written request from the Trustee, the Debtors shall provide commercially reasonable cooperation, and shall supply at the Liquidation Trust's sole expense and subject to confidentiality protections reasonably acceptable to the Debtors, all reasonable information, books, records, and documentation, to the Trustee that is required to promptly, diligently, and effectively evaluate, file, prosecute, and settle the Liquidation Trust Causes of Action. Additionally, upon request by the Trustee, the Debtors shall use commercially reasonable efforts to make available personnel with information relevant to the Liquidation Trust Causes of Actions.

11.4    <u>Prevailing Party</u>.

If the Trustee or the Liquidation Trust, as the case may be, is the prevailing party in a dispute regarding the provisions of this Agreement or the enforcement thereof, the Trustee or the Liquidation Trust, as the case may be, shall be entitled to collect any and all costs, expenses, and fees, including attorneys' fees, from the nonprevailing party incurred in connection with such dispute or enforcement action.

11.5    <u>Laws as to Construction</u>.

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of law which would require the application of the law of another jurisdiction. In the event of any conflict between the terms of this Agreement and the Plan, the Plan shall control. To the maximum extent allowed by law, the Bankruptcy Court shall have exclusive jurisdiction of matters arising out of or in connection with this Agreement.

11.6    <u>Severability</u>.

If any provision of this Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to

any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

11.7    Notices.

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended at such address as set forth below or such other address as filed with the Bankruptcy Court:

If to the Trust Advisory Board or the Trustee:

[_____]
[_____]
[_____]
Attn: [_____]

If to the Trustee, then to:

[_____]
[_____]
[_____]
Attn: [_____]

If to Members of the Trust Advisory Board, then to each of:

[_____]
[_____]
[_____]
[_____]

[_____]
[_____]
[_____]
[_____]

[_____]
[_____]
[_____]
[_____]

11.8    Notices if to a Liquidation Trust Beneficiary.

Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended to the name and address set forth in the case of a Liquidation Trust Beneficiary, on the Debtors' Schedules or such Liquidation Trust Beneficiary's proof of claim, such other notice filed with the Bankruptcy Court and the Liquidation Trust or such other means reasonably calculated to apprise the Liquidation Trust Beneficiary.

11.9     <u>Headings</u>.

The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

11.10   <u>Actions Taken on Other Than Business Day</u>.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

11.11   <u>Inconsistencies</u>.

In the event of any inconsistency between this Agreement and the Reclamation Trust Agreement, the provisions of this Agreement shall govern.

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as the date of the first above written.

Blackjewel, L.L.C., on behalf of itself and its debtor affiliates

By:_____

Name:_____

[_____], Trustee

By:_____

Name:_____

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing pleading was served on February 21, 2025, via electronic mail and filing through the Court's ECF system, on:

John A. Budig
Daniel M. O'Hare
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
Fax: (304) 342-1110
jbudig@baileyglasser.com
dohare@baileyglasser.com

Nicholas S. Johnson
BAILEY & GLASSER, LLP
1055 Thomas Jefferson St. NW
Suite 540
Washington, D.C. 20007
Telephone: (202) 463-2101
Fax: (202) 463-2103
njohnson@baileyglasser.com

*Counsel for Bluegrass Natural Resources, LLC*

- and -

James R. Irving
April A. Wimberg
DENTONS BINGHAM GREENEBAUM
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
Telephone: (502) 589-4200
james.irving@dentons.com
april.wimberg@dentons.com

*Counsel for the INMET Trust*

*/s/ F. Maximilian Czernin*
F. Maximilian Czernin (KY 93674)