**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INMET MINING, LLC,[1] | ) | Case No. 23-70113 |
| | ) | |
| Debtor. | ) | Hon. Gregory R. Schaaf |
| | ) | |
| BLUEGRASS NATURAL RESOURCES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 25-7001 |
| | ) | |
| BLACKJEWEL LIQUIDATION TRUST by and through DAVID J. BECKMAN, TRUSTEE, and THE LIQUIDATING TRUST OF INMET MINING, LLC, | ) | Hon. Douglas L. Lutz |
| | ) | |
| Defendants. | ) | |
| | ) | |
| BLACKJEWEL LIQUIDATION TRUST, LLC by and through DAVID J. BECKMAN, TRUSTEE, | ) | |
| | ) | |
| Counterclaim-Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BLUEGRASS NATURAL RESOURCES, LLC, and THE LIQUIDATING TRUST OF INMET MINING, LLC, | ) | |
| | ) | |
| Counterclaim-Defendants. | ) | |

---

[1] The Debtor in this Chapter 11 case, and the last four digits of the Debtor's taxpayer identification number, are as follows: INMET Mining, LLC (1693).

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF/ COUNTERCLAIM DEFENDANT
BLUEGRASS NATURAL RESOURCES, LLC'S MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

Enough is enough. To date, the Blackjewel Liquidation Trust, LLC, by and through David J. Beckman, Trustee (the "Trust") has failed in an appeal of the 2023 Sale Order (as defined below) that this Court entered in the above-captioned case. It has failed in an appeal of this Court's determination that INMET's royalty obligations do not run with the land. It has brought meritless allegations of tortious interference against affiliates of Plaintiff Bluegrass Natural Resources, LLC ("Bluegrass"), which are awaiting summary judgment, related to the transactions approved by this Court's 2023 Sale Order. And now, in this case, the Trust once again asks this Court to conclude that its own 2023 Sale Order does not mean what it says.

This case is a dispute over ownership of real property. In its 2023 Sale Order, this Court made an express finding that Debtor INMET Mining, LLC ("INMET") was "the sole and lawful owner" of the property in question. This Court approved the sale of the property in question from INMET to Bluegrass, free and clear. It further authorized Bluegrass to execute deeds reflecting the sale of the property to Bluegrass. And the Trust objected to exactly *none* of this, despite objecting, appealing, and suing on multiple other grounds. Indeed, the Trust had been afforded "[a] reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein," yet it stood silent.

Then, roughly a year later, after Bluegrass had invested substantial capital in running a coal processing business on the real property at issue, including catching up on unpaid taxes, the Trust belatedly spoke up. Based on a single sentence in a poorly drafted contract from 2019, the Trust now argues, years after the fact, that it did not sell the real property at issue to INMET. Inexplicably, according to the Trust, it sold INMET a preparation plant, a refuse impoundment, a

1

rail loadout, and all the associated permits, but did *not* sell or lease the land on which those things sit. Then, the Trust stood by and watched INMET and then Bluegrass conduct coal mining and processing operations on the land for five years, without objection.

The Trust is wrong. First, res judicata bars any attempt to undo the 2023 Sale, not to mention the 2019 Sale. The Trust had every opportunity to object and—even while drawing the Court's attention to the issue now before this Court—never claimed that it owned the assets in dispute. Thus, the Trust cannot complain now because of its earlier inaction.

Second, the contract on which the Trust bases its arguments is, at a minimum, ambiguous, and at best, expresses an intention to sell the disputed property to INMET. Given the Blackjewel Debtors' extreme financial distress and their reckless pre-petition recordkeeping, the parties to the 2019 Sale lacked readily available schedules of owned real property. In view of the vacuum of information, the Blackjewel Debtors and INMET did the following. First, they relied on a consultant, Marshall Miller & Associates, Inc. ("Marshall Miller") to research and create those schedules. But Marshall Miller mistakenly concluded that the Blackjewel Debtors owned no real property in Lee County, Viriginia, leading to a mistake in some language in the 2019 Sale. Second, anticipating those issues, they included a catchall statement that "[i]t is the intention of the parties that Buyer acquire, lease or sublease all assets, properties and rights necessary for the operation of the Purchased Business," which would necessarily include the property in dispute here.

Third, even assuming *arguendo* that res judicata does not apply, the Court should grant summary judgment on the Trust's slander of title counterclaim, because the Trust cannot prove malice or special damages as required.

Fourth, the Court should grant summary judgment in favor of Bluegrass on the Trust's affirmative defenses of equitable estoppel, judicial estoppel, unclean hands, and fraudulent and

2

intentional misconduct. Not only can the Trust not prove that Bluegrass made any misrepresentation, changed its position, or engaged in fraudulent activity or other bad faith action, but Bluegrass can prove the opposite—that it acted pursuant to this Court's Order. Therefore, the Court should grant Bluegrass summary judgment on those defenses.

For these reasons, and those discussed below, Bluegrass respectfully moves the Court to dismiss the Trust's Counterclaims in their entirety and to enter judgment in its favor on Count One of its Complaint (for a declaratory judgment that Bluegrass owns the Disputed Assets[2]), as well as the Trust's affirmative defenses of equitable estoppel, judicial estoppel, unclean hands, and fraudulent and intentional misconduct.

## **FACTUAL BACKGROUND**

### A.    The Lone Mountain Division and the Lee County Surface Parcels Become Property of the Blackjewel Debtors' Bankruptcy Estate.

The relevant part of this case begins in 2017. Back then, Arch Coal, Inc., through subsidiaries, owned coal mining and processing assets along the border of Virginia and Kentucky that it called the "Lone Mountain Division." *See* Ex. 4, Beckman Dep. 27:20-25. And Ark Land Company, Arch Coal's landowning subsidiary, was the title owner of surface parcels in Lee County, Virginia, (the "Lee County Surface Parcels")[3] upon which sits the Lone Mountain coal processing and preparation plant ("Lone Mountain Prep Plant"). *See* Exs. 2, 22-28, BNR017852-BNR017901.

In 2017, Revelation Energy, then owned by Jeff Hoops, was on a mission to acquire distressed coal assets.  Consistent with that mission, Revelation Energy targeted Arch Coal's Lone

---

[2] The "Disputed Assets" consist of disputed properties located in Lee and Wise Counties, Virginia, and Harlan County, Kentucky.
[3] The Lee County Surface Parcels are identified in the schedule at Appendix A of each deed. *See* Exs. 2, 22-28, Appendix A.

Mountain Division. *See* Ex. 4, Beckman Dep. 27:20-5; Ex. 1, Trust 30(b)(6) Dep. 8:4-7. Arch Coal and Revelation Energy agreed to an equity purchase under which Revelation Energy would acquire all the membership interests in Arch's subsidiary, Lone Mountain Processing, LLC. *Id*.

But because the Lone Mountain Prep Plant was constructed on the Lee County Surface Parcels, Hoops's companies needed to own the Lee County Surface Parcels. The parties had a solution. On September 7, 2017, Ark Land, though various mesne conveyances, transferred title to the Lee County Surface Parcels to Lone Mountain Processing, LLC. *See* Ex. 1, Trust 30(b)(6) Dep. 7:20-8:3; 9:3-4; Ex. 2, BNR017895-BNR017901. Ten days later, on September 17, 2017, affiliates of Arch Coal sold all of the membership interests in Lone Mountain Processing, LLC to Revelation Energy, LLC. *See* Ex. 1, Trust 30(b)(6) Dep. 8:4-7; 9:3-4.

But soon, Hoops's businesses would suffer a high-speed come-apart. In July 2019, Blackjewel, L.L.C. and affiliated debtors, including Lone Mountain Processing, LLC (the "Blackjewel Debtors") filed voluntary Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of West Virginia (the "West Virginia Court"). *In re Blackjewel, LLC*, Chap. 11 No. 19-30289 (Bankr. S.D.W. Va. July 1, 2019) (the "Blackjewel Bankruptcy Docket"), ECF No. 1. The Lee County Surface Parcels, therefore, became part of the Blackjewel Debtors' estate.

### B.    The Blackjewel Debtors Conduct a Warp-Speed Sale Process Resulting in Kopper Glo/INMET Winning an Auction for the Lone Mountain Division.

To all involved, and to many observers, the Blackjewel bankruptcy was an exercise in extreme crisis management. Mr. Beckman, who, post-petition, was appointed interim CEO of the Blackjewel Debtors, compared the Blackjewel Debtors' dire financial situation to a "melting ice cube." Blackjewel Bankruptcy Docket, ECF No. 312, ¶ 36. *See also* Ex. 3, Hobson Dep. 56:14-23 (describing the process of finalizing documents as "hectic"). For these reasons, Mr. Beckman

4

"proposed a sale process that [was] significantly shorter than the norm in other Chapter 11 cases."
*See* Ex. 4, Beckman Dep., 42:3-15.

Less than a month after being appointed, Mr. Beckman convened an auction to sell the
Blackjewel Debtors' assets. *Id*. at 89:8-13. Bleary-eyed and full of late-night pizzas, Mr. Beckman
and his investment bankers from Jefferies dragged bidders through three straight days of auction
proceedings. *Id*. Qualified bidders at the auction were asked to bid on assets that had been divided
into so-called "Lots." *Id.* at 70:2-6. The Lots matched Revelation's business divisions: Black
Mountain/Lone Mountain Division; BHL Division; Virginia Division; etc. *Id*.

Kopper Glo Mining LLC (an affiliate of INMET) emerged from the auction as the winning
bidder for the Black Mountain/Lone Mountain division assets. *Id*. at 91:7-16. The auction
concluded without any remark or reservation that the Blackjewel Debtors were excluding the Lee
County Surface Parcels from the sale to Kopper Glo/INMET. *Id*. at 91:25 – 92:3. From there,
Kopper Glo/INMET and the Blackjewel Debtors turned to papering up their deal. *Id*., 92:17-20.

**C.    The 2019 Bill of Sale, a Model of Abstruseness, Contains Contradictory
Language Throughout.**

After a drafting process discussed in more detail below, on September 17, 2019, the
Blackjewel Debtors and Kopper Glo/INMET (collectively, the "Parties") ultimately landed on
Assignment and Assumption Agreement and Bill of Sale Regarding Specific Assets. Ex. 16,
Blackjewel Bankruptcy Docket, ECF No. 1096, at 42-164 (the "2019 Bill of Sale"). Before diving
into the confusing parts, start with some points of agreement. Everyone here agrees that in the
2019 Bill of Sale, the Blackjewel Debtors sold the Lone Mountain Prep Plant to INMET. *See* Ex.
4, Beckman Dep. 53:3-11. The Blackjewel Debtors sold the permits associated with the Lone
Mountain Prep Plant to INMET. *Id*. at 55:1-9. The Blackjewel Debtors sold the clean coal storage
and rail loadout associated with the Lone Mountain Prep Plant to INMET. *Id*. at 51:11-20. And

they sold the refuse impoundment and associated equipment associated with the Lone Mountain Prep Plant to INMET. *Id*. at 51:24-52:6. Instead, this dispute arises because five years and two sale orders later, the Trust claims that the Blackjewel Debtors did *not* sell the land under those items.

The dispute arises from the following parts of the 2019 Bill of Sale. *First*, Section 1 of the 2019 Bill of Sale states that INMET is purchasing "[t]he real property interests owned by Sellers and associated with the Transferred Permits and described on <u>Exhibit B</u> attached hereto and made a part hereof and incorporated herein by reference (collectively, the "**Owned Real Property**"). Ex. 16, 2019 Bill of Sale at § 1. That sentence includes the Lee County Surface Parcels in the assets being sold in two ways. The Lee County Surface Parcels are associated with the Transferred Permits, specifically the Lone Mountain Prep Plant permit.  *See* Ex. 4, Beckman Dep. 180:9-18. And they are described on Exhibit B. Ex. 16, 2019 Bill of Sale at Ex. B.

*Second*, in a separate section, the 2019 Bill of Sale affirmatively spells out the intention of the parties.  It says, "It is the intention of the parties that Buyer acquire, lease or sublease all assets, properties and rights necessary for the operation of the Purchased Business[.]" *Id.* at § 7. Everyone here agrees that the Lee County Surface Parcels are necessary for the operation of the Lone Mountain Prep Plant and therefore the Purchased Business. *See* Ex. 4, Beckman Dep. 185:3-13. This sentence, therefore, also includes the Lee County Surface Parcels within the assets sold.

*Third,* the Trust ignores those two parts of the 2019 Bill of Sale in favor of language contained on an exhibit.  On Exhibit B in the preamble to the schedule of properties, the following language appears.

> The Purchased Assets include all Owned Real Property associated with the Transferred Permits including, without limitation, the real property interests identified in this <u>Exhibit B</u> or any attachment hereto, to the extent such real property interests are associated with the Transferred Permits. For avoidance of doubt, any real property listed below and situated in locations other than Harlan County, Kentucky, or Wise County, Virginia,

6

> are specifically excluded from the Owned Real Property, unless otherwise
> agreed upon by Buyer after the Effective Date. The final schedule of
> Owned Real Property shall be determined no later than the final
> determination of the Assumed Leases schedule in accordance with the
> Contract Procedures as shared in the Bidding Procedures entered by the
> Bankruptcy Court in the Bankruptcy Case, it being understood ad agreed
> that additions to and deletions from the final Owned Real Property
> schedule shall be subject to the mutual agreement of Buyer and Sellers.

Ex. 16, 2019 Bill of Sale, Exhibit B, Preamble. The remaining pages of Exhibit B contain schedules

of real property that contain the Lee County Surface Parcels. According to the Trust's theory the

first sentence sells the Lee County Surface Parcels. But, according to the Trust, because the Lee

County Surface Parcels are situated in locations other than Harlan or Wise Counties, the second

sentence excepts them. But as discussed below, even the exception contains a caveat: "unless

agreed upon by Buyer after the Effective Date."

### D.    The Inexplicable Limitation on the Owned Real Property Schedule to Harlan and Wise Counties Is the Product of a Mistake.

The 2019 Bill of Sale, according to its own language, intended to have "Buyer acquire,

lease or sublease all assets, properties and rights necessary for the operation of the Purchased

Business[.]" Ex. 16, 2019 Bill of Sale at § 7, ECF No. 1-1 at 45. This includes the Lee County

Surface Parcels. *See* Ex. 4, Beckman Dep. 185:3-13. This renders the Harlan and Wise County

language in the preamble to Exhibit B puzzling.

But having dug through the facts, the failure to include Lee County in the preamble's

limitation is the product of a mistake.  In the process leading up to the 2019 Bill of Sale, the parties

lacked accurate information regarding Blackjewel's property rights. *See id.* at 117:1-119:4;

145:24-147:15.  In fact, Blackjewel's records under Mr. Hoops's leadership "had been

demonstrated to be incorrect . . . specifically on the asset front." *Id.* at 87:2-7.

Consequently, the Parties hired Marshall Miller, a consulting firm specializing in mineral

resource, mining, and environmental industries, to determine what the Blackjewel Debtors owned.

*See* Ex. 4, Beckman Dep. 115:2-119:4. Marshall Miller correctly identified that the Blackjewel Debtors *leased* property in Lee County, Virginia. *See* Ex. 18, BJLT_00000141 (identifying the property and mineral owners in Lee County connected with various permits); Ex. 1, Trust 30(b)(6) Dep. 7:20-8:16; 9:3-13 (the Blackjewel Debtors, through Lone Mountain Processing, LLC, owned the Lee County Surface Parcels). But Marshall Miller incorrectly concluded that the Blackjewel Debtors owned no real property in Lee County. *Id*. In fact, upon review of the Marshall Miller information, Paul Shin of Jefferies (the Blackjewel Debtors investment banker) concluded, "it appears that there is no Blackjewel owned real property associated with right-of-entry for the listed permits being acquired." *See* Ex. 5, BJLT_0000676 (PX18). This was factually untrue at the time.

INMET and the Blackjewel Debtors relied on this mistaken conclusion in negotiating the 2019 Bill of Sale. *See* Ex. 4, Beckman Dep. 150:15-151:17. As a result, the Parties changed the language of the Preamble to Exhibit C (Assumed Leases) to *include* Lee County. *See* Ex. 6, BJLT_00000488-BJLT_00000489. But because Marshall Miller told them that no Debtor-owned real property existed in Lee County, the parties did not make a similar change to the language in the preamble to Exhibit B (Owned Real Property).

The West Virginia Court entered the 2019 Bill of Sale on September 17, 2019. 2019 Bill of Sale. Reflecting upon the hurried process and vacuum of information, Mr. Beckman testified that he did not expect the 2019 Bill of Sale to describe perfectly the assets being bought and sold. *See* Ex. 4, Beckman Dep. 145:11-14, 230:9-17. Nor did he expect the 2019 Bill of Sale to be a final list of the assets involved in the transaction. *Id.* at 145:24-146:15.

### E.    For Four Years, INMET Operated on the Lee County Surface Parcels, Without Objection or Claim of Trespass from the Trust.

From September 17, 2019 until July 28, 2023, INMET conducted coal mining, processing, and loading operations on the Lee County Surface Parcels. *See* Decl. of Jeffrey Strobel in Supp.

of First Day Motions of Debtor-in-Possession, *In re INMET, LLC*, Chap. 11 No. 23-70113 (Bankr.
E.D. Ky.) (the "INMET Bankruptcy Docket"), ECF No. 46, ¶¶ 7-8; *Notice of Closing of Asset
Sales*, INMET Bankruptcy Docket, ECF No. 580. In July 2023, INMET, with approval from this
Court, sold the Lone Mountain Prep Plaint and the Lee County Surface Parcels to Bluegrass.
Bluegrass then conducted coal mining, processing, and loading operations on those same assets.
From September 7, 2019 through April 3, 2024, a period of four and a half years, the Trust never
claimed to own the Lee County Surface Parcels or assert that INMET or Bluegrass were
trespassers. Ex. 3, Hobson Dep. 67:18-24; Ex. 1, Trust 30(b)(6) Dep. 13:9-15:5.

And the Trust had specific knowledge that INMET conducted operations at the Lone
Mountain Prep Plant. In 2022, the Trust sued Kopper Glo and INMET in the West Virginia Court
because they had failed to make royalty payments to the Trust. *See* Adversary Proceeding No.
3:22-ap-03001, S.D. W.Va.  In connection with those claims, Mr. Beckman submitted an affidavit
to the West Virginia Court in which he swore that INMET produced coal in 2020 and 2021 at the
Darby Fork Mine. Ex. 4, Beckman Dep. 199:3-14. Mr. Beckman also knew that "some, if not a
majority, of Darby Fork [coal production] is processed at Lone Mountain." *Id*. at 32:13-22. Yet
despite this knowledge, the Trust made no objection or claim of trespass either inside or outside
of that adversary proceeding. *Id.* at 200:14-21. The case later terminated when the Trust dismissed
INMET with prejudice—a termination on the merits—without the Trust ever alleging that INMET
was a trespasser. *Id*. at 202:2-17.

### F.    The Sworn Statements, Representations to Courts, and Behavior All Confirm Bluegrass's Interpretation and Belie the Trust's Position.

In November 2019, following the sale of the relevant assets to INMET, the Blackjewel
Debtors filed a motion with the West Virginia Court seeking authorization to sell certain "*de*

*minimis* assets." Ex. 20, Blackjewel Bankruptcy Docket, ECF No. 1365. In that Motion, the

Blackjewel Debtors represented to the West Virginia Court as follows:

> 10. Following the sale of substantially all of their marketable assets, the Debtors are now in possession of assets of little or no usable value to the Debtors' estates that the Debtors anticipate can be sold profitably for the benefit of their estates and creditors. . . .

> 11. Given the small monetary value of such De Minimis Assets in relation to the Debtors' overall operations and the carrying costs associated with the many [sic] of the De Minimis assets, it would be inefficient to seek court approval every time the Debtors have an opportunity to sell such De Minimis Assets.

*Id.* at ¶¶ 10-11. The Blackjewel Debtors therefore moved the West Virginia Court for authorization

to sell the De Minimis Assets without a further Court order. *Id.* at ¶ 11.

Discussing this motion, Mr. Beckman, Trustee of the Trust, confirmed that "we didn't think

we had anything that was of too much value, that we wanted to be able to sell them without having

to go back to the Court, yeah." Ex. 4, Beckman Dep. 204:9-19. Yet now, despite having told the

West Virginia Court that it owned nothing of value, the Trust now tells this Court that it actually

always owned around $5 million worth of property.

INMET and Hunter Hobson, INMET's President, also consistently maintained that they

owned the Lee County Surface Parcels. For example, Mr. Hobson testified that as of November

11, 2019, he believed that INMET had acquired the Lee County parcels through the 2019 Sale. Ex.

3, Hobson Dep. 26:16-28:9; 59:9-16. Further, Mr. Beckman testified that he understood INMET's

intention was to purchase every parcel listed on Exhibit B without any limitation. Ex. 4, Beckman

Dep. 164:1-165:5. In early 2022 Mr. Hobson explored leasing a tract in Lee County to third parties

for a solar project. Ex. 12, BNR003796-BNR003798. When questions were raised concerning the

lack of a deed showing INMET's ownership, Mr. Hobson replied: "The sale order that we received

from the bankruptcy court is as good as a deed." Ex. 13, BNR003405. In April, 2022 INMET

represented in federal court that it had had a 60% ownership of a large tract partially located in Lee County since September 17, 2019. *See Mem. of Law in Supp. of Mot. Summ. J.*, Case No. 2:20-cv-00011 (W.D. Va. Apr. 11, 2022), ECF No. 131, at 4, 6; ¶¶ 1, 10. INMET used the property to transport coal through an underground beltway system and surface roads. *Id.* at 6-7 ¶ 12. Because the Lee County surface area was key to the use of the Purchased Business (as defined in the 2019 Bill of Sale), Mr. Hobson testified that it would not make practical sense not to purchase the real property on which the Lone Mountain Prep Plant, load out, and refuse area sit. *See* Ex. 3, Hobson Dep. 67:8-17.

Later in July 2023, when investigating whether the Trust in fact owned Lee County Surface Parcels, Mr. Beckman sent Michael Costello, an independent contractor investigating for the Trust, the email earlier sent by Marshall Miller. *See* Ex. 5, BJLT_0000676. Mr. Beckman wrote, "Seems like this was deemed determinative by Jefferies at the time that there was no owned property that should have been associated with the Virginia permits purchased by INMET." *Id.*

## A.    Bluegrass Purchases the Disputed Assets in the 2023 Sale Without the Trust Objecting That It Owns the Disputed Assets.

INMET filed a voluntary Chapter 11 petition on April 5, 2023. See INMET Bankruptcy Docket, ECF No. 1.

On May 10, 2023, this Court entered the *Order (A) Establishing Bidding and Sale Procedures with Respect to the Sale of Substantially All of the Debtor's Kentucky Assets, (B) Authorizing the Entry into One or More Stalking Horse Agreements, (C) Scheduling an Auction and Sale Hearing and Approving the Form and Manner of Notice Thereof and (D) Granting Related Relief.* Ex. 21, INMET Bankruptcy Docket, ECF No. 248 (the "Bid Procedures Order"). Pursuant to the Bid Procedures Order, the Trust was on notice that, by failing to file an objection to the sale, it would be "forever barred from asserting any objection to entry of the Sale Order or

consummation of the applicable Sale Transaction." *Id.* at ¶ 28. The Trust received notice of the

pending sale and in fact filed two separate objections. *See* INMET Bankruptcy Docket, ECF Nos.

357 and 509. Neither objection raised the Trust's ownership of the Lee County Surface Parcels.[4]

In fact, in its later objection, the Trust observed:

> As acknowledged by the Debtor in Schedules 2.1(d)(i) and 5.4(a) of the
> APA, the Court should take notice that the Debtor never recorded any
> deeds evidencing the transfer of ownership of any real property it may
> have acquired from the Blackjewel Debtors, including the real property
> the Debtor is seeking to sell to BMMS. The impact of this on the proposed
> sale to BMMS is not clear to the Trust but the Trust believes it is relevant
> to highlight to the Court. In the event that the Debtor seeks to have the
> Trust execute deeds to evidence the transfer of ownership of real property,
> the Trust has no obligation, under applicable case law, to take such action
> because of the Debtor's uncontroverted prepetition material breach of its
> obligations to the Blackjewel Debtors and the Trust.

Ex. 19, INMET Bankruptcy Docket, ECF No. 509 at 2 & n.1. Crucially, as the INMET Bankruptcy

Docket shows, and as Mr. Beckman confirmed, the Trust did not object to the sale of assets it

supposedly owned even in mid-2023. *Id.*; Ex. 4, Beckman Dep. 216:19-217:4; 218:20-25.

On July 28, 2023, this Court entered the *Order (I) Approving the Sale of Certain Assets to*

*Bluegrass Energy LLC Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II)*

*Approving the Assumption and Assignment of Certain Executory Contracts and Expired Leases,*

*and (III) Granting Related Relief*, ECF No. 536 (the "2023 Sale Order"). Ex. 15. In the 2023 Sale

Order, the Court made factual findings that INMET was "the sole and lawful owner of the

Purchased Assets." *Id.* at ¶ K. The 2023 Sale Order defined the "Purchased Assets" as the

"Debtor's properties and assets being sold pursuant to the Stalking Horse Agreement." *Id.* at 3.

---

[4] The Trust's preliminary objection objected only to cure under royalty agreements (because they were not executory contracts) and to the sale free and clear of the putative royalty interests. *See* INMET Bankruptcy Docket, ECF No. 357. In its more comprehensive objection to the sale of the assets to Bluegrass, to the sale, the Trust objected to Black Mountain Marketing & Sales ("BMMS") being considered a "good faith purchaser," as well as BMMS's ability to credit bid without reserving funds for the Trust's remaining claims in the Adversary Proceeding. *See* INMET Bankruptcy Docket, ECF No. 509 (PX29).

Pursuant to the *Amended and Restated Stalking Horse Asset Purchase Agreement*, ECF No. 617-1 (the "2023 APA"), the term "Purchased Assets" is defined as including "all (i) Owned Real Property wherever situated, including, without limitation, the Owned Real Property listed in Schedule 2.1(d)(i)[.]" Ex. 14, 2023 APA § 2.1(d). The Disputed Assets, including the Lee County Surface Parcels, are listed on Schedule 2.1(d). *Id.* at Sched. 2.1(d). The Lee County Surface Parcels specifically are necessary to operate the assets purchased in 2023 as a going concern. *See* Ex. 8, Bluegrass 30(b)(6) Dep. 70:5-72:24 (explaining that it is necessary to have access to the surface properties in Lee County to run the assets as an operating enterprise).

The 2023 Sale Order further provided that INMET sold the Disputed Assets, including the Lee County Surface Parcels, to Bluegrass "free and clear of all Liens, Claims, and Interests[.]" Ex. 15, 2023 Sale Order ¶ 7(A). Addressing the Trust specifically, the 2023 Sale Order concluded that the 2023 Sale was free and clear of its interests, because the Trust could be compelled to accept a money satisfaction and because its interests were disputed. *Id.* at ¶ V. Along with finding notice proper, the 2023 Sale Order contained the following injunction:

> 14. Permanent Injunction. Except as otherwise expressly provided in the Stalking Horse Agreement and this Order, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtor to transfer the Purchased Assets to the Buyer in accordance with the Stalking Horse Agreement and this Order. Following the Closing, except for persons entitled to enforce Permitted Encumbrances and Assumed Liabilities, all persons . . . holding Liens, Claims, or Interests in the Purchased Assets or against the Debtor with respect to the Purchased Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing any Liens, Claims, or Interests of any kind or nature whatsoever against the Buyer or any affiliate of the Buyer or any of its respective property, successors and assigns, or the Purchased Assets, as an alleged successor or on any other grounds. No person shall assert, and the Buyer and the Purchased Assets shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), liabilities, claims and interests, or basis of any

13

> kind or nature whatsoever to delay, defer, or impair any right of the Buyer
> or the Debtor, or any obligation of any other party, under or with respect
> to, any Purchased Assets, with respect to any act or omission that occurred
> prior to the Closing or with respect to any other agreement or any
> obligation of the Debtor that is not an Assumed Liability or Permitted
> Encumbrance.

*Id.* at ¶¶ G, 14.

### B.    The Trust Collaterally Attacks the 2023 Sale Order.

Since obtaining the Purchased Assets (as defined in the 2023 APA), Bluegrass has been operating on those assets. On April 4, 2024, counsel for the Trust sent a letter to counsel for Bluegrass and INMET claiming that the Trust owned the Lee County Surface Parcels. Ex. 9, BJLT_00002052-2054. In fact, until sending a letter on April 4, 2024, neither the Blackjewel Debtors nor the Trust had at any point notified INMET or Bluegrass that either was trespassing on property that the Trust claimed to own. Ex. 1, Trust 30(b)(6) Dep. 13:9-15:20. Nor did the Blackjewel Debtors or Trust ever send any correspondence to INMET or Bluegrass claiming ownership of the Lee County Surface Parcels until that same date. *Id.* Despite the April 4, 2024 letter, no party disputes that the Lee County Surface Parcels are necessary for the operation of the Purchased Assets (as defined in the 2023 APA). See Beckman Dep. 183:7-185:13; Strobel Dep. 111:16-112:21.

On September 25, 2024, the United States District Court for the Eastern District of Kentucky (the "District Court") dismissed the Trust's appeal challenging BMMS's good faith in the 2023 Sale as moot under 11 U.S.C. § 363(m). *See* Ex. 11, Order Dismissing Appeal, *Blackjewel Liq. Tr. v. INMET Mining, LLC*, et al., Case No. 7:23-CV-59-REW (E.D. Ky. Sept. 25, 2024), ECF No. 37 (the "Sale Appeal Order"). In dismissing, the Court observed:

> Removal of the good faith finding (and with it the sale protection assured)
> and elimination of the free-and-clear transfer would invalidate the sale.
> Those material terms were deal conditions, and an appellate result that
> alters material terms, such as a free-and-clear transfer, crosses the

14

> § 363(m) line. . . . This is not a case where extant proceeds remain
> available and subject to redistribution. . . . That is not the nature of the
> appeal anyway, and the concluded interdependent closings and settlement
> eliminate that possibility. Blackjewel seeks to pull agreement linchpins by
> removing transactional protection and preserving against the Kentucky
> Assets its claimed interests. Section 363(m) precludes the possibility of
> that result, in this unstayed case, thus yielding mootness.

*Id.* at 22. On February 14, 2025, the District Court dismissed the Trust's related appeal of this

Court's ruling that the Trust's royalty agreements did not run with the land, again noting that "the

Court cannot grant Blackjewel effective relief without disturbing the validity of the Kentucky

Assets Sale[.]" *See Order*, *Blackjewel Liquidation Tr., LLC v. Liquidating Tr. of INMET Mining,*

*LLC*, et al., Case No. 7:23-CV-89-REW (E.D. Ky. Feb. 14, 2025), ECF No. 32, at 16.

## <u>SUMMARY JUDGMENT STANDARD</u>

A court must grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a), made applicable to this proceeding by Fed. R. Bankr. P. 7056. "No genuine dispute

of material fact exists where the record 'taken as a whole could not lead a rational trier of fact to

find for the non-moving party.'" *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 131 (6th Cir. 2014)

(quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The

movant must inform the court of the "basis for its motion" and point to evidence in the record

"which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986). To avoid summary judgment, the non-movant must then

demonstrate "that there is a genuine issue of material fact," which requires more than "some

metaphysical doubt as to the material facts." *Matusushita*, 475 U.S. at 585-86. Rather, the non-

movant "must make an affirmative showing with proper evidence in order to defeat the motion."

*Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). The non-movant's failure to present

admissible evidence to counter a well-supported motion for summary judgment is grounds in itself

for granting the motion. *Id.* To adjudicate a motion for summary judgment, the court views all evidence and draws all reasonable inferences in favor of the non-moving party. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015).

## LEGAL ARGUMENT

## I.     Res Judicata Bars the Trust's Counterclaims.

In the related bankruptcy case in 2023, this Court entered a Sale Order. The Sale Order made a specific finding that INMET was "the sole and lawful owner of the Purchased Assets." Ex. 15, 2023 Sale Order ¶ K. The definition of Purchased Assets specifically included each Lee County Surface Parcel on a schedule. The Court approved the sale of those Lee County Surface Parcels to Bluegrass, free and clear. Under principles of res judicata, the Sale Order bars the Trust's claims.

### A.     Because this Court Resolved the Issues in the Instant Proceeding in the 2023 Sale, Res Judicata Bars the Trust's Counterclaims.

As explained above, the Trust had notice that the Lee County Surface Parcels would be sold to Bluegrass and objected to other aspects of the 2023 sale. But the Trust did not object to the sale of the Lee County Surface Parcels because it supposedly owned those assets. Therefore, res judicata bars the Trust's claims.

Res judicata requires:

> 1) a final decision on the merits by a court of competent jurisdiction; 2) a subsequent action between the same parties or their privies; 3) an issue in the subsequent action that was or should have been litigated in the prior action; and 4) an identity in the causes of action.

*In re HNRC Dissolution Co.*, 585 B.R. 837, 847 (B.A.P. 6th Cir. 2018). First, a bankruptcy sale order is a final order for purposes of res judicata. *See Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 579 (6th Cir. 2008). As the Sixth Circuit explained:

> A sale order signals an end to litigation in a bankruptcy proceeding; with the execution of the sale order the debtor's assets are judicially sold and no further litigation can be brought regarding those assets without forcing

the court to undo the sale, an action of the very kind res judicata seeks to prohibit. If sale orders were not final, parties could continue to litigate issues regarding the assets long after their sale, which is certainly an outcome worth prohibiting.

*Id.*

Because the 2023 Sale Order is final, and has been affirmed on appeal, the first element is satisfied. And, as the language dismissing the Trust's two appeals quoted above shows, the Trust's previous attempts to disturb the 2023 Sale Order have failed because the sale free and clear of the Trust's liens, claims, and interests is an integral part of the 2023 Sale. This Court should not countenance the Trust's continued attempts to argue otherwise.

Second, the instant proceeding is "a subsequent action between the same parties or their privies." Bluegrass, as the assignee of the property BMMS purchased in the 2023 Sale, was also privy to the litigation in the bankruptcy. *See Ludwig v. Township of Van Buren*, 682 F.3d 457, 462 (6th Cir. 2012) (citing *Taylor v. Sturgell*, 553 U.S. 880. 893-95 (2008) (identifying parties with "a pre-existing substantive legal relationship," including assignees and assignors, as privies and noting that the categories are not "constitutionally rigid"); Ex. 15, 2023 Sale Order at 2 (designating Bluegrass as the buyer). In fact, the Trust has unsuccessfully argued before this Court and on appeal that BMMS's lack of good faith should prevent Bluegrass's purchase from being subject to 11 U.S.C. § 363(m). *See* Ex. 11, Sale Appeal Order at 9-19. The Trust cannot now question that Bluegrass is BMMS's privy. Indeed, the Sixth Circuit has emphasized that the term "party" should be interpreted broadly in a bankruptcy context for purposes of res judicata. *See Sanders Confectionary Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 481 (6th Cir. 1992).

Third, the identical issue—the ownership of the assets now in dispute—was in play during the INMET bankruptcy, and the Trust was obligated to raise it. A claim is related to a bankruptcy proceeding "'if it would have affected the debtor's rights or liabilities.'" *Winget*, 537 F.3d at 579

(quoting *In re Dow Corning Corp.*, 86 F.3d 482, 489 (6th Cir 1996)). Since the Trust's putative ownership of the disputed assets directly implicates the right to sell those assets, the issue here and in the INMET bankruptcy case is the same. The Trust received notice of the pending sale and in fact filed several objections. *See* INMET Bankruptcy Docket, ECF Nos. 357 and 509, Ex. 19.

Neither objection raised the Trust's ownership of the Lee County Surface Parcels. In fact, in its later objection, the Trust acknowledged that INMET "may have acquired" real property for which INMET had not recorded any deeds noting the transfer of ownership. Ex. 19, INMET Bankruptcy Docket, ECF No. 509 at 2 & n.1. And while noting the issue currently before this Court, the Trust not only failed to assert any ownership, but confessed that the "impact" of the unrecorded deeds was "not clear to the Trust." *Id*.

Further, the Trust's asserted rationale for refusing to transfer the deeds also was not that they owned those properties, but rather INMET's failure to pay the royalties the Trust was allegedly owed. *See id.* The Trust's claims thus "attack[] the heart of the Sale Order[.]" *Winget*, 537 F.3d at 580. The Trust was on notice that it would be "forever barred from asserting any objection to entry of the Sale Order or consummation of the applicable Sale Transaction," and yet it chose not to object. Ex. 21, INMET Bankruptcy Docket, ECF No. 248, ¶ 28.

Fourth, the identity of claims requirement requires that "the claims arose out of the same transaction or series of transactions" or that "the claims arose out of the same core of operative facts." *Winget*, 537 F.3d at 580 (cleaned up and quotation omitted). Both the 2023 Sale and the instant proceeding focus on the ownership of assets sold during the 2023 Sale. The Trust seeks a declaratory judgment that it is the owner of the Disputed Assets (Counterclaims ¶¶ 90-95), and each of its subsequent counterclaims depends on its assertion that these assets were not sold in the 2019 and 2023 sales. *See* Countercls. ¶¶ 96-132. And, as noted, in the 2023 Sale Order, the Court

18

made factual findings that INMET was "the sole and lawful owner of the Purchased Assets." Ex. 15, 2023 Sale Order ¶ K. Nor does the inclusion of different legal theories change the fundamental identity of issues. *See In re HNRC Dissolution Co.*, 549 B.R. 469, 483 (Bankr. E.D. Ky. 2016) ("A different legal theory, based on the same set of facts as in the prior action will not save the claim from *res judicata*.").

Therefore, res judicata bars the Blackjewel Trust's counterclaims, and the Court should dismiss them.

### B.   Case Law Supports the Application of Res Judicata to Bar the Blackjewel Trust's Claims.

This Court's decision in *In re Cambrian Holding Co.* supports the application of res judicata here. 2020 WL 214746 (Bankr. E.D. Ky. Jan. 3, 2020), *aff'd*, 110 F.4th 889 (2024). In *Cambrian*, Hazard Coal Corporation ("Hazard") entered into a lease as lessor with Debtor Perry County Coal ("Perry") eventually becoming the lessee. *Id.* at *1. Though Hazard received notice of the sale of Perry's assets, it did not object to the sale until one minute after the sale hearing had started and did not attend the hearing. *Id.* at *2-3. Hazard argued its lease with Perry had terminated prepetition, but American Resources, the buyer of the assets, tried to cure the lease based on its interpretation of the lease's provisions. *Id.* at *4-5.

The Court applied res judicata to block Hazard's claims because Hazard

> ignored the deadlines in the Bid Procedures Order, which bluntly told all counterparties to the Assigned Contracts, including Hazard Coal, that the failure to object "barred, estopped and permanently enjoined" them from making "any objection or defense to the assumption and assignment."

*Id.* at *6. Hazard thus did not meet its burden to assert any objections to the sale before the lease was assumed and assigned. *Id.* This Court also observed that no further litigation regarding the assets subject to the sale could be brought without undoing the sale. *Id.* (citing *Winget*, 537 F.3d

at 579). Further, a bankruptcy sale is an *in rem* proceeding good against the world. *Id.* (quoting *In re HNRC Dissolution*, 549 B.R. at 479).

After the sale, Hazard argued that American Resources was permit-blocked at the time of the sale. *Id.* at *8. However, the Court determined that this did not qualify as new evidence warranting reconsideration because American Resources' permit-blocked status was a matter of public record at the time of the sale. *Id.* Similarly, Hazard's argument that the property sold did not belong to the estate was an impermissible collateral attack on the sale order. *Id.* (citing *In re HNRC Dissolution*, 549 B.R. at 480). The Sixth Circuit affirmed despite the "seemingly blatant misrepresentation" that the buyer's counsel made to the Bankruptcy Court (that American Resources was not permit blocked), agreeing with this Court that "the misrepresentations did not suffice to overcome Hazard Coal's failure to timely challenge the lease assignment." 110 F.4th at 900.

Other case law emphasizes that failure to object to a sale at the proper time bars any objection to the sale. *See In re Hi Tech Fleet Service, Inc.*, 339 B.R. 428, 433 (Bankr. E.D. Mich. 2006) (concluding that the Chapter 7 Trustee could not challenge a Chapter 11 sale that occurred before conversion because "the Trustee cannot raise issues which could have been raised by creditors in the Chapter 11 sale process"); *Al Perry Enters. v. Appalachian Fuels, LLC*, 503 F.3d 538, 542-43 (6th Cir. 2007) (finding that the appellant's failure to assert his claim before an asset sale barred the claim against the purchaser); *In re Allnutt*, 220 B.R. 871, 892 (Bankr. D. Md. 1998) ("The failure of a co-owner to object to a trustee's notice of sale has been held to authorize a sale free and clear of all liens, encumbrances and interests, such as the interest claimed here by the plaintiff."); *Veltman v. Whetzal*, 93 F.3d 517, 521-22 (8th Cir. 1996) (appellants' failure to object to the sale of their property interest in the bankruptcy court constituted a waiver of that argument).

The same principles apply here. The Trust had every opportunity to assert its ownership of the Disputed Assets. In fact, the Trust objected to the 2023 Sale on other grounds, going so far as to mention that deeds of Disputed Assets had not been retitled in INMET's name. *See* Ex. 19, INMET Bankruptcy Docket, ECF No. 509 at 2 & n.1 (PX29). As in *Cambrian*, those property records were a matter of public record. *See* Ex. 1, Trust 30(b)(6) Dep. 7:20-8:16; 9:3-4; Ex. 2, BNR017895-BNR017901. But the Trust simply did not assert its ownership of the Disputed Assets, and thus it is deemed to have consented to the sale. *See In re Junk*, 566 B.R. 897, 916 (Bankr. S.D. Ohio 2017) (citing *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002)) ("Failure to object by any party that received notice of the Motion constitutes consent within the meaning of § 363(f)(2) to the sale free and clear."). As in *Cambrian*, the relief the Trust seeks is impossible without undoing the sale. Nor does the argument that the sold property did not belong to the estate justify undoing the sale on equitable grounds. *See In re Cambrian Holding Co.*, 2020 WL 214746, at *8 (citing *In re HNRC Dissolution*, 549 B.R. at 480).

Therefore, the Court should dismiss the Trust's Counterclaims as barred by res judicata.

## II.    The Language of the 2019 Bill of Sale Provides for the Sale of the Lee County Surface Parcels.

### A.    The 2019 Bill of Sale Is, at a Minimum, Ambiguous, and at Best, Expresses a Clear Intention to Sell the Disputed Assets to INMET.

The 2019 Bill of Sale reflects an express intention to sell the Lee County Surface Parcels to INMET. While the Trust may point to potentially contradictory language, both the language of the 2019 Bill of Sale and external evidence confirm that the Disputed Assets were part of the 2019 and 2023 Sales. Consequently, the Court should grant Bluegrass summary judgment on Count One of its Complaint.

The 2019 Bill of Sale provides for the application of New York law. Ex. 16, 2019 Bill of Sale § 10. The following analysis applies New York law, since the laws of Kentucky and New

York are not in conflict on this issue.[5] *See, e.g.*, *Brass Reminders Co. v. RT Eng'g Corp.*, 462 F.

Supp. 3d 707, 716 (E.D. Ky. 2020) ("Further, a full choice of law analysis is only necessary where

two states' laws are in conflict.").

Whether a contract is ambiguous with respect to the question posed by the parties presents

a question of law. *See In re Dreier LLP*, 450 B.R. 452, 460 (Bankr. S.D.N.Y. 2011) (quoting *Law*

*Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (3d Cir. 2010)). "A contract is

ambiguous if it 'could suggest more than one meaning when viewed objectively by a reasonably

intelligent person who has examined the context of the entire integrated agreement and who is

cognizant of the customs, practices, usages, and terminology as generally understood in the

particular trade or business.'" *Id.* (quoting *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*,

309 F.3d 76, 83 (2d Cir. 2002)). And a contract may be ambiguous upon application to one set of

facts rather than another. *Elbit Sys. Ltd. v. Cred. Suisse Grp.*, 842 F. Supp. 2d 733, 739 (S.D.N.Y.

2012). If the court determines the contract is ambiguous, it may admit relevant extrinsic evidence

to resolve the ambiguity. *Ezrasons, Inc. Travelers Indemn. Co.*, 89 F.4th 388, 396 (2d Cir. 2023).

"'A court may . . . grant summary judgment regarding the interpretation of ambiguous language if

---

[5] Federal courts disagree whether the law of the forum state or federal law provides the choice of law rules in bankruptcy. *See In re Miller*, 459 B.R. 657, 671-72 (B.A.P. 6th Cir. 2011) (collecting cases). Both federal and Kentucky courts apply the Restatement (Second) of Conflicts of Laws. *See id.* at 672 (citing *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 570 & n.9) (federal courts begin choice of law analysis with the Restatement (Second) of Conflicts of Laws); *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 878 (Ky. 2013) (Kentucky law applies the Restatement (Second) of Conflicts of Laws § 188 to resolve choice of law issues in contract disputes). However, Kentucky's interpretation of the Second Restatement favors the application of its own law. *Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562, 574 (6th Cir. 2019) (citing *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017)). Further, Kentucky courts apply the most significant relationship test even if the contract under dispute contains a valid choice of law clause. *Id.* at 574-75. Because many of the assets sold in the 2023 Sale are located in Kentucky, Kentucky has a more significant relationship to the sale than New York does. However, federal courts generally enforce a valid choice of law clause. *See Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2005). The following analysis thus assumes, for the purposes of this motion, that a federal choice of law analysis would result in the application of New York law, while Kentucky choice of law principles would result in applying Kentucky law.

the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language.'" *In re Dreier LLP*, 450 B.R. at 460 (quoting *Compagnie Financiere de CIC et de l'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)).

Here, the language of the 2019 Bill of Sale is at a minimum ambiguous. Most notably, the Trust draws attention to the following single sentence from the preamble to Exhibit B: "For avoidance of doubt, any real property listed below and situated in locations other than Harlan County, Kentucky, or Wise County, Virginia, are specifically excluded from the Owned Real Property, unless otherwise agreed upon by Buyer after the Effective Date." Ex. 16, 2019 Bill of Sale, Exhibit B, Preamble (the "Preamble B Exclusion"). But even this sentence demonstrates that the 2019 Bill of Sale is ambiguous as to whether Buyer agreed upon real property located outside of Harlan County, Kentucky and Wise County, Virginia after the Effective Date. Thus, extrinsic evidence is necessary to interpret the ambiguity.

Additionally, the 2019 Bill of Sale defines the "Purchased Business" as "certain assets related to the mining. Processing [sic], preparation, selling and shipping of coal and related operations conducted with respect to the Black Mountain and Lone Mountain mining operations situated in Harlan, County [sic] Kentucky, Letcher County, Kentucky, and Wise County, Virginia[.]" *Id.* at Recital A. Thus, the definition of Purchased Business in the 2019 Bill of Sale includes Letcher County, Kentucky, which is missing from the Preamble B Exclusion. Similarly, Exhibit B, Schedule 2.1(a) to the 2019 Bill of Sale contains owned property located in Letcher County and it is ambiguous whether the Preamble B Exclusion applies to this property as well.

But the definition of the Purchased Business in the 2019 Bill of Sale cannot be correct, either, because Exhibit A, the list of permits, includes several permits located in Lee County,

Virginia. These include the "LMP Prep Pland [sic]" (Permit Number 1301411) the Benco Deep Mine (Permit Number 1201390), and the 6C Deep Mine (Permit Number 1202262). Ex. 16, 2019 Bill of Sale, Ex. A; *see* Ex. 7, BJLT_00000145, BJLT_00000147 for the permits' location in Lee County. Section 1 of the 2019 Bill of Sale notes that Blackjewel is selling "[t]he real property interests owned by Sellers associated with the Transferred Permits and described on Exhibit B attached hereto and made a part hereof and incorporated herein by reference[.]" *Id.* at § 1.1(ii). Thus, section 1.1(ii) of the 2019 Bill of Sale states that real property associated with the transferred permits and described on Exhibit B, including the Lee County properties associated with the enumerated permits and "described" in Schedule 2.1(a) of Exhibit B, are being sold pursuant to the 2019 Bill of Sale. Thus, section 1.1(ii), read in conjunction with Exhibit A of the 2019 Bill of Sale, completely contradicts the Exhibit B Exclusion and the definition of Purchased Business by identifying permits to be transferred in Lee County.

This interpretation is confirmed by the first sentence of the Preamble to Exhibit B, which reads: "The Purchased Assets include all Owned Real Property associated with the Transferred Permits including, **without limitation**, the real property interests identified in this <u>Exhibit B</u> or any attachment hereto, to the extent such real property interests are associated with the Transferred Permits." *Id.* at Exhibit B, Preamble (emphasis added). Only by removing the words "without limitation" does the first sentence of Preamble B square with the second sentence. These contradictions are exacerbated by the Preamble to Exhibit C of the 2019 Bill of Sale, which, like the list of permits in Exhibit A, identifies property in Lee County as among those leases to be assumed. *Id.* at Exhibit C, Preamble. Further, the Trust sold INMET the equipment associated with the Lone Mountain Preparation Plant, the coal refuse impoundment that receives coal refuse from that plant, and the rail loadout that permits loading of the output of that plant. *See id.* at Exs. A, D;

(describing equipment associated with permit P15, the Lone Mountain Prep Plant, including the Loadout Facility, Refuse Disposal Facility, Preparation Plant, Stocker Plant, raw stockpile facilities, and the Mine 6C Transfer Conveyer).

All of this demonstrates that the 2019 Bill of Sale's descriptions of the location of the assets being sold was ambiguous. In fact, the Parties explicitly recognized this ambiguity in the 2019 Bill of Sale. Section 7 provides:

> It is the intention of the parties that Buyer acquire, lease or sublease all assets, properties and rights necessary for the operation of the Purchased Business as conducted, including all mining, processing, loading, transporting, marketing, and selling of coal and all reclamation activities but excluding the Excluded Assets.

*Id.* at § 7, ECF No. 1-1 at 45. This section clarifies that the Parties intended to sell all assets necessary for the operation of the Purchased Business, other than the Excluded Assets (those "not described on Exhibits A-D hereof"). *See id.* at § 1 (defining "Excluded Assets"). Thus, the Parties intended any properties necessary for the operation of the Purchased Business, in the reasonable discretion of Buyer, to be included with the 2019 Sale, including the Lee County Surface Parcels. And there is no commercially viable reason to purchase the assets in Exhibit B without the right of access to the nineteen surface parcels in Lee County. *See In re Dreier*, 450 B.R. at 460 (the reasonable person viewing the contract must be knowledgeable about customs in the industry). Nor would a state transfer mining permits without such right of access. *See id.* In addition, section 7 of the 2019 Bill of Sale, like the preamble to Exhibit B, refers to external events outside the four corners of the agreement that are necessary to interpret it. Ex. 19, 2019 Bill of Sale, § 7. Taken together, then, the evidence suggests that the single sentence in the preamble to Exhibit B is far from definitive and that the 2019 Bill of Sale is ambiguous about the location of the property to be sold. Therefore, the Court should admit external evidence to interpret it.

25

**B.      External Evidence Confirms That the Disputed Assets Were Part of the 2019 Sale.**

      **1.      To the Extent That the Disputed Assets Are Not Reflected in Exhibit B of the 2019 Bill of Sale, This Is the Result of a Mistake.**

External evidence places it beyond any doubt that the Parties intended to include the Disputed Assets in the 2019 Sale. First, the Parties incorrectly believed that the Blackjewel Debtors did not have title to the Disputed Assets, and to the extent those assets are not reflected in Exhibit B to the 2019 Bill of Sale, this is due to a mistake. In the process leading up to the INMET APA, neither the Blackjewel Debtors nor INMET was certain what properties the Blackjewel Debtors owned. *See* Ex. 4, Beckman Dep. 117:1-119:4; 145:24-147:15. Consequently, the Parties hired Marshall Miller, a consulting firm specializing in mineral resource, mining, and environmental industries, to determine what the Blackjewel Debtors owned. *See* Ex. 4, Beckman Dep. 115:2-119:4. Marshall Miller identified that the Blackjewel Debtors had leasehold interests in Lee County, Virginia, but identified no real property that the Blackjewel Debtors owned, despite the Blackjewel Debtors owning the nineteen parcels in dispute. *See* Ex. 18, BJLT_00000141 (identifying the property and mineral owners in Lee County connected with various permits); Ex. 1, Trust 30(b)(6) Dep. 7:20-8:16; 9:3-4 (the Trust, through Lone Mountain Processing, LLC, owned the Lee County Surface Parcels). The Parties relied on this mistaken conclusion in negotiating the 2019 Bill of Sale. *See* Ex. 4, Beckman Dep. at 150:15-151:17. For example, Paul Shin, then Vice President of Investment Banking for Jefferies LLC, representing the Blackjewel Debtors, sent counsel for INMET the Marshall Miller work on the Virginia permits, noting that "according to the Virginia DMLR, it appears that there is no Blackjewel owned real property associated with right-of-entry for the listed permits being acquired." *See* Ex. 5, BJLT_0000676. As a result, the Parties changed the language of the Preamble to Exhibit C of the 2019 Bill of Sale to include Lee County, but did not change the language in the preamble to Exhibit B to include

real property located in Lee County.  *See* Ex. 6, BJLT_00000488-BJLT_00000489; Ex. 16, 2019

Bill of Sale, Exs. B and C. Thus, though the Parties intended to include the assets in the 2019 Sale,

they incorrectly believed that the Blackjewel Debtors did not own those assets. Thus, to the extent

the Disputed Assets are omitted from Exhibit B of the 2019 Bill of Sale, this stems from a factual

mistake.

This mistake fits the extremely compressed timeframe for the 2019 Sale. Mr. Beckman

described the Blackjewel Debtors' dire financial situation at the time as being akin to a "melting

ice cube." Blackjewel Bankruptcy Docket, ECF No. 312, ¶ 36. *See also* Ex. 3, Hobson Dep.

56:14:23 (describing the process of finalizing documents as "hectic"). Due to this compressed time

frame, Mr. Beckman testified he did not expect the 2019 Bill of Sale to describe perfectly the

assets being bought and sold. *See* Ex. 4, Beckman Dep. 145:11-14, 230:9-17. Nor did he expect

the 2019 Bill of Sale to be a final list of the assets being bought and sold. *Id.* at 145:24-146:15.

> **2.      The Parties' Behavior After the 2019 Sale Shows That the Disputed Assets Were Part of the Sale.**

Second, the Parties' behavior after the 2019 Sale shows that the Disputed Assets were part

of the sale. In November 2019, following the sale, the Blackjewel Debtors filed a motion with the

West Virginia Court seeking authorization to sell certain "*de minimis* assets." Ex. 20, Blackjewel

Bankruptcy Docket, ECF No. 1365. In that Motion, the Blackjewel Debtors represented to the

Court as follows:

> 10. Following the sale of substantially all of their marketable assets, the Debtors are now in possession of assets of little or no usable value to the Debtors' estates that the Debtors anticipate can be sold profitably for the benefit of their estates and creditors. . . .

> 11. Given the small monetary value of such De Minimis Assets in relation to the Debtors' overall operations and the carrying costs associated with the many [sic] of the De Minimis assets, it would be inefficient to seek court approval every time the Debtors have an opportunity to sell such De Minimis Assets.

*Id.* at ¶¶ 10-11. The Blackjewel Debtors therefore moved the West Virginia Court for authorization to sell the De Minimis Assets (as defined in Ex. 20) without a further Court order. *Id.* at ¶ 11. Mr. Beckman, Trustee of the Blackjewel Litigation Trust, confirmed that "we didn't think we had anything that was of too much value, that we wanted to be able to sell them without having to go back to the Court, yeah." Ex. 4, Beckman Dep. at 204:9-19.

INMET and Mr. Hobson, INMET's President, also consistently maintained that they owned the Lee County Surface Parcels. For example, Mr. Hobson testified that as of November 11, 2019, he believed that INMET had acquired the Lee County parcels through the 2019 Sale. Ex. 3, Hobson Dep. 26:16-28:9; 59:9-16. Further, Mr. Beckman testified that he understood INMET's intention was to purchase every parcel listed on Exhibit B without any limitation. *See* Ex. 4, Beckman Dep. 164:1-165:5. In early 2022 Mr. Hobson explored leasing a tract in Lee County to third parties for a solar project. Ex. 12, BNR003796-BNR003798. When questions were raised concerning the lack of a deed showing ownership, Mr. Hobson replied: "The sale order that we received from the bankruptcy court is as good as a deed." Ex. 13, BNR003405. In April, 2022 INMET represented in federal court that it had had a 60% ownership of a large tract partially located in Lee County since September 17, 2019. *See Mem. of Law in Supp. of Mot. Summ. J.* Case No. 2:20-cv-000111 (W.D. Va. Apr. 11, 2022), ECF No. 131 (PX40), at 4, 6; ¶¶ 1, 10. INMET used the property to transport coal through an underground beltway system. *Id.* at 6-7 ¶ 12.

Later in July 2023, when investigating whether the Trust in fact owned Lee County surface parcels, Mr. Beckman sent Michael Costello, an independent contractor investigating for the Trust, the email earlier sent by Marshall Miller. *See* Ex. 5, BJLT_0000676. Mr. Beckman wrote, "Seems like this was deemed determinative by Jefferies at the time that there was no owned property that should have been associated with the Virginia permits purchased by INMET." *Id.* Crucially, as the

INMET Bankruptcy Docket shows, and as Mr. Beckman, trustee of the Trust confirmed, the Trust did not object to the sale of assets it supposedly owned even in mid-2023. Ex. 19, ECF No. 509 at 2 & n.1; Ex. 4, Beckman Dep. 216:19-217:4; 218:20-25. In the Objection, the Trust conceded that INMET "may have acquired" certain real property whose transfer had not been recorded, and "[t]he impact of this on the proposed sale to BMMS is not clear but the Trust believes it is relevant to highlight to the Court." Ex. 19, ECF No. 509 at 2 & n.1.

In fact, until sending a letter on April 4, 2024, neither the Blackjewel Debtors nor the Trust notified INMET or Bluegrass that either was trespassing on property that the Trust claimed to own. Ex. 1, Trust 30(b)(6) Dep. 13:9-15:20. Nor did the Blackjewel Debtors or Trust ever send any correspondence claiming ownership of the Lee County Surface Parcels to INMET or Bluegrass until that same date. *Id.* No party disputes that the Lee County Surface Parcels are necessary for the operation of the Black Mountain and Lone Mountain Complex.  See Ex. 4, Beckman Dep. 183:7-185:13; Ex. 10, Strobel Dep. 111:16-112:21; Ex. 3, Hobson Dep.67:8-17.

### 3.    Neither INMET nor Bluegrass Would Have Finalized the Sales If the Disputed Assets Were Not Included.

Third, neither INMET nor Bluegrass would have purchased the Black Mountain and Lone Mountain complexes if the Disputed Assets were not included. *See* Ex. 3, Hobson Dep. 67:8-17 (testifying it would not make practical sense not to purchase the real property on which the Lone Mountain Prep Plant, load out, and refuse area sit); Ex. 10, Strobel Dep. 111:22-112:21 (explaining that not selling the Disputed Assets as part of the 2019 Sale would not make business sense); Ex. 8, Bluegrass 30(b)(6) Dep. 70:5-72:24 (explaining that it is necessary to have access to the surface properties in Lee County to run the assets as a going concern).

Therefore, because the 2019 Bill of Sale is ambiguous and external evidence confirms that the Disputed Assets were part of the 2019 and 2023 Sales, the Court should grant Bluegrass summary judgment on Count One of its Complaint.

## III. The Trust Has Not Proven Malice or Special Damages Sufficient To Sustain a Claim of Slander of Title.

Even assuming *arguendo* that the Trust's counterclaims are not dismissed due to res judicata, the Court should grant summary judgment on the Trust's slander of title counterclaim, because the Trust cannot prove malice or special damages as required. Virginia applies the *lex loci delicti*, the law of the place of the wrong, to tort actions. *See Milton v. IIT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998) (citing *Jones v. R.S. Jones & Assoc., Inc.*, 246 Va. 3, 431 S.E.2d 33, 34 (1993)). Because the deeds to the Lee County Surface Properties were recorded in Lee County, Virginia law applies to the tort. Although the Supreme Court of Virginia has never articulated the elements required for slander of title, circuit courts have identified them as: "'(1) the uttering and publication of the slanderous words by the defendant, (2) the falsity of the words, (3) malice, (4) and special damages.'"[6] *Celebrate Va. S. Holding Co., LLC v. CVAS Prop. Mgmt., LLC*, 569 F. Supp. 3d 316, 346 (E.D. Va. 2021) (citing *Lodal v. Verizon Va., Inc.*, 74 Va. Cir. 110, 2007 WL 5984179 (Va. Cir. Ct. Aug. 22, 2007)) (additional citation omitted).

> Malice is typically defined as a sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or a desire to injure the plaintiff. . . . Absent such motivations, communications made with such gross indifference and recklessness as to amount to a wanton or willful disregard of the plaintiff's rights may also constitute malice.

*Lodal*, 2007 WL 5984179, at *2 (citation omitted).

---

[6] The Supreme Court of Virginia recognized the tort in *Donohoe Constr. Co., Inc. v. Mt. Vernon Assocs.*, 235 Va. 531, 369 S.E.2d 857 (1988) but precluded recovery in that case because the Court concluded that the filing of a mechanic's lien constituted a privileged judicial proceeding.

Special damages can consist of lost contracts or the decreased value of property, but such damages need to be substantiated by competent evidence. *See Bison Bldg. Co., LLC v. Brown*, 70 Va. Cir. 348, 2006 WL 1360893, at *7 (Va. Cir. Ct. Apr. 5, 2006) (not crediting the "highly unspecific and conclusory testimony" of one "who was by no means a disinterested witness"). The plaintiff must demonstrate actual pecuniary loss. *See Redman v. Fed. Nat'l Mortg. Ass'n*, 2015 WL 149833, at *5 (W.D. Va. Jan. 12, 2015) (quoting *Sparks v. Kendall*, 73 Va. Cir. 325, 326 (Va. Cir. Ct. 2007)) ("Thus, 'to succeed on an action for slander of title, the plaintiffs must prove that they suffered special damages in the form of a pecuniary loss resulting from the disparaging words or material.'").

Besides proving that the recorded deeds were false, the Trust cannot make out malice or special damages here. Malice fails because Bluegrass did not act through gross indifference or recklessness, but pursuant to this Court's order. Besides determining that INMET was the "sole and lawful owner of the Purchased Assets," Ex. 15, 2023 Sale Order ¶ K, the Sale Order also provided that INMET and Bluegrass were permitted to take all actions to effectuate the terms of the 2023 APA and the 2023 Order. *Id.* at ¶ 17. The 2023 Sale Order thus gave Bluegrass the authority to record the Lee County deeds with the full authority of INMET, and further gave INMET all required authority to implement the terms of the 2023 APA and the Sale Order. Not only does the available evidence not suggest malice, then, but it suggests the opposite—action pursuant to this Court's order. *Cf. Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 412 (4th Cir. 2015) (affirming the District Court's finding that, under Virginia law, the failure to file a certificate of satisfaction, standing alone, did not constitute malice). Thus, the Trust cannot prove malice, and its claim for slander of title fails.

Nor has the Trust provided sufficient evidence to prove special damages. "[I]t is not sufficient to simply allege a cloud on the title of the plaintiffs' property; a plaintiff must plead and prove that he has suffered a monetary loss as a result of the defendant's actions." *Celebrate Va.*, 569 F. Supp. 3d at 346 (quotation and quotation marks omitted). Mr. Beckman testified that the Trust did not market the Lee County Surface Properties to any party in 2021 or 2022. Ex. 4, Beckman Dep. 207:2-208:8. The only value produced by the Trust in response to the question of damages based on the Trust's slander of title claim in Lee County was for the entire claimed tax value of the Lee County Surface Properties, computed by the Trust to value $4,984,440. Ex. 1, Trust 30(b)(6) Dep. 48:15-57:13. Thus, the Trust has not produced any evidence at all showing actual pecuniary loss as the result of any alleged slander of title. *See Redman*, 2015 WL 149833, at *5.

Finally, the Trust's claim for attorney's fees related to the purported cloud on title also fails. Virginia law provides only a few limited exceptions to the rule that attorney's fees are not recoverable unless allowed by statute or contract, and slander of title is not among these exceptions. *Koz v. Wells Home Mortg.*, 83 Va. Cir. 96, 2011 WL 8956203, at *3 (Va. Cir. Ct. June 9, 2011) (citing *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 92, 515 S.E.2d 291, 300 (1999)); *see also Killette v. Pittman*, 127 F.3d 1099, 1997 WL 657005, at *7 & n.8 (4th Cir. Oct. 22, 1997) (unpublished table decision) ("Damages in a slander-of-title claim must be separate from and predate the incurrence of attorneys' fees."). Because the Supreme Court of Virginia has not determined that attorney's fees can be recovered in an action for slander of title, this Court should also decline to award them here.

Therefore, Bluegrass moves the Court to grant summary judgment on the Trust's slander of title claim.

**IV.    Because Bluegrass Acted Pursuant to the 2023 Sale Order in Taking Possession of the Disputed Assets, the Court Should Dismiss the Trust's Affirmative Defenses of Equitable Estoppel, Judicial Estoppel, Unclean Hands, and Fraudulent and Intentional Misconduct.**

Finally, the Court should grant summary judgment on the Trust's affirmative defenses of equitable estoppel, judicial estoppel, unclean hands, and fraudulent and intentional misconduct. Not only can the Trust not prove that Bluegrass made any misrepresentation, changed its position, or engaged in fraudulent activity or other bad faith action, but Bluegrass can prove the opposite— that it acted pursuant to this Court's Order, as explained above. Therefore, the Court should grant Bluegrass summary judgment on those defenses.

"'The traditional elements of equitable estoppel are: (1) misrepresentation by the party against whom the estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel.'" *In re Davis*, 330 B.R. 606, 611 (Bankr. E.D. Tenn. 2005) (quoting *Mich. Express, Inc. v. United States*, 373 F.3d 424, 427 (6th Cir. 2004)). Similarly, "'[t]he doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition.'" *In re Anthony*, 659 B.R. 879, 883 (Bankr. S.D. Ohio 2024) (quoting *Audio Technica U.S., Inc. v. United States*, 963 F.3d 569, 575 (6th Cir. 2020)) (further quotation and quotation marks removed). Finally, "[t]he doctrine of unclean hands may be invoked by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Sherfel v. Gassman*, 748 F. Supp. 2d 776, 789 (S.D. Ohio 2010) (citing *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995)).

The Trust cannot prove that Bluegrass committed a misrepresentation or acted in bad faith as required for the above defenses. As explained, by acting as the owner of the Disputed Assets, Bluegrass acted consistently with the 2023 Sale Order. That Order found that the Disputed Assets were owned by INMET and gave INMET and Bluegrass permission to take any action necessary to effectuate the 2023 Sale. Ex. 15, 2023 Sale Order ¶¶ K, 17. Further, Bluegrass straightforwardly represented its claim to own the Lee County Surface Properties before the 2023 Sale. *See* Ex. 17, INMET Bankruptcy Docket, ECF No. 487-2, at 10-12. It neither misrepresented its ownership nor took a position contrary to an earlier one accepted by the Bankruptcy Court. Thus, these affirmative defenses fail.

Similarly, the Trust's affirmative defense of "fraudulent and intentional misconduct" must also fail. "In Virginia, proof of actual fraud requires that the claimant prove by clear and convincing evidence that a party knowingly and intentionally made a false representation of material fact, intending to mislead, upon which the other party relied to his detriment." *Noell Crane Sys,. GmbH v. Noell Crane & Serv., Inc.*, 677 F. Supp. 3d 852, 871 (E.D. Va. 2009) (citing *Va. Nat'l Gas Co., Inc. v. Hamilton*, 249 Va. 449, 454-55, 457 S.E.2d 17 (1995)). Fraud by concealment requires intentional and willful nondisclosure of something material by a party who knows that the counterparty assumes that the fact does not exist. *Id.* (quoting *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592 (1984)). Concealing a required fact can constitute constructive fraud, even without intent to mislead, where the concealing party had a duty to disclose and the counterparty suffers damages. *Id.* (citing *Kohn v. Knowledge Connections, Inc.*, 266 Va. 362, 369, 585 S.E.2d 578 (2003)). A party seeking to withstand summary judgment on an affirmative defense must provide evidence sufficient to meet the clear and convincing standard under Virginia law. *Id.* (citing *White v. Potocska*, 589 F. Supp. 2d 631, 640 (E.D. Va. 2008)). To

establish fraud, the defrauded party must demonstrate "the right to reasonably rely upon the misrepresentation.'" *Norfolk Aviation, LLC v. Rafamedia, LLC*, 2025 WL 1298566, at *7 (Va. Ct. App. May 6, 2025) (quoting *Metrocall of Del., Inc. v. Cont'l Cellular Corp.*, 246 Va. 365, 437 S.E.2d 189 (1993)). When a party has made its own investigation, "'whether complete or not, into the subject matter at hand,'" the party cannot show reasonable reliance. *Id.* (quoting *Harris v. Dunham*, 203 Va. 760, 767, 127 S.E.2d 65, 70 (1962)).

As with the other affirmative defenses, the Trust cannot meet this higher standard. Because the Trust completed an investigation of the ownership of the Lee County Surface Properties before the 2023 Sale, it could not have reasonably relied on any representation that Bluegrass made. Before the 2023 Sale, the Trust hired Marshall Miller to determine the ownership of the Lee County Surface Properties. *See* Ex. 18, BJLT_00000133-BJLT_00000148 (Paul Shin sends representatives of INMET and the Trust the Marshall Miller maps on the Virginia Properties). Further, the Trust was aware that INMET had not retitled deeds to some of the property purchased from INMET into its own name. Ex 19, INMET Bankruptcy Docket, ECF No. 509, at 2 & n.1. The Trust was obligated to investigate further. Thus, the Trust had completed at least a partial investigation and could not justifiably rely on any representations by Bluegrass.

In addition, as with the other affirmative defenses above, the Trust cannot demonstrate that Bluegrass made any misrepresentation at all or acted in bad faith. INMET claimed ownership of the Lee County Surface Properties in advance of the 2023 Sale. *See* Ex. 17, INMET Bankruptcy Docket, ECF No. 487-2, at 10-12. The Sale Order found that these assets belonged to INMET and gave INMET and Bluegrass the authority to take actions to effectuate their sale.

Therefore, the Court should grant Bluegrass on the Trust's affirmative defenses of equitable estoppel, judicial estoppel, unclean hands, and fraud.

**CONCLUSION**

For the reasons above, Bluegrass respectfully moves the Court to enter summary judgment in its favor on Count One of its Complaint and to dismiss the Trust's Counterclaims in their entirety. The Court further asks the Court to enter judgment in Bluegrass's favor on the Trusts affirmative defenses of equitable and judicial estoppel, unclean hands, and fraudulent and intentional misconduct.

Dated: February 6, 2026

Respectfully submitted,

*/s/Nicholas S. Johnson*
Nicholas S. Johnson (admitted *pro hac vice*)
BAILEY & GLASSER, LLP
1055 Thomas Jefferson St. NW
Suite 540
Washington, D.C. 20007
202.463.2101
njohnson@baileyglasser.com

John A. Budig (KYSB #100287)
Daniel M. O'Hare (admitted *pro hac vice*)
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301
304.345.6555
jbudig@baileyglasser.com
dohare@baileyglasser.com

*Attorneys for Bluegrass Natural Resources, LLC*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on February 6, 2026, a copy of the foregoing was e-filed and served in accordance with ECF procedures, on all counsel of record, in the above-captioned matter.

*/s/Nicholas S. Johnson*
Nicholas S. Johnson